24-1345

# United States Court of Appeals for the Federal Circuit

---

**FINTIV, INC.,**

*Appellant*

v.

**APPLE INC.,**

*Appellees*

---

Appeal from the United States Patent Trial and Appeal Board in IPR 2022-00976 before Administrative Patent Judges Kristen L. Droesch, Michael R. Zecher and George R. Hoskins

---

## APPELLANT FINTIV, INC.'S OPENING BRIEF

---

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
John W. Downing
Heather S. Kim
ThucMinh Nguyen
**Kasowitz Benson Torres LLP**
333 Twin Dolphin Drive
Suite 200
Redwood Shores, CA 94065
650.453.5170
jwaldrop@kasowitz.com
djones@kasowitz.com
mbarber@kasowitz.com
jdowning@kasowitz.com
hkim@kasowitz.com
tnguyen@kasowtiz.com

Meredith Martin Addy
Charles A. Pannell, III
**ADDYHART P.C.**
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
312.320.4200
meredith@addyhart.com
cpannell@addyhart.com

Benjamin M. Cappel
**ADDYHART P.C.**
401 North Michigan Avenue
Suite 1200-1
Chicago, Illinois 60611
732.991.7285
benjamin@addyhart.com

***Attorneys for Appellant Fintiv, Inc.***

*(continued on next page)*

Jeceaca An
**Kasowitz Benson Torres LLP**
1633 Broadway
New York, NY 10019
212.506.1808
jan@kasowitz.com

Caren A. Yusem
**ADDYHART P.C.**
1101 Pennsylvania Ave., N.W.
Suite 300
Washington, DC 20004
312.804.4885
caren@addyhart.com

June 6, 2024

***Attorneys for Appellant Fintiv, Inc.***

## REPRESENTATIVE CLAIM

1. A monetary transaction system for conducting monetary transactions between subscribers and other entities, the system comprising one or more of:

an integration tier operable to manage mobile wallet sessions, the integration tier also including a communication application programming interface (API) and other communication mechanisms to accept messages from channels;

notification services operable to send notifications through different notification channels including one or more of short message peer-to-peer, short-message services and simple mail transfer protocol emails;

business process services operable to implement business workflows, including at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects;

database services operable to store financial transaction details, store customer profiles, and manage money containers;

a payment handler service operable to use APIs of different payment processors including one or more APIs of banks, credit and debit cards processors, bill payment processors;

a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce constraints including transaction constraints;

a security service operable to perform subscriber authentication;

at least one entity that is to be involved in the specified transaction, the at least one entity having a profile with the monetary transaction system: wherein the at least one entity is the agent;

wherein the monetary transaction system is implemented to deposit funds at an agent branch, the funds being deposited by a subscriber at the agent branch using a mobile device configured to run a monetary transaction system application, the monetary transaction system performing the following steps:

receiving a communication message from the mobile device over one of a plurality of channels connected to the monetary transaction system, the communication message being received by an API associated with the integration tier of the monetary transaction system, the communication message indicating that the subscriber desires to deposit a specified amount of funds into the subscriber's account;

validating the status of the subscriber's account, wherein validating the status of the subscriber's account comprises communicating from the integration tier to the database services to query attributes of the subscriber's account;

committing a pending transaction through the business process services, wherein the integration tier communicates a transaction commitment request to the business process services;

receiving a confirmation from the business process services that the pending transaction has been committed;

sending, through the notification services, a receipt notification to the mobile device; and

upon receiving a confirmation of commitment from the business process services, committing the pending transaction to the database services; and

wherein committing the pending transaction further comprises the following steps as orchestrated by the business process services:

ensuring, via the database services, that the subscriber has an active account;

validating, through communication with the security services, one or more of a PIN number and an access control list;

applying with the rules engine, velocity rules;

creating with the database services a new pending transaction history record;

holding funds from the agent account balance using the payment handler,

loading the funds to the subscriber account using the payment handler; and

updating, using the database services, a pending transaction history record to reflect the funds.

Appx0154–0155 30:54 32:2

## CERTIFICATE OF INTEREST

Counsel for Appellant Fintiv, Inc., certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

    **Fintiv, Inc**.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

    **None**.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

    **None**.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

    (a) **Daniel H. Golub**
    **Brandon R. Theiss**
    **Volpe Koenig**

    (b) **Not applicable**.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

    **Yes**.

    If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cr. R. 47.5(b).

*Fintiv, Inc. v. PayPal Holdings, Inc.*, No. 23-2312 (Fed. Cir.) (Appeal from United States District Court for the Western District of Texas, No. 6-23-cv-00490-ADA).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**.

Dated: June 6, 2024

By: /s/ *Meredith Martin Addy*
Meredith Martin Addy

## TABLE OF CONTENTS


REPRESENTATIVE CLAIM ....................................................................... -1
CERTIFICATE OF INTEREST ........................................................................ i
TABLE OF CONTENTS ............................................................................... iii
TABLE OF AUTHORITIES ............................................................................ v
STATEMENT OF RELATED CASES ................................................................ 1
STATEMENT OF JURISDICTION ................................................................... 1
STATEMENT OF THE ISSUES ...................................................................... 1
STATEMENT OF THE CASE .......................................................................... 2

I. Background .......................................................................................... 2
   A. The Patented Technology ............................................................... 3
   B. The Patent Claims ........................................................................... 8
II. The *Inter Partes* Review Proceedings at the Board ....................................... 9
   A. U.S. Patent Application No. 12/477,360 ("Dill") ................................. 9
   B. The Board's Decision ..................................................................... 11

SUMMARY OF THE ARGUMENT .................................................................. 12
STANDARD OF REVIEW ............................................................................. 14
ARGUMENT ............................................................................................. 15

I. The Board Erred in Failing to Properly Construe "Auditing" Based on the Record Evidence That Resulted In an Overly Broad Interpretation ....... 16
   A. The Board Erred in Construing "Auditing" More Broadly Than the Evidence Without A Reasoned Explanation ................................ 16
   B. No Record Evidence Supports the Board's Broad Interpretation ...... 21
II. Using a Transaction ID to Execute a Financial Transaction Is Not "Auditing Financial Transactions" Under Any Proposed Construction ....... 24
   A. The Transaction Identifier in Dill Is Used to Execute a Transaction, Not Audit the Transaction Itself ..................................... 25
   B. The Board Lacks Substantial Evidence Suggesting Dill's Use of a Transaction Identifier is "Auditing a Financial Transaction" ............ 27

1. Apple's Attorney Argument Lacks Expert Support ................. 27

2. Even if Verifying the Transaction Identifier to Obtain Recipient and Delivery Information was "Auditing," it Still was not "Auditing Financial Transactions," as claimed .......... 30

III. The Prior Art Did Not Disclose A "Deposit Transaction" ........................... 32

A. Dill Does Not Disclose An Entity that Acts Simultaneously As Both A Sender And Receiver ............................................................ 33

B. The Funds Withholding System and Money Orders in Dill Are Not Deposits to a Subscriber's Own Account.................................... 36

CONCLUSION ............................................................................................ 39

CERTIFICATE OF COMPLIANCE ........................................................................ a

ADDENDUM ........................................................................................... i

# TABLE OF AUTHORITIES

## Cases

*Apple Inc. v. MPH Techs. Oy,*
28 F.4th 254 (Fed. Cir. 2022) .................... 25, 30

*August Tech. Corp. v. Camtek, Ltd.*,
655 F.3d 1278 (Fed. Cir. 2011) .................... 24

*Brassica Prot. Prods. LLC v. Sunrise Farms*,
301 F.3d 1343 (Fed. Cir. 2002) .................... 16

*Dickinson v. Zurko*,
527 U.S. 150 (1999).................... 14

*Google LLC v. Ecofactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .................... 15

*Honeywell Int'l, Inc. v. United States*,
609 F.3d 1292 (Fed. Cir. 2010) .................... passim

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*,
401 F.3d 1367 (Fed. Cir. 2005) .................... 31

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) .................... 14

*KSR Int'l Co. v. Teleflex Inc.,*
550 U.S. 398 (2007).................... 38

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) .................... 26

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) .................... 37

*Personalized Media Communs., LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) .................... 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .................... 17, 19

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015) .......... 14

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*,
66 F.4th 1373 (Fed. Cir. 2023) .......... 14

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) .......... passim

*Vizio, Inc. v. ITC*,
605 F.3d 1330 (Fed. Cir. 2010) .......... 24

**Statutes**

28 U.S.C. § 1295(a)(4)(A) .......... 1

35 U.S.C. § 103 .......... 9

35 U.S.C. § 141(c) .......... 1

35 U.S.C. § 319 .......... 1

**Regulations**

37 C.F.R. § 42.100 .......... 18

37 C.F.R. § 90.2 .......... 1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a)(2), the following case pending in this Court may directly affect or be directly affected by the Court's decision here: *Fintiv, Inc. v. PayPal Holdings, Inc.,* CAFC, Case No. 23-2312, appealed from the United States District Court for the Western District of Texas, Case No. 6-23-cv-00490-ADA.

## STATEMENT OF JURISDICTION

Apple Inc., ("Apple") filed a Petition for *Inter Partes* Review ("IPR") on U.S. Patent No. 9,892,386 (the "'386 patent") with the Board on May 16, 2022. The Board issued its Final Written Decision ("FWD") on November 8, 2023. Appx0001. Pursuant to 37 C.F.R. § 90.2, Appellant Fintiv, Inc. ("Fintiv") timely noticed its appeal on January 11, 2024. Fed. Cir. 24-1345, Dkt.1.35 U.S.C. §§ 141(c), 319. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1. Whether the Board properly rejected Fintiv's construction of "auditing financial transactions" in favor of its own purported plain and ordinary meaning of any "official examination of financial transactions" that was broader than the evidence considered.

2. Whether the Board properly found that the Dill reference used to establish obviousness of claims 1-3 disclosed "auditing financial transactions" through the receipt and verification of a transaction identifier used to execute a transaction.

3. Whether the Board properly found that the Dill reference disclosed a "deposit transaction" to a subscriber's account by interpreting the sender and recipient of a transaction in Dill to be the same party.

## STATEMENT OF THE CASE

### I. Background

Appellant/Patent Owner, Fintiv, is a technology company that has designed and provided financial transaction and payment solutions for mobile commerce since the 2000's. Appx3065. Its cloud-based software technology for mobile payments is deployed in retail, financial services, consumer goods, and telecom companies worldwide. Appx3065. Fintiv owns multiple patents relating to financial transaction and payment solutions, including the '386 patent titled a "Monetary Transaction System."

Appellee/Petitioner, Apple Inc. ("Apple"), is a technology company that designs, develops, and sells computer hardware, software, and online services, including mobile wallet services, such as Apple Pay. In May of 2022, Apple filed the underlying IPR petition challenging claims 1-3 of the '386 patent as obvious.

### A. The Patented Technology

The ’386 Patent is one of several patents that claim priority to initial provisional application filings in 2011. Appx0140 1:6-19. At the time, the inventor recognized that there were individuals who lacked access to a bank account. The patent describes a subscriber as a person who has profile with the system, and who may or may not have access to a bank account. Appx0141 3:48-50 and 3:63-65. In order to provide a means of transferring money to such “unbanked subscribers,” the ’386 patent discloses a “mobile wallet application” that can be used by such persons. Appx0140 1:58-59; Appx0145, 12:54-58; Appx2753. The specification further recognized that many unbanked subscribers primarily used prepaid phones, and hence, disclosed a system in which a mobile wallet application could be installed on both plan-based phones and prepaid mobile phones. Appx0147 15:32-38.

The mobile wallet application claimed in the ’386 patent allows an unbanked subscriber to initiate financial transactions from his or her mobile phone and transfer money between subscribers and other entities that may not have access to regular bank accounts and credit cards, as shown in Figure 2 below.




*FIG. 2*

Appx0095; Appx0004; Appx0140 1:36-44; Appx2752 ¶35; *see also* Appx3862. As described in the patent, the "subscriber indicates, via the monetary transaction system application, one or more specified transactions that are to be performed using the monetary transaction system." Appx0140 1:44-47, Appx0141 3:50-53; Appx2749-2750 ¶31. The '386 patent explains that "[p]erforming these transactions includes communicating with a monetary transaction database to determine whether the transaction is permissible based on data indicated in the subscriber's profile." Appx0140 1:49-52, Appx0141 3:55-58; Appx2750 ¶51. The '386 patent provides for the initiation of various types of transactions using the mobile device application, including "depositing funds in a mobile wallet, withdrawing funds from a mobile wallet, . . . [and] transferring funds through a mobile wallet." Appx0140 1:62-2:4.

The ’386 patent refers to one such deposit transaction as a “cash-in” transaction. During the “cash-in” transaction an agent at a branch location “accepts the cash from the subscriber and transfers the equivalent amount of eMoney to the subscriber’s mobile wallet account.” Appx0144 10:31-34. Figure 14 of the ’386 patent shows such a transaction.




FIG. 14

Appx0109; Appx0151 23:55-24:14. When a subscriber informs an agent that he or she would like to deposit a specified amount of cash, “[t]he agent takes the cash and

notifies the monetary transaction system 210 of the deposit." Appx0151 23:55-67. Then, the "system 210 credits the subscriber's mobile wallet account (1403)." *Id.*

In one embodiment, the monetary transaction system is used to deposit funds using a mobile wallet. In that case, the agent communicates a subscriber's desire to make a deposit (1410), a transaction processor validates the status of the bank account (1420) and determines if the agent branch is authorized to make a deposit (1430) and performs a limited check on the bank account (1440). Appx0151 24:15-27. The system then credits the bank account with the specified amount of funds (1450), confirms the deposit with the agent branch (1460), and notifies the subscriber of the deposit (1470). *Id.* 24:27-34. As a result, the '386 patent makes plain that the cash being deposited is being deposited into a specific "bank … account *associated with a subscriber's mobile wallet*." *Id.* 24:34-36 (emphasis added).

In addition to various transactions that the '386 patent describes, the specification details the architecture of the monetary transaction system as shown in Figure 1 below.




***Figure 1***

Appx0094. The transaction system includes various components, such as the integration tier 101, notification services 102, service connectors 103, business process services 104, payment handler 105, database 108 and a rules engine 109, which correspond to distinct computer processes. Appx0146 13:4-51; Appx2750 ¶33; *see also* Appx3795 ¶59.

The business process service component 104 is central to the financial transaction system. It is configured to implement various workflows of the system, "including executing financial transactions, *auditing financial transactions*, invoking third-party services, handling errors, and logging platform objects." Appx0146 13:25-28 (emphasis added). Although the patent does not explicitly define the "auditing financial transaction" term, it is commonly used by the financial

community as a means to retrospectively inspect and verify completed financial transactions in order to, for example, check records and books of account and determine if a transaction was properly entered into. Appx3788-3790 ¶¶46-48; Appx3826; Appx3331-3337.

### B. The Patent Claims

In this case, Apple challenges Claims 1-3 that recite limitations of the monetary transaction system. All three challenged claims, recite various parts of the system architecture, including the "*business process services* operable to implement business workflows, including at least one of executing financial transactions, *auditing financial transactions*, invoking third-party services, handling errors and logging platform objects." Appx0155 32:16-20 (emphasis added).

Claim 1 specifies a system that performs a deposit transaction, where a subscriber utilizes an agent branch to deposit funds into the subscriber's account using the subscriber's mobile wallet application. Specifically, claim 1 requires that "the monetary transaction system is implemented to *deposit funds at an agent branch*" and performs these steps, among other things:

- receiving a "communication message indicating that the subscriber desires to *deposit a specified amount of funds into the subscriber's account;*" and
- "*loading the funds to the subscriber account.*"

Appx0155 31:22-23, 31:33-35, 31:66-67.

Claims 2 and 3 of the patent are similar in structure to Claim 1. Appx2766 ¶51. However, Claim 2 requires a system for withdrawing funds from a subscribers account. Appx0155 32:52-53, 32:60-63. And, Claim 3 recites a system for transferring funds from a subscriber to a recipient. Appx0156 34:18-25; Appx2765.

## II. The *Inter Partes* Review Proceedings at the Board

On November 15, 2022, the Patent Trial and Appeal Board ("Board") instituted the underlying IPR on the grounds that Claims 1 and 3 were unpatentable pursuant to 35 U.S.C. § 103 in light of the combined teachings of four separate references: Dill, Vadhri, Akashika, and Hansen. Appx0612; Appx0617. The Board further instituted on the grounds that claim 2 was unpatentable pursuant to 35 U.S.C. § 103 in light of the combined teachings of five separate prior art references: Dill, Vadhri, Akashika, Hansen, and Liao. Appx0626.

### A. U.S. Patent Application No. 12/477,360 ("Dill")

Dill teaches a method that "allows entities that are unrelated to allow their enrolled consumers to send a mobile money transaction to a consumer either enrolled under another entity or not enrolled—in which case they are able to enroll in a mobile wallet service, pick up cash at a retail location of the money transfer facilitator or other cash retail outlet or designate a destination for receipt of the money transfer." Appx2937 ¶0057. Specifically, a "sender 105 can access the services of the money transfer facilitator 140 via a web site of the money transfer facilitator 140 and initiate

a money transfer from a source account 165 owned by the sender 105" and "[t]he recipient 110 of the payment may then, for example, pick up the payment from the agent's 135 retail location." Appx2936 ¶0051.

In Dill, in order for funds to be transferred from the sender 105 to the recipient 110, a money transfer facilitator 140 "access[es] a source account 165 of one financial institution 160 and/or a destination account 175 of the same or a different financial institution 170 to affect a transfer from and/or to the accounts 165 and 175 via the financial transfer network 155." Appx2935-2936 ¶0049. The money transfer facilitator 140 identifies the recipient 110 based on the recipient's unique identifier included in the sender's message. Appx2936-2937 ¶0055.

Specifically, Dill describes that the "money transfer facilitator 140 can receive a request to initiate the money transfer transaction, for example, a payment from the sender 105 to the recipient 110." Appx2936 ¶0054. Dill details that the "request can include a unique identifier for the recipient 110 of the money transfer transaction" and "[t]he unique identifier for the recipient 110 can comprise one or any combination of a phone number for a mobile device of the recipient, an email address for the recipient, an instant messaging identifier for the recipient, a preferred customer number for the recipient …." Appx2936 ¶0054.

As a result, Dill teaches a method where the sender 105 sends a message that identifies the recipient 110 of the funds transfer to the money transfer facilitator 140.

The money transfer facilitator 140 receives the message, determines an account for the recipient, and causes the sender's financial institution 160 to transfer the funds to the account of the recipient 110.

### B. The Board's Decision

In its FWD, the Board held Claims 1-3 unpatentable. While Fintiv challenged the disclosures of the prior art references on multiple grounds, the Board made three key decisions relevant to this appeal. First, the Board rejected Fintiv's request to construe the term "auditing financial transactions" pursuant to the extrinsic definition to mean "performing retrospective inspection and verification of financial transactions," and instead determined based on Apple's assertion, that the claim term was entitled to simply its plain and ordinary meaning. Appx0016-0020. However, Apple did not set forth a plain and ordinary meaning, but the Board on its own determined that to be "an official examination of financial transactions" based on the same extrinsic definition of the term. Appx0019. Second, the Board held that the prior art to Dill disclosed "auditing financial transactions" by assigning and using a transaction identifier (*e.g.*, a number) to a transaction so that the system could look up the sender, recipient, and delivery rules in order to execute a pending transaction. Appx0038. Third, the Board held that Dill disclosed the separate limitation of depositing to a subscriber's account because Dill did not explicitly prevent the sender and recipient to a transaction from being the same entity. Thus, under the

Board's logic, because the same entity in Dill could be simultaneously both the sender and the recipient to the same transaction, the funds transfer would result in a deposit. Appx0057.

Fintiv disagreed with the Board's decision and now appeals.

## SUMMARY OF THE ARGUMENT

The Board erred in finding claims 1-3 of the '386 patent unpatentable due to obviousness.

First, the Board's adoption of a plain and ordinary meaning of the term "auditing financial transactions" to mean "an official examination of financial transactions" was excessively broader than what the evidence allowed. The meaning applied by the Board was based entirely upon only one sentence of a textbook excerpt, that described auditing as an "official examination of accounts." That evidence described how audits were used to examine the existing books and records of accounts; however, in its construction the Board truncated the extrinsic definition and simply replaced "auditing" with "official examination." Thus, the court broadened the definition of the term in the evidence from "an official examination of an account's financial transactions" to simply an "official examination of financial transactions," which it then applied as an official examination of anything related to a financial transaction. Such broadening was legal error.

Second, even if the Board's construction was correct, its application to the prior art was not. The Dill reference relied upon by the Board described a system that used a transaction identifier that could be verified to determine a sender, recipient, and delivery method during the execution of a transaction. But, such use of an identifier is not an "audit of financial transactions." It is the process to execute a transaction. Further still, the examination occurs on the identifier and not the transaction because there is no indication the transaction will ever ultimately occur. Thus, if there is no transaction, there is nothing to audit. Examining data used in a potential transaction is not an audit of the transaction itself. Finally, the claims require the auditing of multiple transactions, however the identifier in Dill is only used during execution of the single transaction. There is no indication it is used after the transaction is complete or that Dill ever examines multiple transactions in an account.

Third, the Board erred when it found the deposit transaction required by Claim 1 to be present in Dill. There is no evidence that Dill allowed for a deposit to a subscriber's account. In order to establish a deposit, the Board found that Dill disclosed an entity could act as a sender and recipient simultaneously in this same transaction, but this analysis lacked substantial evidence. While Dill allowed an entity to be a sender or a recipient at different times in different transactions, it never suggest the sender and recipient can be the same entity in the same transaction.

Indeed, Apple's own expert never suggested Dill could be read as the Board proposes. Further, evidence in Dill relating to deposits and transfers to recipients were unrelated, resulting in insufficient evidence or reasoning to establish that a deposit transaction was disclosed in Dill.

## STANDARD OF REVIEW

This Court's review of the Board's decision "is rooted not only in the law of obviousness, but also in basic principles of administrative law." *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019). Accordingly, the Board's decisions require "meaningful review" in which court's cannot "simply rubber-stamp[] agency factfinding." *Id.* at 1357-58 (quoting *Dickinson v. Zurko*, 527 U.S. 150 (1999)). This Court's "review of a patentability determination is confined to 'the grounds upon which the Board actually relied.'" *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) (quoting *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012)). Thus, for effective judicial review by this Court, the Board must "provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions.'" *TQ Delta*, 942 F.3d at 1358 (citation omitted).

Ultimately, a petitioner has the "burden to prove unpatentability by a preponderance of the evidence." *Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*, 66 F.4th 1373, 1379 (Fed. Cir. 2023) (citation omitted). This Court

reviews the Board's obviousness and claim construction determinations de novo and any underlying factual determinations for substantial evidence. *Google LLC v. Ecofactor, Inc.*, 92 F.4th 1049, 1054 (Fed. Cir. 2024); *TQ Delta*, 942 F.3d at 1357. Under the substantial evidence standard, the Court must ask "whether a reasonable fact finder could have arrived at the agency's decision," and "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.* at 1357 (citation omitted). The substantial evidence standard cannot be sustained by conclusory expert testimony. *See id.* at 1358-59 (citing cases). "'Rejections on obviousness grounds,' in particular, 'cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'" *Id.* at 1359 (citations omitted). Thus, conclusory assertions with no explanation are inadequate to support findings of fact. *Id.*

## ARGUMENT

In order to determine obviousness, the Board must (1) properly construe any disputed meaning of the claim term and then (2) determine if that properly construed term can be found in the prior art reference. *See Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1299 (Fed. Cir. 2010) (reversing obviousness finding where expert failed to opine that a filter passed "perceptible" red light as required by the proper claim construction); *see also Brassica Prot. Prods. LLC v. Sunrise Farms*,

301 F.3d 1343, 1346 (Fed. Cir. 2002) (noting anticipation "is determined by first construing the claims and then comparing the properly construed claims to the prior art").

Here, Board erred in both its construction of "auditing financial transactions" and its application of that term to Dill. The Board further erred in determining that Dill disclosed the claimed "deposit transaction" limitation through its disclosure of a funds transfer from a sender to a recipient.

## I. The Board Erred in Failing to Properly Construe "Auditing" Based on the Record Evidence That Resulted In an Overly Broad Interpretation

In its FWD, rather than construe the claimed "auditing financial transactions," pursuant to the record evidence, the Board purported to apply the plain and ordinary meaning, which it described as the "official examination of financial transactions." Appx0019. Because "financial transactions" was already in the claim limitation, the Board effectively construed "auditing" to merely be any "official examination." But, such a broad interpretation is not supported by any definition of "auditing" presented to the Board and is excessively broader than even the broadest construction of "auditing" in the evidence.

### A. The Board Erred in Construing "Auditing" More Broadly Than the Evidence Without A Reasoned Explanation

The Board improperly broadened the term "auditing" by selectively ignoring portions of the evidence and truncating the only definition supplied to it. While the

Board can adopt a broad interpretation of a claim term, that interpretation must still be based on evidence and proper reasoning. *See TQ Delta,* 942 F.3d at 1358. A construction that broadens the meaning of a claim term beyond what the intrinsic or extrinsic evidence supports is inherently incorrect. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, 1321 (Fed. Cir. 2005) (en banc) (noting the sources of claim construction evidence include intrinsic and extrinsic sources but warning against "unduly expansive" constructions based on extrinsic evidence).

In an IPR, claim terms are "construed using the same claim construction standard that would be used to construe the claim in a civil action …, including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history." 37 C.F.R. § 42.100. In some instances, the meaning of a claim term "may be readily apparent … and claim construction in such cases involves little more that the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. However, in many cases the determination of the plain and ordinary meaning requires the review of "sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id.* Those sources include the words of the claims, the specification, the prosecution history, and extrinsic evidence such as the meaning of technical terms in the field. *Id.*

In this case, the Board found that "auditing financial transactions" was not explicitly defined in the '386 patent and that the intrinsic record did not provide any explicit limits to the term. Appx0018-0019. Apple provided no independent evidence on the definition of "auditing" and refused to supply its own construction under a purported plain and ordinary meaning. Appx0722-0724; Appx3223, Appx3229-3231. Ultimately, the Board determined that "auditing financial transactions" was simply entitled to a plain and ordinary meaning, which the board supplied as any "official examination of financial transactions."

The Board selectively extracted its plain meaning from the definition of an "audit" supplied by Fintiv from a textbook titled "Auditing Principles & Techniques":

> ***The dictionary meaning of audit is official examination of accounts.*** Obviously, the person who examines the accounts must be a person who knows what to examine, how to examine and to whom his examination report and observations are to be submitted. In brief, it can be said that auditing is the process by which competent independent individuals collect and evaluate evidence to form an opinion and communicate his opinion to the person interested through his audit report.
>
> Montgomery, a leading American accountant, defines auditing as: ***"Auditing is a systematic examination of the books and records of a business or other organisations, in order to check or verify and to report upon results thereof."***
>
> The ICAI has defined auditing in its AAS-1 as: ***"An audit is the independent examination of financial information of any entity,*** whether profit oriented or not and irrespective of its size or legal form, ***when such an examination is conducted with a view to express an opinion thereon."***

> From the above definitions, it is seen that ***an auditor has not only to see the arithmetical accuracy of the books of accounts but has to go further and find out whether the transactions entered in the books of original entry are correct or not.*** It is possible to perform this function by inspecting, comparing, checking, reviewing, scrutinising the vouchers supporting the transactions in the books of accounts and examining the correspondence, minute books of the shareholders' and directors' meeting, Memorandum of Association and Articles of Associations, etc.

Appx3826 (emphasis added). The broadest definition found in this text book excerpt is the first sentence: "[t]he dictionary meaning of audit is official examination of accounts." *Id.* However, the Board's selective extraction, an "official examination of financial transactions," reads out the "of accounts" requirement set forth in this first sentence. Appx0019. Because the textbook describes an "audit" as an "official examination *of accounts*," Appx3826 (emphasis added), and the Board merely replaced "auditing" with "official examination of," the Board simply changed the claim language "*auditing* financial transactions" to "*official examination of* financial transactions." The Board's construction simply ignores the fact that audits are performed on "accounts" and equates an audit to merely any form of "official examination."

Broadening an extrinsic source without evidence or reasoning to support that broadening is inherently flawed. This Court has already warned that the adoption of a dictionary definitions can "systematically cause the construction of the claim to be unduly expansive." *Phillips*, 415 F.3d at 1321. Thus, adoption of a construction

that is even broader than what that dictionary or other evidence supports is particularly troublesome. While the Board can review the evidence and provide reasoning for its construction from that evidence, it cannot simply broaden the "auditing" definition further to mean any "official examination" and ignore the definition's limitation to "accounts." This is especially true where there is no other evidence on the meaning of a term. *See Personalized Media Communs., LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020) (requiring claim construction based on extrinsic sources to be supported by "substantial evidence").

While "auditing financial transactions" using the Board's definition may involve an official examination of *an account's* financial transactions, the court erred by effectively reading out the most important part of that definition and the description found in that textbook—*i.e.*, that audits are performed by examining accounts and not just any part of any possible transaction. The Board cannot simply cherry-pick what it wants from extrinsic sources it has chosen to rely upon and ignore the rest without some reasoning. *See TQ Delta,* 942 F.3d at 1358. As the textbook the Board relied upon explains "[a]uditing is a systematic examination of the books and records of a business … in order to check or verify and to report upon results thereof." Appx3826.

Indeed, the textbook indicates that "auditing" is far more limited than just any "official examination." Instead, this focus is always on the existing accounts and

records. The textbook relied upon by the Board requires an auditor to "not only see the arithmetical accuracy of the *books of accounts* but has to go further and find out whether the *transactions entered in the books of original entry* are correct or not." Appx3826 (emphasis added). The textbook evidence ignored by the Board goes on to indicate that it is possible to perform such auditing by "inspecting, comparing, checking, reviewing, scrutinizing the vouchers supporting *the transactions in the books of accounts*." Appx3826 (emphasis added). Thus, a full reading of the evidence presented to the Board demonstrates that an audit must review the accuracy and veracity of the transactions actually entered in the account books being audited. It cannot be simply any official examination of financial transactions.

### B. No Record Evidence Supports the Board's Broad Interpretation

There is nothing in the evidence considered by the Board to suggest that auditing could simply be the official examination of financial transactions before they were actually financial transactions in an account. Accordingly, Fintiv proposed a construction that simplifies the understanding of "auditing financial transactions" set forth in the textbook to require a "retrospective inspection and verification of financial transactions." In other words, the transactions must have actually been transacted or actually be "in the books of accounts" before they can be audited, *i.e.,* "officially examined."

Fintiv's construction was supported by the only evidence the Board used to define "auditing" and Fintiv's expert testimony. Apple offered no alternative construction of the auditing term. In line with Fintiv's construction, Apple's expert, could not think of any instance where he had performed an audit that was not retrospective. Appx4265-4268 114:17-117:4.

Instead, Apple asserted U.S. Patent No. 9,147,184 as evidence that "auditing" a financial transaction can take place *before* a financial transaction exists in the books and records. Appx0724 (citing Appx3230-3231 ¶¶29-30, Appx3422 5:27-34). The '184 patent's reference to its audit, however, never indicates it is an audit of any "financial transaction." *Id*. Rather, the '184 patent refers to the fact that a "payment authorization" may involve an audit that "compar[es] data from one or more of a buyer-based audit, seller-based audit or an audit based upon a third party." Appx3422 5:27-30. Thus, the '184 patent explicitly states it only audits other audit data and not the financial transaction. Ultimately, the '184 patent only indicates that the result of its audit of audit data is "provided to the selected networks and used, for example as indication that the transaction can go forward." *Id.* at 5:31-33. Thus, the audit referenced in the '184 patent does not audit a transaction because the transaction has not gone forward.

In fact, the "audit" referenced in the '184 patent only serves to confirm the retrospective nature of "auditing" in general. For example, the "audit" referenced in

the ’184 patent occurs by retrospectively looking at data from the past that is already in existence, *i.e.,* data from buyer, seller, and third-party based audits. Just as the retrospective review of existing data is an “audit” in the ’184 patent, the retrospective review of existing financial transactions is an “audit” of those financial transactions in the ’386 patent.

In the end, an audit has to be performed on the financial transactions in the account, books, and records, and not simply any data that might be used to complete a transaction. Appx3826. While an audit of various data sources can be used to authorize a transaction and conduct business, it does not mean that the audit is of financial transactions. It is simply an audit of other data to authorize a transaction and not an audit of the transaction. In other words, a company may audit data from a supplier to determine if the company should transact business with that supplier, but that audit of data is not an audit of financial transactions with that company.

Here, auditing is retrospective because it must not only verify the “accuracy of the books of accounts” but also “find out whether the transactions entered in the books of original entry are correct.” Appx3826. While accounts and books of account may continually add transactions, the audit must be performed on something that is concluded. In other words, if a system is officially auditing a financial transaction it must audit actual account transactions that exist on the books. Thus, an audit is a retrospective inspection and verification of the thing it is auditing. In

these patent claims those must be the "financial transactions," and not simply a transaction identifier.

## II. Using a Transaction ID to Execute a Financial Transaction Is Not "Auditing Financial Transactions" Under Any Proposed Construction

Under the proper claim construction, Dill does not perform "auditing financial transactions" because the disclosure in Dill relied upon by the Board and Apple refers to steps taken while the transaction is being executed, it cannot be a retrospective inspection and verification of the financial transactions that have not and may never ultimately occur. However, even if "auditing" is merely any "official examination" as the Board held, the transaction identifier disclosed in Dill, relied upon by the Board, still does not meet that limitation.

In order to establish obviousness, the Board must show that all limitations of the claim can be found in the prior art. *See Vizio, Inc. v. ITC*, 605 F.3d 1330, 1342-43 (Fed. Cir. 2010) (affirming finding of nonobviousness where prior art neither alone nor in combination disclosed an element of the claim); *see also August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1290 (Fed. Cir. 2011) (holding prior art was missing the strobing element of a claim and therefore could not establish obviousness); *Honeywell*, 609 F.3d at 1299 (reversing obviousness finding where expert failed to opine there was "perceptible" red light limitation as construed). However, the Board and Apple cannot establish a missing element by simply relying upon the *ipse dixit* of an expert that is "untethered to any supporting evidence." *TQ*

*Delta*, 942 F.3d at 1362. "'[C]onclusory statements and unspecific expert testimony' are thus inadequate to support the Board's factfinding." *Id.* at 1362-63. Indeed, expert testimony regarding what "*could* be," combined with conclusory statements the patent claim is obvious, will be insufficient to establish obviousness. *See Apple Inc. v. MPH Techs. Oy,* 28 F.4th 254, 262-63 (Fed. Cir. 2022).

In this case, the Board held that Dill satisfied the "auditing financial transactions" limitation by assigning and verifying a unique transaction identifier (*e.g.*, an ID number), Appx0037-0038, Appx0063-0064 (citing Appx2942 ¶¶105), which occurs during a request to transfer. Appx2936 ¶54. Apple and the Board contend that the identifier was an audit because it "may be used to identify sender 105, recipient 110, or both together with the delivery option. Appx0063-0064. But, using a transaction ID to determine the sender, recipient, and how a transfer is delivered in an intended transaction is not an "audit of financial transactions" any more than using a social security number to identify the sender and delivery method of a tax return to the IRS is an audit of those tax returns.

### A. The Transaction Identifier in Dill Is Used to Execute a Transaction, Not Audit the Transaction Itself

Verification of the transaction identifier to determine the sender, recipient, and delivery method of the transaction is not an official examination of financial transactions, but rather, the steps to actually perform that transaction, *i.e.,* the delivery of funds from sender to recipient. Appx2942 ¶¶102-105. In other words,

the use of a transaction identifier to determine sender, recipient, or delivery does not "officially examine" the transaction as required by the Board's construction, it is the process to execute the transaction itself. Appx2931 ¶10 (disclosing that "the mobile device can execute a mobile wallet application. The mobile wallet application can be adapted to receive a … PIN … and a transaction identifier for a previously initiated money transfer transaction, verify the PIN, and in response to verifying the PIN, send the transaction identifier via the mobile communications network."); Appx2932 ¶13; Appx2935 ¶45.

However, Dill's execution of the transaction cannot satisfy the '386 patent's requirement of "auditing financial transactions" because the claims treat the process of "***executing*** financial transactions" as a different and separate process than that of "***auditing*** financial transactions". Appx0154-0155, 30:67-31:1 ("business process services …, including at least one of ***executing*** financial transactions, [and] ***auditing*** financial transactions" (emphasis added)). Accordingly, any analysis of the claim and its interpretation should "give meaning to all the terms of the claim" and not render them superfluous of each other. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Here, it is error to suggest that the same process of executing a transaction through delivery, is also an audit of the transaction being executed. *Compare* Appx0037 (noting execution of the transaction involved delivery of the funds to recipient) *with* Appx0064 (indicating transaction identifier

used to identify sender, recipient, and determine delivery). Because such a reading would fail to differentiate between the separate process limitations of "executing" a financial transaction and "auditing" a financial transaction, the use described by the transaction identifier in Dill to execute the transaction cannot also be auditing.

### B. The Board Lacks Substantial Evidence Suggesting Dill's Use of a Transaction Identifier is "Auditing a Financial Transaction"

Apple and the Board place considerable emphasis on Dill paragraphs 41 and 105, which discuss operation of the transaction ID. Appx0063-0064 (citing Appx2394-2395 ¶41 and Appx2942 ¶105); Appx0380-381; Appx0738-0739. Apple and the Board suggest that those paragraphs disclose that the Dill system uses the transaction ID to "verify[] a transaction," Appx0064, Appx0038, but, this assertion lacks support and is inherently flawed.

#### 1. Apple's Attorney Argument Lacks Expert Support

First, there is nothing in these two paragraphs or the expert testimony that suggests the transaction itself is verified or officially examined as the Board determined. Appx0064. In paragraph 41, Dill indicates the "transaction identifier" (not the transaction) is verified: the "money transfer facilitator can … receive and ***verify the transaction identifier.***" Appx2934. In paragraph 105, Dill explains that the transaction identifier "can be assigned or chosen for a transfer transaction" and it can be used to "identif[y] the sender 105, the recipient 110, or both and can be used … to ***determine delivery of the transfer, e.g., used … to select a delivery rule,***

***if any***." Appx2942 (emphasis added). But, there is no indication in these paragraphs that the transaction identifier is used to examine a transaction or even verify the accuracy of sender, recipient, or delivery as the Board suggests to establish the claimed "auditing a financial transaction."

Perhaps most telling is that Apple's expert provides no testimony to explain how verification of the transaction identifier or the underlying identification of a sender, receiver, or delivery rule to complete a transfer is a verification or examination of the transaction itself. The entire testimony from Apple's expert, Dr. Houh, regarding "auditing" can be found at paragraph 97 of his declaration reproduced below:

> 97. Second, Dill discloses that "a transaction identifier can be assigned or chosen for a transfer transaction," such that "[t]his identifier can be used to identif[y] the sender 105, the recipient 110, or both and can be used by the transfer options module 145 to determine delivery of the transfer." APPL-1005, ¶105. Dill teaches that "the money transfer facilitator can in turn **receive and verify the transaction identifier**. In response to verifying the transaction identifier, **the application of the money transfer facilitator can send a recipient identifier to the mobile wallet application**. The recipient identifier can indicate an intended recipient of the money transfer transaction." APPL-1005, ¶41. Thus, Dill teaches that the money transfer facilitator 140 ("business services") is operable to implement business workflows, including…auditing financial transactions (e.g., by means of a unique identifier and verifying related records), as recited in limitation [1.3].

Appx2814-2815 (emphasis in original). This testimony parrots Dill and simply concludes the limitation is met, without explanation. Apple's expert provides no

testimony regarding what is involved in such transaction identifier verification or that the transaction itself is ever verified.

Moreover, there is no expert explanation of how the receipt and verification of a transaction identifier in order to execute the transaction is also an "official examination of financial transactions." Though Dr. Houh concludes his testimony that such verification of a transaction identifier is an audit of financial transactions, such conclusory and unspecific testimony is insufficient to support the Board's finding that the transaction identifier is "auditing financial transactions." *See TQ Delta*, 942 F.3d at 1362-63 (reversing obviousness finding where expert provided conclusory and unspecific testimony); *Honeywell,* 609 F.3d at 1299-1301 (reversing obviousness determination where expert failed to explain how prior art disclosed "perceptible light" under the court's construction).

Indeed, paragraphs 41 and 105 confirm that the verification of the transaction identifier is simply used to execute the transaction. In paragraph 41, the system verifies the transaction identifier in order to send recipient identification to the mobile application that can be used to facilitate a money transfer. Appx2934-2935 ¶¶41-43. In paragraph 105, the system is not verifying a delivery of the transaction, but merely determining what delivery rules the transfer will apply for the transaction. As described elsewhere in Dill, these delivery rules 151 simply define different delivery options for completing a transfer and can be "restrictions or conditions of

the delivery" or rules "based on various governmental and/or banking rules." Appx2942 ¶¶102, 104.

Thus, using a transaction identifier to determine who is the recipient of a transfer and which delivery option to apply in a transfer is not an examination or verification of that transfer or transaction. Again, it is simply determining what rule to apply in order to execute a transaction—not audit or "official examination" of that transaction.

#### 2. Even if Verifying the Transaction Identifier to Obtain Recipient and Delivery Information was "Auditing," it Still was not "Auditing Financial Transactions," as claimed

Even if the verification of a transaction identifier could be considered an audit, the use of Dill's transaction identifier upon which the Board relies refers to a process for executing a singular transaction. There is no audit or official examination of the records of books of accounts or the financial transactions in those accounts as part of the official examination that define an actual audit. To be sure, Dill makes no mention of using the transaction identifier after the transaction is completed and there is no indication in Dill that the transaction identifier is used or maintained in any record or books of account for the financial transactions.

This is significant because even the Board's definition of the claim term requires the "auditing" be an "official examination of ***financial transactions***" in the plural. *See Apple Inc.*, 28 F.4th at 261-62 ("[W]e presume a plural term refers to

two or more items.”). The execution of a transaction that audits a singular transaction identifier, which is never used again, is not an audit of the financial transactions maintained in the books and records of an account as required by the plain and ordinary meaning of “auditing.” *See* Appx3826; Appx3788-3789.

In the end, the Board’s reading to suggest Dill’s transaction identifier comprises “auditing” is so broad that it makes the term virtually meaningless. An audit or “official examination of financial transactions” cannot devolve into ***any examination*** of ***any part*** of ***any potential transfer*** that may become a financial transaction.

Under the Board’s view, auditing “financial transactions” can occur whether the transactions ever become actual financial transactions or not. If that is true, then the claim’s “financial transaction” limitation would have no meaning or ultimately devolve into a paradoxical Schrodinger’s Cat where the “auditing financial transactions” limitation may be both simultaneously satisfied—if the examination of the transaction identifier later results in a complete financial transaction—and not satisfied—if the examination of the transaction identifier does not ultimately result in a financial transaction. Persons of skill in the art must be able to determine if the auditing process being performed is in fact infringing or not. *See Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005) (holding a claim should be “clear enough that a person of ordinary skill in the art

could determine whether a particular [product or method] infringes or not" (citation omitted)).

Because the use of the transaction identifier in Dill to determine the sender, recipient, and delivery rules for a transaction is neither a retrospective inspection and verification of financial transaction nor an official examination of financial transactions, Apple has failed to present substantial evidence the "auditing financial transactions" limitation is disclosed by Dill. Accordingly, the Board's decision finding claims 1-3 of the '386 patent unpatentable should be reversed.

## III. The Prior Art Did Not Disclose A "Deposit Transaction"

The Board further erred when it held that Dill disclosed a "deposit transaction where the sender deposits money into his/her own account, as required by independent claim 1." Appx0053-0054. The references from Dill that Apple presented and the Board relied upon as evidence of a deposit include (1) Dill's description of a transaction from a sender 105 to a recipient 110 and its acknowledgement in paragraph 52 that an "entity can alternately act as sender or recipient," and (2) paragraph 101 of Dill that refers to "delivering funds to a funds withholding system" in light of paragraph 3 of Dill's background that describes a money order deposit. Appx0052-0055 (citing Appx2936 and Appx2941-2942). However, these disclosures fail to describe a deposit into a sender's own account and cannot be interpreted to suggest such a deposit.

### A. Dill Does Not Disclose An Entity that Acts Simultaneously As Both A Sender And Receiver

The Dill reference describes a system for making financial transfers from a sender to a recipient. In Figure 5 relied upon by Apple and the Board, Dill describes a "mobile-to-mobile" transaction from senders to receivers. Appx2932 ¶21; Appx3799-3800 ¶¶68-70. Despite the focus on making financial transactions between a sender entity and a receiver entity, the Board found that "Dill contemplates a deposit transaction where the ***sender and the recipient are the same party***." Appx0052 (emphasis added).

In order to make this conclusion, the Board relied on paragraph 52 of Dill that stated "any given entity and/or device associated with that entity can ***alternately act as sender or recipient.***" Appx0053 (citing Appx2936 ¶52). Under the broadest reasonable reading, this paragraph merely indicates that one person or entity could act as a sender in one transaction and later act as the receiver in a later transaction. Appx3800-3801. As paragraph 52 explains, "the names sender and recipient are used only to illustrate a particular entity's … function at a given time." Appx2936. However, the Board's decision goes further to conclude that paragraph 52 of Dill discloses that "the sender and recipient are the ***same party*** to the ***same transaction***." Appx0053 (emphasis added).

There is no support in Dill or elsewhere for the Board's expansive reading. Indeed, it defies all common sense and logic that a financial transaction to transfer

money from one entity to another as Dill discloses (Appx0031), would contemplate the sender sending that transfer to themselves. The Board portends to support its analysis by noting paragraph 52 limits the sender and receiver "temporally—not by transaction type." Appx0052-0053. But, a single transaction between two entities, ***is*** temporally limited. A sender in a financial transaction is not just the sender at one particular time during the transaction. At all times during a single transaction, the sender must be the sender and the recipient must be the recipient. An entity cannot simply change positions in a transaction from sender to recipient by sending a transaction with one hand and receiving it with the other as the Board appears to believe.

The word "alternately" in paragraph 52 (Appx2936) of the specification does not mean "simultaneously." While Dill certainly does not require an entity that sends a transfer to be permanently labeled a "sender" for all time and all transactions, Dill's description and figures never indicate that both the sender and the recipient can be the same person at the same time in the transaction. In fact, Dill's figures show the sender and recipient as two different entities, and its description frequently points out that the sender and recipient are "unrelated entities" in a transaction. Appx2937 ¶57; Appx3801 ¶¶74-75. Thus, there is nothing in Dill that leads to a reasonable inference or substantial evidence that the sender and receiver can be the same entity in the same transaction.

To be sure, Apple's own expert did not testify that the "sender" and "recipient" in Dill could be the same party in the same transaction. At paragraph 132 of his declaration, Dr. Houh quoted paragraph 52 of Dill and concluded that Dill "is not limited to 'sender' and 'receiver' transactions," but ***Dr. Houh never opined*** that the sender and receiver of Dill could be the same entity in the same Dill transaction to make such a transaction a "deposit transaction." Appx2839-2840. This lack of evidence is particularly fatal to Apple's position as the only expert evidence on point indicates the contrary: that the sender and receiver in Dill ***cannot*** be the same entity in the same transaction. Appx3800-3801 ¶¶72-73 (explaining Dill ¶52). The fact that the only expert testimony on the subject (especially paragraph 52 of Dill) indicates that the sender and receiver in Dill cannot be same entity in the same transaction is reversible error. *See Honeywell*, 609 F.3d at 1299. In *Honeywell*, for example, the Court overturned the finding of obviousness because, even though the expert witness on invalidity had opined that a prior art filter would pass red light, the expert did not testify that the prior art would pass "perceptible" red light. *Id.* at 1299-1301. Because the expert did not provide such key testimony on how the prior art functioned and the patentee's expert testimony on the issue was left uncontroverted, the Federal Circuit reversed the findings of fact on obviousness. *Id.*

Here, there is no indication the sender or recipient of Dill can be the ***same entity*** at the ***same time*** in the ***same transaction*** as required by the claims. Just as in *Honeywell*, the only evidence on that issue indicates that Dill cannot be read in that manner.

### B. The Funds Withholding System and Money Orders in Dill Are Not Deposits to a Subscriber's Own Account

The Board further relied upon Dill's reference to a money order "deposit" in paragraph 3 of the Background and the use of a "funds withholding system" in paragraph 101 to further support its determination of a deposit transaction. In its Petition, Apple contends that the "deliver[y of] funds to a funds withholding system" disclosed in paragraph 101 is a deposit because the money order prior art disclosed in the background of paragraph 3 refers to the transfer of money as a deposit. Appx0400 (citing Appx2931 and Appx2941-2942). But, these disclosures in Dill are not even related to the same types of prior art or systems and certainly do not refer to a subscriber's deposits to their own accounts.

In paragraph 3, for example, Dill references the prior art use of money orders to transfer money in which a sender will deposit money with a third party in exchange for a money order. Appx2931. But, Dill does not indicate the third-party money order company deposits that money into an account for the sender and neither Apple nor the Board point to any evidence of a subscribers account with that third party. *See id.*; Appx0400; Appx0409; Appx0053; Appx2839 (citing account in Dill

¶101). Rather, the sender at paragraph 3 "receives a money order" in exchange for depositing money with the third party. Appx2931.

In paragraph 101, Dill discloses a money transfer facilitator system and a transfer options module that, among other things, allows a sender to "select one or more delivery options for completing the money transfer transaction." Appx2941-2942. In other words, paragraph 101 discloses various options for how a sender can have a transfer delivered to a recipient, which include "delivering funds to a funds withholding system." At no point does paragraph 101 disclose or suggest that the funds be delivered to the sender's account or even that the funds withholding system maintains an account for the sender.

At best, Apple and the Board improperly attempt to assemble unrelated elements of different embodiments of the Dill reference to create what they contend is a deposit to a subscribers account. However, a challenger cannot establish an adequate disclosure by cobbling together unrelated elements of various prior art systems simply because those various elements can be found in distinct parts of the same disclosure. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[I]t is not enough that the prior art reference discloses … multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention."). Combinations of a reference's embodiments still require a proper showing of obviousness, including reasons for their combination. *See id.*(noting

differences in prior art invoke obviousness); *see also KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398 (2007) ("[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements.") Neither the Board nor Apple present reasons to combine the distinct disclosures in paragraphs 3 and 101 of Dill.

Indeed, Apple provides no expert testimony that a person of skill in the art would know to or could combine the money order deposit of paragraphs 3 with the fund withholding system of paragraph 101. Regarding paragraph 3 and 101, Apple's expert only testified as follows with regard to deposit transactions.

> 131. Second, Dill teaches a deposit transaction. Dill discloses that one of the types of transactions that may be performed in its money transfer facilitation system is "delivering funds to a funds withholding system." APPL-1005, ¶101; see also APPL-1005, ¶ 15 (same disclosure). Dill's disclosure of "delivering funds" teaches "deposit[ing] funds" because funds are transferred to an account. APPL-1005, ¶101 (delivery options include "delivering funds to a bank account"); see also APPL-1005, ¶3 (explaining that when a sender transfers money (e.g., "wiring" or money order), the money is "deposited with the third party.").

Appx2839. But this testimony never explains how Dill deposits to a subscriber's account. Apple truncates the quote to a bank account in paragraph 101 that in full makes clear that Dill is "delivering funds to a bank account *of a recipient*." Appx2942. And, in paragraph 3, the deposit is to a third party in exchange for a money order. There is no testimony suggesting the subscriber has their own account.

The missing pieces of evidence are critical to Apple and the Board's conclusions that Dill's paragraph 3 and 101 disclose a deposit to a subscriber's account. Appx0050-51(citing Appx0409; Appx2941-2942 ¶101; Appx2931 ¶3)). Because such evidence is lacking, there cannot be a finding of obviousness. See *Honeywell*, 609 F.3d at 1300-01.

## CONCLUSION

The Court should reverse the Board's decision because the Board erred in its overly broad plain and ordinary meaning of "auditing a financial transaction" and erred in its determination that claims 1-3 are obvious over Dill and other references because Dill does not disclose "auditing a financial transaction" or a "deposit transaction" as claimed.

June 6, 2024

Respectfully submitted,

*Meredith Martin Addy*

Meredith Martin Addy
Charles A. Pannell, III
**ADDYHART P.C.**
10 Glenlake Parkway
Suite 130
Atlanta, Georgia 30328
312.320.4200
meredith@addyhart.com
cpannell@addyhart.com

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
John W. Downing
Heather S. Kim
ThucMinh Nguyen
**Kasowitz Benson Torres LLP**
333 Twin Dolphin Drive
Suite 200
Redwood Shores, CA 94065
650.453.5170

jwaldrop@kasowitz.com
djones@kasowitz.com
mbarber@kasowitz.com
jdowning@kasowitz.com
hkim@kasowitz.com
tnguyen@kasowtiz.com

Benjamin M. Cappel
**ADDYHART P.C.**
401 N. Michigan Ave
Suite 1200-1
Chicago, Illinois 60611
732.991.7285
benjamin@addyhart.com

Jeceaca An
**Kasowitz Benson Torres LLP**
1633 Broadway
New York, NY 10019
212.506.1808
jan@kasowitz.com

Caren A. Yusem
**ADDYHART P.C.**
1101 Pennsylvania Ave., N.W.
Suite 300
Washington, DC 20004
312.804.4885
caren@addyhart.com

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATIONS**

***Fintiv, Inc. v Apple Inc.***

No. 24-1345

This brief complies with the relevant type-volume limitation of the Federal Rule of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally-spaced typeface and includes 8,611 words.

Dated: June 6, 2024

By: /s/ *Meredith Martin Addy*
Meredith Martin Addy

**ADDENDUM**

Final Written Decision/Judgment ........................................................... Appx00001

U.S. Patent No. 9,892,386 ..................................................................... Appx00089

Trials@uspto.gov
571.272.7822

Paper 27
Date: November 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.,
Petitioner,

v.

FINTIV, INC.,
Patent Owner.

---

IPR2022-00976
Patent 9,892,386 B2

---

Before KRISTEN L. DROESCH, MICHAEL R. ZECHER, and GEORGE R. HOSKINS, *Administrative Patent Judges*.

ZECHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Petitioner, Apple Inc. ("Apple"), filed a Petition requesting an *inter partes* review ("IPR") of claims 1–3 of U.S. Patent No. 9,892,386 B2 (Ex. 1001, "the '386 patent"). Paper 2 ("Pet."). Patent Owner, Fintiv, Inc. ("Fintiv"), filed a Preliminary Response. Paper 7 ("Prelim. Resp."). Taking into account the arguments presented in Fintiv's Preliminary Response, we determined that the information presented in the Petition established that there was a reasonable likelihood that Apple would prevail with respect to challenging at least one of claims 1–3 of the '386 patent as unpatentable. Pursuant to 35 U.S.C. § 314, we instituted this IPR on November 15, 2022, as to all challenged claims and all grounds raised in the Petition. Paper 9 ("Dec. on Inst.").

During trial, Fintiv filed a Patent Owner Response (Paper 11, "PO Resp."), Apple filed a Reply to the Patent Owner Response (Paper 17, "Pet. Reply"), and Fintiv filed a Sur-reply to the Reply (Paper 19, "PO Sur-reply"). In addition, an oral argument was held on August 23, 2023, and a transcript of the hearing is included in the record. Paper 25 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1–3 of the '386 patent. For the reasons we identify below, we hold that Apple has demonstrated by a preponderance of the evidence that all challenged claims are unpatentable.

*A. Real Party in Interest (“RPI”)*

Apple identifies itself as the only RPI. Pet. 1. Fintiv identifies itself as the only RPI. Paper 4 (Fintiv’s Mandatory Notices), 2.[1]

*B. Related Matters*

The parties indicate that the ’386 patent is the subject of the district court case captioned *Fintiv, Inc. v. PayPal Holdings, Inc.*, No. 6:22-cv-00288 (W.D. Tex.) (complaint filed Mar. 17, 2022). Pet. 1; Paper 4, 2.

*C. The ’386 Patent*

The ’386 patent, titled “Monetary Transaction System,” issued from U.S. Patent Application No. 15/201,152 (“the ’152 application”), filed on July 1, 2016. Ex. 1001, codes (54), (21), (22). The ’152 application includes an extensive chain of priority that ultimately results in it claiming the benefit of U.S. Provisional Patent Application No. 61/493,064 (“the ’064 application”), filed on June 3, 2011. *Id.* at code (60), 1:6–19.

The ’386 patent generally relates to a “monetary transaction system for conducting monetary transactions between transaction system subscribers and other entities.” Ex. 1001, 1:37–38. Figure 2 of the ’386 patent, reproduced below, illustrates one embodiment of a monetary transaction system. *Id.* at 2:37–38.

---

[1] Fintiv’s Mandatory Notices, filed in accordance with 37 C.F.R. § 42.8, do not include page numbers. Paper 4. We consider the Title page as page 1 and then proceed from there in numerical order.




FIG. 2

Figure 2 illustrates monetary transaction system 200 that includes first subscriber 205 using mobile device 206 that runs mobile wallet application 207 to conduct indicated transaction 208 with entity 222 or 223, which may be a second subscriber, a retail store, or an agent company. *Id.* at 14:27–64. Using mobile device 206 that runs mobile wallet application 207, first subscriber 205 sends indicated transaction 208 to transaction processor 216 in mobile wallet platform 210, which, in turn, may access subscriber profile information 211 about the first subscriber, and consult rules engine 220 to determine whether the indicated transaction is permissible. *Id.*

### *D. Challenged Claims*

Claims 1–3 are independent claims. Each independent claim is directed to "[a] monetary transaction system for conducting monetary transactions between subscribers and other entities." Ex. 1001, 30:54–55, 32:3–4, 33:34–35. The parties, however, agree that these three independent claims differ in how the monetary transaction is conducted (i.e., depositing

funds in independent claim 1, withdrawing funds in independent claim 2, and transferring funds in independent claim 3). *Compare* Pet. 6, *with* Prelim. Resp. 7. Independent claim 1 is illustrative of the challenged claims and is reproduced below:

> 1. A monetary transaction system for conducting monetary transactions between subscribers and other entities, the system comprising one or more of:
>
> an integration tier operable to manage mobile wallet sessions, the integration tier also including a communication application programming interface (API) and other communication mechanisms to accept messages from channels;
>
> notification services operable to send notifications through different notification channels including one or more of short message peer-to-peer, short-message services and simple mail transfer protocol emails;
>
> business process services operable to implement business workflows, including at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects;
>
> database services operable to store financial transaction details, store customer profiles, and manage money containers;
>
> a payment handler service operable to use APIs of different payment processors including one or more APIs of banks, credit and debit cards processors, bill payment processors;
>
> a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce constraints including transaction constraints;
>
> a security service operable to perform subscriber authentication;
>
> at least one entity that is to be involved in the specified transaction, the at least one entity having a profile with the monetary transaction system: wherein the at least one entity is the agent;
>
> wherein the monetary transaction system is implemented to deposit funds at an agent branch, the funds being deposited

by a subscriber at the agent branch using a mobile device configured to run a monetary transaction system application, the monetary transaction system performing the following steps:

receiving a communication message from the mobile device over one of a plurality of channels connected to the monetary transaction system, the communication message being received by an API associated with the integration tier of the monetary transaction system, the communication message indicating that the subscriber desires to deposit a specified amount of funds into the subscriber's account;

validating the status of the subscriber's account, wherein validating the status of the subscriber's account comprises communicating from the integration tier to the database services to query attributes of the subscriber's account;

committing a pending transaction through the business process services, wherein the integration tier communicates a transaction commitment request to the business process services;

receiving a confirmation from the business process services that the pending transaction has been committed;

sending, through the notification services, a receipt notification to the mobile device; and

upon receiving a confirmation of commitment from the business process services, committing the pending transaction to the database services; and

wherein committing the pending transaction further comprises the following steps as orchestrated by the business process services:

ensuring, via the database services, that the subscriber has an active account;

validating, through communication with the security services, one or more of a PIN number and an access control list;

applying with the rules engine, velocity rules;

> creating with the database services a new pending transaction history record;
> holding funds from the agent account balance using the payment handler,
> loading the funds to the subscriber account using the payment handler; and
> updating, using the database services, a pending transaction history record to reflect the funds.

*Id.* at 30:54–32:2.

### *E. Asserted Prior Art References*

Apple relies on the prior art references set forth in the table below.

| **Name**[2] | **Reference** | **Dates** | **Exhibit No.** |
|---|---|---|---|
| Dill | US 2009/0265272 A1 | published Oct. 22, 2009; filed June 3, 2009 | 1005 |
| Vadhri | US 2010/0133334 A1 | published June 3, 2010; filed Dec. 3, 2008 | 1006 |
| Akashika | US 2009/0217047 A1 | published Aug. 27, 2009; filed Nov. 18, 2008 | 1007 |
| Hansen | US 2004/0230527 A1 | published Nov. 18, 2004; filed Apr. 26, 2004 | 1008 |
| Liao | US 7,865,141 B2 | issued Jan. 4, 2011; filed June 7, 2007 | 1009 |

### *F. Asserted Grounds of Unpatentability*

Apple asserts that claims 1–3 of the ’386 patent would have been unpatentable based on the grounds set forth in the table below. Pet. 6, 8–109.

---

[2] For clarity and ease of reference, we only list the first named inventor.

| Claims Challenged | 35 U.S.C. § | Reference(s) |
|---|---|---|
| 1, 3 | 103(a)[3] | Dill, Vadhri, Akashika, Hansen |
| 2 | 103(a) | Dill, Vadhri, Akashika, Hansen, Liao |

Apple supports its arguments in the Petition with the testimony of Dr. Henry Houh. Ex. 1003 (Declaration of Dr. Houh in support of Petition). Apple supports its arguments in the Reply with the testimony of Dr. Houh. Ex. 1017 (Supplemental Declaration of Dr. Houh in support of Petitioner's Reply). Fintiv supports its arguments in the Patent Owner Response with the testimony of Dr. Michael I. Shamos. Ex. 2009 (Declaration of Dr. Shamos in support of Patent Owner's Response).

## II. ANALYSIS

### *A. Claim Construction*

In this IPR, claim terms are construed using the same claim construction standard as in a civil action under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b) (2021). That is, claim terms generally are construed in accordance with their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art, in view of the specification and the prosecution history pertaining to the patent at issue. *See id.* The ordinary and customary meaning of a claim term "is its meaning

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103, effective March 16, 2013. Because the '386 patent claims the benefit of the '064 application, which was filed before March 16, 2013, and neither party has argued that the provisions of the AIA apply, we apply the pre-AIA version of 35 U.S.C. § 103. *See* Ex. 1001, codes (21), (22), (60), (63).

to the ordinary artisan after reading the entire patent," and "as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1321 (Fed. Cir. 2005) (en banc).

In its Petition, Apple contends that "no claim term requires construction beyond its ordinary and customary meaning." Pet. 5. Relying on the testimony of Dr. Houh, Apple asserts that "[a person of ordinary skill in the art] would apply the ordinary and customary meaning to all terms in [independent claims 1–3]." *Id.* (citing Ex. 1003 ¶ 43). In its Patent Owner Response, Fintiv contends that, after reading the '386 patent, a person of ordinary skill in the art would have understood that the following claim terms have specific meanings: (1) "committing a pending transaction"; (2) "at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform object"; (3) "auditing financial transactions"; (4) "handling errors";[4] and (5) "logging platform objects." PO Resp. 15–24. We address each claim term below.

*1. "committing a pending transaction" (independent claims 1–3)*

In its Patent Owner Response, Fintiv proposes that we construe the claim term "'committing' a pending transaction" as "saving data permanently after a set of tentative changes, rather than rolling back the tentative changes." PO Resp. 16, 19 (citing Ex. 2009 ¶ 43). To support its

[4] Fintiv actually proposes a construction for "error handling," but that term does not appear in the '386 patent. *See* PO Resp. 22. Instead, we assume that Fintiv intended to propose a construction for "handling errors," which is a term explicitly recited in each of independent claims 1–3. *See* Pet. Reply 14–15 n.4 (assuming the same).

proposed construction, Fintiv argues that "'[c]ommitting' is a concept from the database art." *Id.* at 16. According to Fintiv, "[committing] does not refer to entering into a legal commitment (as in a contract)," but "refers instead to finalizing data so that it can be saved permanently." *Id.* (citing Ex. 2009 ¶ 39).

Fintiv further contends that the '386 patent discloses performing financial transactions using "Distributed Transaction Processing." PO Resp. 16. Relying on extrinsic evidence, Fintiv argues that distributed transaction processing such as that disclosed in the '386 patent requires a transaction that includes certain properties, one of which is "[a]tomicity" requiring that "[t]he results of the transaction's execution are either all committed or all rolled back." *Id.* at 16–17 (quoting Ex. 2010, 3) (citing Ex. 2010, 1; Ex. 2009 ¶ 40). Fintiv further argues that "[c]ommitment" in the context of distributed transaction processing "is the act that ends a transaction and makes permanent all changes to resources specified during that transaction." *Id.* at 18 (quoting Ex. 2010, 4) (citing Ex. 2009 ¶ 40). Fintiv then asserts that the '386 patent "achieves atomicity through its series of staged commitments," but "[i]f committed data is found to be erroneous," "the data is 'rolled back.'" *Id.* at 18–19 (citing Ex. 2009 ¶ 41).

In its Reply, Apple maintains that the claim term "'committing' a pending transaction" should be accorded its ordinary and customary meaning. Pet. Reply 7–8, 10 (citing Ex. 1017 ¶¶ 11, 18), 12 (citing Ex. 1017 ¶ 11). Apple contends that Fintiv's proposed construction of "'committing' a pending transaction" is incorrect for the following reasons: (1) apart from using the phrase "commit transaction" in a few figures, the terms "committing," "commit," and "commitment" do not appear in the

specification of the ’386 patent outside the claims, and the extrinsic evidence relied upon by Fintiv to support its proposed construction is divorced from the ’386 patent and its prosecution history; (2) the structure of the challenged claims counsels against Fintiv’s proposed construction because these claims continually refer to "‘committing’ a pending transaction" through the business process services and the database services, without any reference to "saving data permanently after a set of tentative changes"; and (3) the challenged claims do not require a staged, sequential commitment process, but rather merely require "‘committing’ a pending transaction" through the business process services and the database services. *Id.* at 8–12 (citing Ex. 1001, 3:28–29, 5:32–40, 30:14–23, Figs. 20A–20F; Ex. 2010, 7; Ex. 1017 ¶¶ 13–24). At bottom, Apple asserts that it would be improper to limit the claim term "‘committing’ a pending transaction" by importing additional limitations from the extrinsic evidence introduced by Fintiv. *See id.* at 9.

In its Sur-reply, Fintiv asserts that Apple fails to meet its burden under 37 C.F.R. § 42.104(b)(3) by setting forth in the Petition how the claim term "committing a pending transaction" should be construed in the context of the ’386 patent. *See* PO Sur-reply 10–12. Fintiv does not otherwise address Apple’s counter arguments presented in the Reply regarding the proper construction of this claim term. *See id.*

As an initial matter, we do not agree with Fintiv’s argument that Apple was required to propose a construction for the claim term "committing a pending transaction" in the Petition, itself. *See* PO Sur-reply 10–12. Although 37 C.F.R. §§ 42.104(b)(3)–(4) requires Apple to explain how the challenged claims are to be construed and how the construed claims

are unpatentable over the asserted prior art references, not all claim terms are required to be construed in a petition. This holds true here because it appears Apple did not have notice that Fintiv intended to dispute the claim term "committing a pending transaction" until Fintiv filed its Patent Owner Response in this proceeding. Indeed, the claim term "committing a pending transaction" was not at issue during the preliminary phase of this proceeding, nor does this claim term appear to be one of the claim terms disputed in the related district court case involving the '386 patent. *See* Dec. on Inst. 16–17; Ex. 2015 (Final Claim Constructions of the Court); *cf.* PO Resp. 24 n.3 (confirming that "[n]one of the claim terms addressed in the Claim Construction section of [its] Patent Owner Response were addressed in that Order"). Moreover, the U.S. Court of Appeals for the Federal Circuit recently stated that, when a new claim construction is advanced by the patent owner or the Board after institution, "the petitioner must be afforded a reasonable opportunity in reply to present argument and evidence under that new construction." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1383 (Fed. Cir. 2023). Consequently, Apple's counter arguments in the Reply were both timely and proper because they are responsive to Fintiv's claim construction arguments presented for the first time in the Patent Owner Response.

Apple argues that the plain language of the challenged claims is controlling as to the ordinary and customary meaning of the claim term "committing a pending transaction." *See* Pet. Reply 7–12. We agree. Independent claim 1 recites, in relevant part, "committing a pending transaction through the business process services," and "upon receiving a confirmation of commitment from the business process services, committing

the pending transaction to the database services." Ex. 1001, 31:41–42, 31:50–52. Independent claim 1 further recites "wherein committing the pending transaction further comprises the following [seven] steps as orchestrated by the business process services:" (1) "ensuring" step; (2) "validating" step; (3) "applying" step; (4) "creating" step; (5) "holding" step; (6) "loading" step; and (7) "updating" step. *Id.* at 31:53–32:2. Independent claims 2 and 3 include similar limitations. *Id.* 33:4–5, 33:13–33, 34:31–32, 34:40–59. Based on the plain language of independent claims 1–3, "committing a pending transaction" includes processing/carrying out a transaction through the business process services and the database services by performing the aforementioned seven steps. Stated differently, the asserted combinations of prior art references would account for "committing a pending transaction" as required by each of independent claims 1–3 if they collectively teach processing/carrying out a transaction through the business process services and the database services by performing the aforementioned seven steps. Nothing more is required.

As Apple correctly notes in its Reply, apart from using the phrase "commit transaction" in a few figures, the terms "committing," "commit," and "commitment" do not appear in the specification of the '386 patent outside the claims. Pet. Reply 8. Although the phrase "commit transaction" is used to describe the relationship between the various components illustrated in Figures 20B, 20E, and 20F, there is no guidance in the corresponding description of these figures as to scope and meaning of this phrase. Ex. 1001, 30:14–23. Consequently, we are left with the plain language of the challenged claims to ascertain the scope and meaning of "committing a pending transaction."

Although we take into account Exhibit 2010, which is a guide for Distributed Transaction Processing, in determining the proper construction of the claim term "committing a pending transaction," we must consider the significance of that extrinsic evidence relied on by Fintiv. *See* PO Resp. 16–19. The Federal Circuit has cautioned that, "while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *See Phillips*, 415 F.3d at 1317 (quotations omitted). Extrinsic evidence is less reliable because, among other reasons, "there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question." *Id.* at 1318. Based on the particular circumstances presented here, we determine that Exhibit 2010 is less significant than the intrinsic record and it has marginal, if any, relevance that could be brought to bear on the proper construction of the claim term "committing a pending transaction."

Fintiv's reliance on Exhibit 2010 is predicated on the notion that "committing" is a concept from the database art. *See* PO Resp. 16. We disagree. The '386 patent is titled "Monetary Transaction System," and it generally relates to a "monetary transaction system for conducting monetary transactions between transaction system subscribers and other entities." Ex. 1001, code (54), 1:37–39. Although the challenged claims require "committing the pending transaction to the database services" and "updating, using the database services, a pending transaction history record to reflect the funds," these limitations, without more, are not enough to confine "committing" to the database art. *See, e.g., id.* at 31:51–52, 32:1–2 (relevant limitations of independent claim 1). Instead, when considering the

challenged claims as a whole, we view the concept of "committing" as being more applicable to art directed to conducting monetary transactions. *See* Tr. 9:21–10:4 (Apple's counsel arguing that "[t]he relevant field of endeavor . . . is financial transactions").

In addition, Fintiv inextricably links the concept of "committing" in the database art to distributed transaction processing. *See* PO Resp. 16. The specification of the '386 patent, however, makes clear that only some embodiments may be practiced in distributed system environments. Ex. 1001, 5:24–40. Consequently, we decline to limit the claim term "committing a pending transaction" to these embodiments, especially without a clear indication in the intrinsic record that the challenged claims were meant to be so limiting. *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.").

In summary, upon weighing all the evidence bearing on the construction of the claim term "committing a pending transaction," we apply the ordinary and customary meaning of this claim term as dictated by plain language of the challenged claims, which is not limited to the database art.

2. *"at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform object" (independent claims 1–3)*

In the Patent Owner Response, Fintiv contends that the claim term "at least one of" together with the use of the word "and" requires "*at least one instance from each category in the list* [to] be present." PO Resp. 19. Consequently, Fintiv asserts that the claim term "at least one of executing

financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform object" requires that the business process services be operable to implement "*at least one financial transaction, handling at least one error, and logging at least one platform object*." *Id.* at 20. In its Reply, Apple contends that we need not address Fintiv's proposed claim construction for this claim term "because Dill discloses the business process services performing each of the listed functions." Pet. Reply 19 (citing Pet. 27–31; Ex. 1003 ¶¶ 96–102).

Based on the fully developed trial record, we need not address Fintiv's proposed construction for the claim term "at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform object." *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))). Even if we were to agree with Fintiv that this claim term requires the business process services to perform at least one financial transaction, handle at least one error, and log at least one platform object, Apple provides arguments and evidence explaining how the combined teachings of Dill, Vadhri, Akashika, and Hansen (with or without the teachings of Liao) accounts for each of the claimed functions. Pet. 27–31, 85; Ex. 1003 ¶¶ 96–102, 201; *see infra* Sections II.B.7, 7.e, and 7.f.

*3. "auditing financial transactions" (independent claims 1–3)*

In its Patent Owner Response, Fintiv proposes that we construe the claim term "auditing financial transactions" as "performing retrospective

inspection and verification of financial transactions." PO Resp. 21–22 (citing Ex. 2009 ¶¶ 46–48). To support is proposed construction, Fintiv introduces a textbook that purportedly sets forth the ordinary and customary meaning of auditing as, among other things, an "official examination of accounts." *Id.* at 21 (quoting Ex. 2011, 3[5]).

In its Reply, Apple maintains that the claim term "auditing financial transactions" should be accorded its ordinary and customary meaning. Pet. Reply 13 (citing Ex. 1017 ¶ 25). Apple contends that Fintiv's proposed construction of the claim term "auditing financial transactions" is incorrect because this term appears once in the specification of the '386 patent outside the challenged claims, but it is only repeated verbatim without being ascribed a specific meaning. *Id.* at 12–13 (citing Ex. 1001, 13:25–29). Apple also argues that Fintiv improperly relies on extrinsic evidence to arrive at its proposed construction. *Id.* at 13. Apple asserts that the word "retrospective" does not appear anywhere within the four corners of the document that is Exhibit 2011, nor does this document suggest that "auditing" must include both "inspection" and "verification." *Id.* at 13–14 (citing Ex. 1017 ¶ 28). Contrary to Fintiv's proposed construction, Apple argues that a person of ordinary skill in the art would have known that auditing a financial transaction in an electronic payment system may not be retrospective, but could be performed as part of the transaction prior to completion. *Id.* at 14 (citing Ex. 1017 ¶¶ 29, 30; Ex. 1019, 5:27–34).

---

[5] All references to the page numbers in the textbook titled "Auditing Principles & Techniques" refer to the page numbers inserted by Fintiv in the bottom, right-hand corner of each page in Exhibit 2011.

In its Sur-reply, Fintiv reiterates that we construe the claim term "auditing financial transactions" as "performing retrospective inspection and verification of financial transactions." PO Sur-reply 12 (citing PO Resp. 21–22). Fintiv maintains that its proposed construction is supported by the document that is Exhibit 2011, as well as the testimony of its declarant, Dr. Shamos. *Id.* (citing Ex. 2011; Ex. 2009 ¶¶ 46–48). According to Fintiv, Apple "does not cite any authority for its unarticulated claim construction of this term." *Id.*

We begin our analysis with a review of the specification of the '386 patent, which includes the challenged claims. *See Phillips*, 415 F.3d at 1315 (stating that "the specification is 'the single best guide to the meaning of a disputed term'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The plain language of the challenged claims provides little, if any, guidance because the challenged claims do not provide any additional explanation as to how the business process services is operable to implement the function of "auditing financial transactions." Ex. 1001, 30:65–31:3, 32:16–20, 33:46–50. As Apple correctly notes in its Reply, the claim term "auditing financial transactions" appears once in the specification of the '386 patent outside the claims. *See* Pet. Reply 12–13. This single instance in the specification also provides little, if any, guidance because it merely repeats "auditing financial transactions" verbatim. Ex. 1001, 13:25–29. Absent a clear indication in the intrinsic record that the claim term "auditing financial transactions" should be limited in any way, we decline to impose any temporal restriction, much less re-write this term to require "inspection and verification" in lieu of "auditing."

Although we take into account Exhibit 2011, which is a textbook titled "Auditing Principles & Techniques," in determining the proper construction of the claim term "auditing financial transactions," we must consider the significance of that extrinsic evidence relied on by Fintiv. *See* PO Resp. 21–22; PO Sur-reply 12. Similar to our claim construction analysis of claim term "committing a pending transaction" above, we determine that Exhibit 2011 is less significant than the intrinsic record and it has marginal relevance that could be brought to bear on the proper construction of the claim term "auditing financial transactions." *See Phillips*, 415 F.3d at 1317–18. Fintiv does not explain in its Patent Owner Response nor its Sur-reply why there is a need to interject a temporal requirement into the construction of this claim term. In any event, Exhibit 2011 does not support interjecting a temporal requirement because it does not dictate that the function of "auditing" must be performed retrospectively, as asserted by Fintiv. Although Exhibit 2011 states that "[i]t is *possible* to perform this function by inspecting, comparing, checking, reviewing, scrutinizing the vouchers supporting the transactions" (Ex. 2011, 3 (emphasis added)), it does not state that every audit must include both "inspection" and "verification," as asserted by Fintiv. *See id.* (stating "[t]he dictionary meaning of audit is official examination of accounts").

In summary, upon weighing all the evidence bearing on the construction of the claim term "auditing financial transactions," we apply the ordinary and customary meaning of this claim term as merely the official examination of financial transactions. Contrary to Fintiv's assertions, the ordinary and customary meaning of this claim term does not require any

temporal restriction nor does it require replacing the word "auditing" with the words "inspection and verification."

*4. "handling errors" (independent claims 1–3)*

In its Patent Owner Response, Fintiv proposes that we construe the claim term "handling errors" as "procedures for responding to and recovering from errors." PO Resp. 22 (citing Ex. 2009 ¶¶ 49–52). To support is proposed construction, Fintiv introduces a textbook that defines error handling as "responding to errors," which may include, among other things, "*log[ging] the error* to a file, database, or the Windows Event Log." *Id.* at 22 (quoting Ex. 2012, 3[6]). Fintiv also asserts that the rollback processes in the '386 patent are examples of handling errors because they provide a process for recovering from errors. *Id.* (citing Ex. 2009 ¶ 51).

In its Reply, Apple maintains that the claim term "handling errors" should be accorded its ordinary and customary meaning. Pet. Reply 15 (citing Ex. 1017 ¶ 32). Apple contends that Fintiv's proposed construction of the claim term "handling errors" is incorrect because this term appears once in the specification of the '386 patent outside the challenged claims, but it is only repeated verbatim without being ascribed a specific meaning. *Id.* (citing Ex. 1001, 13:25–29). Apple also argues that Fintiv's reliance on extrinsic evidence to arrive at its proposed construction is unavailing. *Id.* at 16. Apple asserts that the document that is Exhibit 2012 does not indicate that handling errors requires "recovering" from the error. *Id.* (citing

---

[6] All references to the page numbers in the textbook titled "VBScript Programmer's Reference, Second Edition" refer to the page numbers inserted by Fintiv in the bottom, right-hand corner of each page in Exhibit 2012.

Ex. 1017 ¶ 37). According to Apple, even Fintiv's declarant, Dr. Shamos, acknowledged that Exhibit 2012 does not support the "recovering" aspect of Fintiv's proposed construction. *Id.* (citing Ex. 1018, 108:12–109:2).

In its Sur-reply, Fintiv reiterates that we should construe the claim term "handling errors" as "procedures for responding to and recovering from errors." PO Sur-reply 13 (citing PO Resp. 22). Fintiv maintains that its proposed construction is supported by the rollback processes illustrated in Figures 20C and 20E of the '386 patent, each of which purportedly provides an example of "handling errors," the document that is Exhibit 2012, and the testimony of Dr. Shamos. *Id.* at 13–14 (citing Ex. 2012; Ex. 2009 ¶¶ 49–52). According to Fintiv, Apple "does not cite any authority for its unarticulated claim construction of this term." *Id.* at 14.

We begin our analysis with a review of the specification of the '386 patent, which includes the challenged claims. *See Phillips*, 415 F.3d at 1315. The plain language of the challenged claims provides little, if any, guidance because, once again, it does not provide any additional explanation as to how the business process services is operable to implement the function of "handling errors." Ex. 1001, 30:65–31:3, 32:16–20, 33:46–50. As Apple correctly notes in its Reply, the claim term "handling errors" appears once in the specification of the '386 patent outside the claims. *See* Pet. Reply 15. This single instance in the specification also provides little, if any, guidance because it merely repeats "handling errors" verbatim. Ex. 1001, 13:25–29.

We do not agree with Fintiv's argument that the rollback processes illustrated in Figures 20C and 20E supports its proposed construction by providing sufficient examples of "handling errors" required by the

challenged claims. *See* PO Resp. 22; PO Sur-reply 13. Although the phrase "On Error" is used to describe messages sent between the various components illustrated in Figures 20C and 20E, there is no guidance in the corresponding description of these figures as to the scope and meaning of this phrase. Ex. 1001, 30:14–23. Consequently, we are unable to glean from the specification how the rollback processes illustrated in Figure 20C and 20E implicates the "handling errors" required by the challenged claims. Absent a clear indication in the intrinsic record that the claim term "handling error" should be limited in any way, we decline to impose a recovery procedure, much less re-write this term to require "responding to . . . errors" in lieu of "handling errors."

Although we take into account Exhibit 2012, which is a textbook titled "VBScript Programmer's Reference, Second Edition," in determining the proper construction of the claim term "handling errors," we must consider the significance of that extrinsic evidence relied on by Fintiv. *See* PO Resp. 22; PO Sur-reply 13–14. Similar to our claim construction analysis of the claim term "committing a pending transaction" above, we determine that Exhibit 2012 is less significant than the intrinsic record and it has marginal relevance that could be brought to bear on the proper construction of the claim term "handling errors." *See Phillips*, 415 F.3d at 1317–18. Fintiv does not explain in its Patent Owner Response nor its Sur-reply why there is a need to interject a recovery procedure into the construction of this claim term. That is, apart from disclosing "a 'global' error handling scheme" that, among other things, "log[s] the error to a file, database, or the Windows Event Log" (Ex. 2012, 3), this textbook is silent as

to why its error handling scheme must also include a recovery procedure, as asserted by Fintiv.

In summary, upon weighing all the evidence bearing on the construction of the claim term "handling errors," we apply the ordinary and customary meaning of this claim term as merely an error handling scheme. Contrary to Fintiv's assertions, the ordinary and customary meaning of this claim term does not require a recovery procedure nor does it require replacing the words "handling errors" with the words "responding to . . . errors."

*5. "logging platform objects" (independent claims 1–3)*

In its Patent Owner Response, Fintiv proposes that we construe the claim term "logging platform objects" as "storing or recording platform objects in a log." PO Resp. 23–24 (citing Ex. 2009 ¶¶ 53–56). According to Fintiv, the terms "logging" and "logs" are used thirty times in the specification of the '386 patent and, in each instance, these terms mean storing or recording. *Id.* at 23 (citing Ex. 1001, 8:53–56, 10:4–8, 13:24–29, 16:5–10, 17:1–4; Ex. 2009 ¶¶ 53, 54). As further support for its proposed construction, Fintiv introduces a general-purpose dictionary definition of "logging" as "enter (something) in a log" or "make a systematic recording of events." *Id.* at 23–24 (quoting Ex. 2013,4[7]). Fintiv then asserts that logging may occur in connection with handling errors by logging an error in a database or file. *Id.* at 24 (citing Ex. 2012).

[7] All references to the page numbers in the general-purpose dictionary titled "Concise Oxford English Dictionary" refer to the page numbers inserted by Fintiv in the bottom, right-hand corner of each page in Exhibit 2013.

In its Reply, Apple maintains that the claim term "logging platform objects" should be accorded its ordinary and customary meaning. Pet. Reply 17 (citing Ex. 1017 ¶ 39). Apple contends that Fintiv's proposed construction of the claim term "logging platform objects" is incorrect because neither the challenged claims nor the specification of the '386 patent specifically require logging platform objects "in a log." *Id.* (citing Ex. 1017 ¶¶ 40, 41). Apple argues that none of the disclosures in the specification relied on by Fintiv are dispositive because (1) there is no connection to platform objects in those disclosures; and (2) they merely state that one of the system components "logs the transaction" without more. *Id.* at 17–18. Apple also argues that Fintiv's reliance on extrinsic evidence to arrive at its proposed construction is improper because Fintiv adds an unnecessary limitation (i.e., logging "in a log") that is not consistent with how the claim term "logging platform objects" is used in the context of the '386 patent. *Id.* at 18 (citing Ex. 1017 ¶ 42).

In its Sur-reply, Fintiv reiterates that we should construe the claim term "'[l]ogging' platform objects" as "storing or recording platform objects in a log." PO Sur-reply 16 (citing PO Resp. 23–24). Fintiv maintains that its proposed construction is supported by the use of the terms "logging" and "logs" thirty times in the specification of the '386 patent, the general-purpose dictionary that is Exhibit 2013, and the testimony of Dr. Shamos. *Id.* (citing Ex. 2013; Ex. 2009 ¶¶ 53, 54). According to Fintiv, Apple "does not cite any authority for its unarticulated claim construction of this term." *Id.*

We begin our analysis with a review of the specification of the '386 patent, which includes the challenged claims. *See Phillips*, 415 F.3d at

1315. The plain language of the challenged claims provides little, if any, guidance because, once again, these claims do not provide any additional explanation as to how the business process services is operable to implement the function of "logging platform objects." Ex. 1001, 30:65–31:3, 32:16–20, 33:46–50. The term "logging platform objects" appears once in the specification of the '386 patent outside the claims. This single instance in the specification also provides little, if any, guidance because it merely repeats "logging platform objects" verbatim. *Id.* at 13:25–29. Although the terms "logs" and "object" appear separately in several disclosures throughout the specification, none of these disclosures provide sufficient guidance as to the scope and meaning of "logging platform objects." *See, e.g., id.* at 13:52–56 (disclosing how name matching engine 110 matches "different objects," which includes "find[ing] similarities between names, addresses, etc."), 16:5–10 ("The subscriber gives cash to [the] agent manager or agent, and the mFS platform processes the request, updates the agent branch and subscriber's eMoney balances, logs the transaction, and sends details," such as "transaction logs."). Absent a clear indication in the intrinsic record that the claim term "logging platform objects" should be limited in any way, we decline to require logging platform objects "in a log," much less re-write this claim term to require "storing or recording" in lieu of "logging."

Although we take into account Exhibit 2013, which is a general-purpose dictionary, in determining the proper construction of the claim term "logging platform objects," we must consider the significance of that extrinsic evidence relied on by Fintiv. *See* PO Resp. 23–24; PO Sur-reply 16. Similar to our claim construction analysis of the claim term "committing

a pending transaction" above, we determine that Exhibit 2013 is less significant than the intrinsic record in determining the proper construction for the claim term "logging platform errors." *See Phillips*, 415 F.3d at 1317–18. Fintiv does not explain in its Patent Owner Response nor its Sur-reply why there is a need to interject logging platform objects "in a log" into the construction of this claim term. At best, the general-purpose dictionary definition of a "log" set forth in Exhibit 2013 suggests that "logging" is synonymous with "storing or recording" because "logging" is nothing more than "a systematic recording of events." Ex. 2013, 4. This, without more, does not dictate that we should replace the "logging" function chosen by the patentee to define the precise scope of the claimed invention with the functions of "storing or recording." When the language of a claim term is clear, such as here, we decline to re-write the term to require synonymous functions. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee.").

In summary, upon weighing all the evidence bearing on the construction of the claim term "logging platform objects," we apply the ordinary and customary meaning of this claim term as merely a systematic logging of events. Contrary to Fintiv's assertions, the ordinary and customary meaning of this claim term does not require logging platform objects "in a log" nor does it require replacing the function of "logging" with the synonymous functions of "storing or recording."

### *B. Obviousness Over the Combined Teachings of Dill, Vadhri, Akashika, and Hansen*

Apple contends that independent claims 1 and 3 of the ’386 patent are unpatentable under § 103(a) as obvious over the combined teachings of Dill, Vadhri, Akashika, and Hansen. Pet. 14–94. Apple contends that the teachings of Dill, Vadhri, Akashika, and Hansen account for the subject matter of each challenged claim, and provides reasoning as to why a person of ordinary skill in the art would have been prompted to combine the teachings of these references. *Id.* During trial, Fintiv contends that Dill fails to teach the following: (1) the deposit transaction required by independent claim 1; (2) “a communication message from the mobile device . . . indicating that the subscriber desires to deposit a specified amount of funds into the subscriber’s account,” as recited in independent claim 1; (3) the commitment process required by each of independent claims 1 and 3; and (4) the “business process services operable to implement business workflows, including at least one of . . . auditing financial transactions, . . . handling errors, and logging platform objects,” as recited in each of independent claims 1 and 3. PO Resp. 26–42, 44–45; PO Sur-reply 1–8, 17–20.

Based on the fully developed trial record, we determine that Apple has shown by a preponderance of the evidence that claims 1 and 3 of the ’386 patent are unpatentable as obvious over the combined teachings of Dill, Vadhri, Akashika, and Hansen. We begin our analysis with the principles of law that generally apply to an obviousness ground, next we assess the level of skill in the art, followed by brief overviews of Dill, Vadhri, Akashika, and

Hansen, and then we address the parties' contentions with respect to the challenged claims.

### *1. Principles of Law*

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations, such as commercial success, long-felt but unsolved needs, failure of others, etc.).[8] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We analyze the asserted grounds based on obviousness with the principles identified above in mind.

### *2. Level of Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having

---

[8] During trial, Fintiv does not present arguments or evidence of secondary considerations. *See* PO Resp.

ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

Based on the fully developed trial record, we are able to determine the knowledge level of a person of ordinary skill in the art. Relying on the testimony of Dr. Houh, Apple argues the following:

> [a] person of ordinary skill in the art . . . in June 2011 would have had a working knowledge of mobile payment techniques pertinent to the '386 patent, including software development in the field of mobile payment techniques. Such [a person of ordinary skill in the art] would have had a bachelor's degree in electrical engineering, computer science, or equivalent training, and approximately two years of work experience in software development. Lack of work experience can be remedied by additional education, and vice versa.

Pet. 4 (citing Ex. 1003 ¶¶ 21, 22). In its Patent Owner Response, Fintiv does not address the level of ordinary skill in the art. *See* PO Resp.

Accordingly, we maintain our preliminary determination regarding the level of ordinary skill in the art. Dec. on Inst. 18–20. That is, we adopt

Apple's proposed assessment of the level of ordinary skill in the art because Dr. Houh's supporting testimony is consistent with the '386 patent and the asserted prior art. We apply this assessment of the level of ordinary skill in the art in our obviousness evaluations below.

### *3. Overview of Dill*

Dill generally relates to "financial transfers" and, in particular, "to financial transfers utilizing a unique identifier to facilitate flexible payment options for the transaction." Ex. 1005 ¶ 2. Figure 9 of Dill, reproduced below, illustrates an "exemplary system for making financial transfers according to one embodiment." *Id.* ¶ 25.




**FIG. 9**

Figure 9 illustrates system 100 that includes, among other things, sender 105 initiating a money transfer transaction (e.g., payment) to recipient 110 via mobile wallet application 121 of mobile network operator 120. *Id.* ¶ 54; *see id.* Fig. 9, ¶ 100 (stating that system 100 in Figure 9 "can comprise a system as described above with reference to [Figure 1] and can include some or all of the same components and may perform some or all of the same functions"). Money transfer facilitator 140 receives the money transaction information from mobile wallet application 121 via mobile network 115. *Id.* ¶ 100. Money transfer facilitator 140[9] is coupled to financial transfer network 155 such that it is capable of transferring money in accordance with the money transfer transaction between source account 165 in sender's financial institution 160 and destination account 175 in recipient's financial institution 170. *Id.* ¶ 49.

*4. Overview of Vadhri*

Vadhri generally relates to "value holding accounts" and, in particular, "to systems and methods for accessing a value holding account" that "may hold anything considered valuable." Ex. 1006 ¶¶ 1, 2. Figure 5 of Vadhri, reproduced below, illustrates a network diagram of "a client-server system, within which example embodiments may be deployed." *Id.* ¶ 8.

---

[9] Money transfer facilitator 140 includes two components that are both labeled using the same numerical identifier—transfer options module 145 and mobile application 145. Ex. 1005 ¶¶ 50, 101, 102, Fig. 9.




*FIG. 5*

Figure 5 illustrates client-server system 500 that includes networked system 502 that manages payment services between various applications and accounts. *Id.* ¶¶ 47–50. Networked system 502 includes, among other things, "Application Program Interface (API) server 514" that provides a "programmatic interface" between programmatic client 508 (e.g., a "seller application" such as "eBay") executing on client machine 512 and "marketplace and payment applications 520 and 522" hosted by application server 518. *Id.* ¶¶ 48, 50, 52.

*5. Overview of Akashika*

Akashika generally relates to "a service providing system, a service providing server and an information terminal device." Ex. 1007 ¶ 3. More specifically, Akashika is directed to an access control system that promotes secure communications by protecting sensitive data such as "electronic money or important personal information." *Id.* ¶¶ 7, 9. In one embodiment, Akashika discloses an "area management server" that includes "an access control list generation section generating an access control list." *Id.* ¶ 17.

Figure 3 of the Akashika, reproduced below, illustrates "an area management server according to [one] embodiment." Ex. 1007 ¶ 29.

FIG.3




Figure 3 illustrates certificate authority server 100, area management server 200, and service providing server 300. *Id.* ¶¶ 51, 52, 57, 58. Area management server 200 includes, among other things, "access control list

generation section 208 [that] generates an access control list" identifying "the scope of . . . access right[s]" to client device 400 (not illustrated in Figure 3 above). *Id.* ¶ 60. The access control list identifies "[t]he access right[s]" (e.g., "read permission, write permission, restriction on frequency of access") permitted for a secure area. *Id.* ¶ 62.

*6. Overview of Hansen*

Hansen generally relates to "online money transfers" and, in particular, "to payment authentication for online money transfers." Ex. 1008 ¶ 2. Figure 6A of Hansen, reproduced below, illustrates a block diagram of "a process for performing a money transfer" according to one embodiment. *Id.* ¶ 15.




Fig. 6A

Figure 6A illustrates process 600 for performing a money transfer. *Id.* ¶ 78. Process 600 includes, among other things, checking internal business rules along with velocity checks at step 604. *Id.* Hansen discloses that "velocity checks could include a limit on the amount of a single transaction, a limit on the aggregate amount for various transactions over a time period, a limit on the number of transactions during a time period, etc." *Id.*

*7. Claim 1*

For purposes of consistency and added clarity, we address each limitation of independent claim 1 in turn by relying on the bracketed annotations provided by Apple in the Petition. Pet. 113–16 (Claims App'x). The preamble of independent claim 1 recites limitation [1.0]—"[a] monetary transaction system for conducting monetary transactions between subscribers and other entities, the system comprising one or more of." Ex. 1001, 30:54–56. To the extent the preamble should be treated as limiting, Apple contends that Dill teaches limitation [1.0] because Figure 9 of Dill illustrates system 100 for conducting monetary transactions between subscribers, such as sender 105 and recipient 110, and other entities, such as agent 135 and financial institutions 160 and 170. Pet. 14–16 (citing Ex. 1005 ¶¶ 49, 51, 53, 100, Fig. 9; Ex. 1003 ¶¶ 73–76).

Independent claim 1 recites limitation [1.1.1]—"an integration tier operable to manage mobile wallet sessions." Ex. 1001, 30:57–58. Apple contends that Dill teaches limitation [1.1.1] because Dill's transfer options module 145 manages mobile wallet sessions when it sends and receives transaction details between mobile wallets 125 and 130 within mobile wallet application 121, and each transaction corresponds to a mobile wallet session tied to the unique transaction identifier assigned by mobile network operator

120. Pet. 16–19 (citing Ex. 1005 ¶¶ 100–02, 105, Fig. 9; Ex. 1003 ¶¶ 77–79).

Independent claim 1 recites limitation [1.1.2]—"the integration tier also including a communication application programming interface (API) and other communication mechanisms to accept messages from channels." Ex. 1001, 30:58–61. Apple contends that the combination of Dill and Vadhri teaches limitation [1.1.2] because Dill discloses that transfer options module 145 "[is] communicatively coupled" to one or more interfaces 136–138 and, therefore, includes multiple communication mechanisms for accepting messages from different channels. Pet. 18–20 (quoting Ex. 1005 ¶ 101) (citing Ex. 1005 ¶¶ 51, 101, Fig. 9; Ex. 1003 ¶¶ 80–83). Apple turns to Vadhri's API server 514 that provides an interface with different services and functions in a marketplace to teach that communication APIs were well-known in the art. *Id.* at 20–21 (citing Ex. 1006 ¶¶ 1, 47–50, 52, 55, Fig. 5; Ex. 1003 ¶¶ 84, 85). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill's transfer options module 145 to include a communication API to facilitate flexible communication with different parties, as taught by Vadhri, because Dill recognizes the need for flexible payment systems that may be used by different parties, and Vadhri's API server 514 provides for increased flexibility by providing access to different services and functions in a marketplace through its API interface. *Id.* at 22–23 (citing Ex. 1005 ¶¶ 4, 49; Ex. 1006 ¶¶ 50, 52, 53; Ex. 1003 ¶¶ 86–88).

Apple contends that combining the teachings of Dill and Vadhri in this way would have been the combination of prior art elements (i.e., combining "Dill's transfer options module 145 with Vadhri's API

interface") according to known methods (i.e., "configuring a web interface to utilize a communication API, as taught by Vadhri") to yield the predictable result of "expanding the types of services that Dill's transfer options module 145 may communicate" (e.g., via web interface 137).

Pet. 23–24 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶¶ 88, 89). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in modifying Dill's transfer options module 145 to include Vadhri's API interface because "it was well-known to utilize APIs in payment systems" and "payment APIs were commonly used." *Id.* at 24 (citing Ex. 1003 ¶¶ 88, 90).

Independent claim 1 recites limitation [1.2]—"notification services operable to send notifications through different notification channels including one or more of short message peer-to-peer, short-message services [("SMS")] and simple mail transfer protocol emails." Ex. 1001, 30:62–65. Apple contends that Dill teaches limitation [1.2] because it discloses that mobile application 145 sends messages through different channels, including by email or SMS. Pet. 25–27 (citing Ex. 1005 ¶¶ 80, 104, Fig. 9; Ex. 1003 ¶¶ 92–95).

Independent claim 1 recites limitation [1.3]—"business process services operable to implement business workflows, including at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects." Ex. 1001, 30:66–31:3. Apple contends that Dill teaches limitation [1.3] because it discloses that money transfer facilitator 140 implements business workflows, including executing financial transactions (e.g., by delivering funds to the bank account of recipient 110 such as destination account 175 of

recipient's financial institution 170), auditing financial transactions (e.g., by assigning and verifying a unique transaction identifier to a transaction), invoking third-party services (e.g., by disclosing that money transfer facilitator 140 may include systems operated by Western Union), handling errors (e.g., by only processing transactions when sender 105's transfer request has been verified), and logging platform objects (e.g., by looking up in a database whether recipient 110 is registered and logging that information in the database). Pet. 27–31 (citing Ex. 1005 ¶¶ 34, 41, 49, 77, 78, 101, 105, Figs. 5 (step 520), 9; Ex. 1003 ¶¶ 96–101).

Independent claim 1 recites limitation [1.4]—"database services operable to store financial transaction details, store customer profiles, and manage money containers." Ex. 1001, 31:4–6. Apple contends that Dill teaches limitation [1.4] because it discloses that mobile subscriber data 150 stores transaction details in the form of unique customer identifiers for structured settlements, it identifies entities/accounts based on mobile subscriber data, and it manages accounts based on the mobile subscriber data. Pet. 30–33 (citing Ex. 1005 ¶¶ 50, 57; Ex. 1003 ¶¶ 103–07).

Independent claim 1 recites limitation [1.5]—"a payment handler service operable to use APIs of different payment processors including one or more APIs of banks, credit and debit cards processors, bill payment processors." Ex. 1001, 31:7–10. Apple contends that the combination of Dill and Vadhri teaches limitation [1.5] because Dill discloses that money transfer facilitator 140 processes transactions with numerous financial institutions, including payment processors associated with banks, credit cards, debit cards, and payment services such as PayPal, eBay, Western Union, or bill payment. Pet. 33–34 (citing Ex. 1005 ¶¶ 49, 56, 71, 90, 103,

Fig. 9; Ex. 1003 ¶¶ 108–11). Once again, Apple turns to Vadhri's API server 514 that provides an interface with payment processors (e.g., marketplace and payment applications 520 and 522) to teach that communication APIs were well-known in the art. *Id.* at 36–37 (citing Ex. 1006 ¶¶ 47–50, 52, 55, Fig. 5; Ex. 1003 ¶¶ 112, 113). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill's money transfer facilitator 140, which includes transfer options module 145, to use APIs of different payment processors, as taught by Vadhri, because Dill recognizes the need for flexible payment systems that may be used by different parties, and Vadhri's API server 514 provides for increased flexibility by providing access to different services and functions in a marketplace through its API interface. *Id.* at 38–39 (citing Ex. 1005 ¶¶ 4, 49, 56, 71, 90, 103; Ex. 1006 ¶¶ 50, 52; Ex. 1003 ¶¶ 114–16).

Apple contends that combining the teachings of Dill and Vadhri in this way would have been the combination of prior art elements (i.e., combining "Dill's money transfer facilitator 140 with Vadhri's API programmatic interface") according to known methods (i.e., "configuring a payment interface to utilize an API of different payment processors, as taught by Vadhri") to yield the predictable result of "expanding the types of services with which Dill's money transfer facilitator 140 would be configured to communicate." Pet. 39 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶ 117). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in modifying Dill's money transfer facilitator 140 to include Vadhri's APIs of different payment processors because "it was well-known to utilize APIs in payment systems." *Id.* (citing Ex. 1003 ¶ 118).

Independent claim 1 recites limitation [1.6]—"a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce constraints including transaction constraints." Ex. 1001, 31:11–14. Apple contends that Dill teaches limitation [1.6] because it discloses that transfer options module 145 gathers financial transaction statistics (e.g., information about a transaction such as amount, involved subscribers, and transaction conditions), and then uses the gathered financial transaction statistics to enforce delivery rules 151 that may place restrictions on delivery or impose restrictions from "various governmental and/or banking rules, service conditions, etc." Pet. 40–42 (quoting Ex. 1005 ¶ 104) (citing Ex. 1005 ¶¶ 77, 102, Fig. 9; Ex. 1003 ¶¶ 120–23).

Independent claim 1 recites limitation [1.7]—"a security service operable to perform subscriber authentication." Ex. 1001, 31:15–16. Apple contends that Dill teaches limitation [1.7] because it discloses mobile wallet application 121 executes mobile application 145 that verifies a subscriber by using a personal identification number ("PIN"). Pet. 42–44 (citing Ex. 1005 ¶¶ 13, 94, Fig. 9; Ex. 1003 ¶¶ 124, 125).

Independent claim 1 recites limitation [1.8]—"at least one entity that is to be involved in the specified transaction, the at least one entity having a profile with the monetary transaction system: wherein the at least one entity is the agent." Ex. 1001, 31:17–20. Apple contends that Dill teaches limitation [1.8] because it discloses several entities that may be involved in a transaction, including agent 135 (who has a profile with system 100) who issues a unique customer identifier to recipient 110, initiates a transaction, and has a corresponding location at which the recipient may pick up

transferred funds. Pet. 45–47 (citing Ex. 1005 ¶¶ 33, 51, 52, 54, Fig. 9; Ex. 1003 ¶¶ 126–29).

Independent claim 1 recites limitation [1.9.1]—"wherein the monetary transaction system is implemented to deposit funds at an agent branch." Ex. 1001, 31:21–22. Apple contends that Dill teaches limitation [1.9.1] because it discloses that sender 105 may complete a monetary transfer transaction by visiting the branch of agent 135, and it contemplates that one of the monetary transfer transactions includes "delivering funds to a bank account." Pet. 48 (quoting Ex. 1005 ¶ 101) (citing Ex. 1005 ¶¶ 3, 33, 51, 52; Ex. 1003 ¶¶ 130, 131). Apple also argues that Dill's system 100 is not limited to "sender" and "receiver" transactions because it contemplates that sender 105 and recipient 110 may be the same party in the same transaction. *See id.* (citing Ex. 1005 ¶ 52; Ex. 1003 ¶ 132).

Independent claim 1 recites limitation [1.9.2]—"the funds being deposited by a subscriber at the agent branch using a mobile device configured to run a monetary transaction system application, the monetary transaction system performing the following steps." Ex. 1001, 31:22–26. Apple contends that Dill teaches limitation [1.9.2] because it discloses that sender 105 may deposit funds at the branch of agent 135 using the sender's mobile device configured to run sender's mobile wallet 125. Pet. 49–52 (citing Ex. 1005 ¶¶ 51, 53, 55, 77, Figs. 5 (step 515), 9; Ex. 1003 ¶¶ 134–38).

Independent claim 1 recites limitation [1.10.1]—"receiving a communication message from the mobile device over one of a plurality of channels connected to the monetary transaction system." Ex. 1001, 31:27–29. Apple contends that Dill teaches limitation [1.10.1] because it discloses

that money transfer facilitator 140 is capable of receiving a request to initiate a money transfer transaction from the sender's mobile wallet 125 over a plurality of channels, including via mobile network 115 and/or agent 135. Pet. 52–53 (citing Ex. 1005 ¶¶ 51, 54, 101, Fig. 9; Ex. 1003 ¶¶ 139, 140).

Independent claim 1 recites limitation [1.10.2]—"the communication message being received by an API associated with the integration tier of the monetary transaction system." Ex. 1001, 31:29–32. Apple contends that the combination of Dill and Vadhri teaches limitation [1.10.2] because, as it identifies above with respect to limitation [1.1.2], a person of ordinary skill in the art would have been motivated to modify Dill's transfer options module 145 (which is part of money transfer facilitator 140) to use Vadhri's API to receive transaction information from sender 105 or recipient 110. Pet. 54–55 (citing Ex. 1005 ¶¶ 100, 101, Fig. 9; Ex. 1006 ¶ 52; Ex. 1003 ¶¶ 141, 142).

Independent claim 1 recites limitation [1.10.3]—"the communication message indicating that the subscriber desires to deposit a specified amount of funds into the subscriber's account." Ex. 1001, 31:32–34. Apple contends that Dill teaches limitation [1.10.3] because it discloses that the sender's mobile wallet application 125 initiates a transaction by sending a request specifying the amount of the desired transaction to mobile application 145. Pet. 56–57 (citing Ex. 1005 ¶ 77, Fig. 5 (step 515); Ex. 1003 ¶ 143). Apple also argues that, as it identifies above with respect to limitation [1.9.1], Dill teaches that the request may include sender 105 depositing funds into his/her own account. *Id.* at 57 (citing Ex. 1005 ¶ 101; Ex. 1003 ¶¶ 144, 145).

Independent claim 1 recites limitation [1.10.4]—"validating the status of the subscriber's account, wherein validating the status of the subscriber's account comprises communicating from the integration tier to the database services to query attributes of the subscriber's account." Ex. 1001, 31:35–39. Apple contends that Dill teaches limitation [1.10.4] because it discloses that money transfer facilitator 140, of which transfer options module 145 is a part, validates the status of the account owned by sender 105 or recipient 110 by determining whether the sender or recipient is enrolled in a mobile wallet with system 100, and then communicates with mobile subscriber data 150 to query attributes of the sender's or recipient's account. Pet. 58–59 (citing Ex. 1005 ¶¶ 34, 50, Fig. 9; Ex. 1003 ¶¶ 146, 147).

Independent claim 1 recites limitation [1.10.5]—"committing a pending transaction through the business process services." Ex. 1001, 31:40–41. Apple contends that Dill teaches limitation [1.10.5] because it discloses a "mobile-to-mobile transaction" where mobile application 145 commits a pending transaction through money transfer facilitator 140. Pet. 60–61 (quoting Ex. 1005 ¶ 78) (citing Ex. 1005 ¶ 79, Fig. 5 (step 525); Ex. 1003 ¶¶ 148, 149).

Independent claim 1 recites limitation [1.10.6]—"wherein the integration tier communicates a transaction commitment request to the business process services." Ex. 1001, 31:41–43. Apple contends that Dill teaches limitation [1.10.6] because it discloses that transfer options module 145 of money transfer facilitator 140 provides a notification of a transaction to recipient 110 and selects "one or more delivery options" for completing the transaction. Pet. 61 (quoting Ex. 1005 ¶ 101). According to Apple, Dill's selection of "one or more delivery options" for the transaction teaches

communicating "a transaction commitment request to the business process services" because transfer options module 145 communicates the selection to money transfer facilitator 140, which, in turn, accesses the source and destination accounts 165, 175 to affect transfer. *Id.* at 61–62 (quoting Ex. 1005 ¶ 101) (citing Ex. 1005 ¶ 49; Ex. 1003 ¶¶ 150, 151).

Independent claim 1 recites limitation [1.10.7]—"receiving a confirmation from the business process services that the pending transaction has been committed." Ex. 1001, 31:44–46. Apple contends that Dill teaches limitation [1.10.7] because it discloses that mobile wallet application 121 receives a money transfer control number ("MTCN") from money transfer facilitator 140 "indicating that the transaction is available for payout." Pet. 62–63 (quoting Ex. 1005 ¶ 80) (citing Ex. 1005 ¶ 79, Fig. 5 (step 545); Ex. 1003 ¶¶ 152–54).

Independent claim 1 recites limitation [1.10.8]—"sending, through the notification services, a receipt notification to the mobile device." Ex. 1001, 31:47–48. Apple contends that Dill teaches limitation [1.10.8] because it discloses that mobile application 145 sends the MTCN to money transfer facilitator 140, which, in turn, sends the MTCN to mobile wallet application 121 that includes both sender's mobile wallet 125 and recipient's mobile wallet 130. Pet. 63–64 (citing Ex. 1005 ¶ 80, Fig. 5 (step 550); Ex. 1003 ¶¶ 155, 156).

Independent claim 1 recites limitation [1.10.9]—"upon receiving a confirmation of commitment from the business process services, committing the pending transaction to the database services." Ex. 1001, 31:49–51. Apple contends that Dill teaches limitation [1.10.9] because it discloses, upon mobile wallet application 121 receiving the MTCN from money

transfer facilitator 140, accessing and updating mobile subscriber data 150 with the "structured settlement" between sender 105 and recipient 110. Pet. 64–68 (quoting Ex. 1005 ¶ 57) (citing Ex. 1005 ¶¶ 50, 57, 80, Fig. 5 (steps 545, 550); Ex. 1003 ¶¶ 157–61).

Independent claim 1 recites limitation [1.11.1]—"wherein committing the pending transaction further comprises the following steps as orchestrated by the business process services." Ex. 1001, 31:52–54. Apple contends that Dill teaches limitation [1.11.1] because, as it identifies above with respect to limitation [1.10.5], money transfer facilitator 140 commits the pending transaction. Pet. 68 (citing Ex. 1003 ¶ 162).

Independent claim 1 recites limitation [1.11.2]—"ensuring, via the database services, that the subscriber has an active account." Ex. 1001, 31:55–56. Apple contends that Dill teaches limitation [1.11.2] because it discloses that, upon receipt of a money transfer request, money transfer facilitator 140 accesses mobile subscriber data 150 to determine whether sender 105 or recipient 110 has an account for the transfer of the specified funds. Pet. 68–69 (citing Ex. 1005 ¶¶ 34, 50; Ex. 1003 ¶¶ 163, 164).

Independent claim 1 recites limitation [1.11.3]—"validating, through communication with the security services, one or more of a PIN number and an access control list." Ex. 1001, 31:57–59. Apple contends that the combination of Dill and Akashika teaches limitation [1.11.3] because Dill discloses that mobile wallet application 121 verifies a PIN entered by recipient 110. Pet. 69–70 (citing Ex. 1005 ¶¶ 13, 94; Ex. 1003 ¶ 165). Apple turns to Akashika's access control list generation section 208 that generates an access control list capable of identifying, among other things, read permissions, write permissions, and restrictions on frequency of access

to demonstrate that it was well-known to use an access control list ("ACL") to promote security of money transfer systems. *Id.* at 70–71 (citing Ex. 1007 ¶¶ 60, 62, 117; Ex. 1003 ¶¶ 166, 167). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill's money transfer facilitator 140 to incorporate the benefits of Akashika's ACL "to assist in authenticating users and limiting access to secure information of the subscribers." *Id.* at 71 (citing Ex. 1003 ¶ 168). Apple further argues that a person of ordinary skill in the art would have understood that implementing Akashika's ACL in Dill's money transfer facilitator 140 would be an extension of using Dill's unique customer identifiers to identify sender 105 and recipient 110 to promote or enhance security. Pet. 71–72 (citing Ex. 1005 ¶ 35; Ex. 1003 ¶ 169).

Apple contends that combining the teachings of Dill and Akashika in this way would have been the combination of prior art elements (i.e., combining "Dill's money transfer facilitator 140 with Akashika's [ACL]") according to known methods (i.e., "configuring an interface to utilize an [ACL], as taught by Akashika") to yield the predictable result of "limiting transactions to authorized users identified in the [ACL]." Pet. 72 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶ 169). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in modifying Dill's money transfer facilitator 140 to include Akashika's ACL because "Dill utilizes secure information to authenticate subscribers," such as unique customer identifiers for sender 105 and recipient 110. *Id.* (citing Ex. 1005 ¶ 35; Ex. 1003 ¶¶ 169, 170).

Independent claim 1 recites limitation [1.11.4]—"applying with the rules engine, velocity rules." Ex. 1001, 31:60. Apple contends that the

combination of Dill and Hansen teaches limitation [1.11.4] because, as identified above with respect to limitation [1.6], Dill's transfer options module 145 enforces delivery rules 151 defined by recipient 110 on sender 105. Pet. 73–74 (citing Ex. 1005 ¶ 102, Fig. 9; Ex. 1003 ¶¶ 172, 173). Apple turns to Hansen's payment enabler 170 that enforces "internal business rules," including "velocity checks" such as "a limit on the number of transactions during a time period," to teach that velocity rules were well-known in the art. *Id.* at 75–76 (quoting Ex. 1008 ¶ 78) (citing Ex. 1008 ¶¶ 22, 24, Figs. 1, 6A (step 604); Ex. 1003 ¶¶ 174–76). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill's money transfer facilitator 140, which includes transfer options module 145, to enforce Hansen's velocity rules that limit the number of transactions a subscriber may perform in a time period to promote additional security in Dill's system 100. *Id.* at 77 (citing Ex. 1003 ¶ 178).

Apple contends that combining the teachings of Dill and Hansen in this way would have been the combination of prior art elements (i.e., "Dill's money transfer facilitator 140 enforcing 'velocity rules' (e.g., time limits) on the sender 105 in the rules database 150") according to known methods (i.e., "defining rules in the rule database 150, as taught by Dill, with rules specifying 'a limit on the number of transactions during a time period,' as taught by Hansen") to yield the predictable result of "applying time-based rules for sender transactions." Pet. 77 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶ 178). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in modifying Dill's money transfer facilitator 140, which, once again, includes transfer options

module 145, to include Hansen's velocity rules because Dill defines rules for sender 105. *Id.* at 77–78 (citing Ex. 1005 ¶ 102; Ex. 1003 ¶¶ 178, 179).

Independent claim 1 recites limitation [1.11.5]—"creating with the database services a new pending transaction history record." Ex. 1001, 31:61–62. Apple contends that Dill teaches limitation [1.11.5] because, as it identifies above with respect to limitation [1.4], Dill's money transfer facilitator 140 uses information in mobile subscriber data 150 to transfer money to recipient 110, updates the recipient's balance, and creates a new MTCN record of the transfer. Pet. 78–79 (citing Ex. 1005 ¶¶ 57, 80, Fig. 5 (step 545); Ex. 1003 ¶¶ 180, 181).

Independent claim 1 recites limitation [1.11.6]—"holding funds from the agent account balance using the payment handler." Ex. 1001, 31:63–64. Apple contends that Dill teaches limitation [1.11.6] because funds from the account for agent 135 are held for recipient 110 to pick up from the agent's retail location. Pet. 79–80 (citing Ex. 1005 ¶ 51; Ex. 1003 ¶ 182). Apple further argues that, after notifying recipient 110 of the transfer, Dill discloses holding funds in the account of agent 135 and then releasing the funds after the recipient requests initiation of the transfer. *Id.* at 80–81 (citing Ex. 1005 ¶¶ 80–82, Fig. 5 (steps 550, 565, 570); Ex. 1003 ¶¶ 183, 184).

Independent claim 1 recites limitation [1.11.7]—"loading the funds to the subscriber account using the payment handler." Ex. 1001, 31:65–66. Apple contends that Dill teaches limitation [1.11.7] because, upon receiving a transfer request, mobile application 145 of money transfer facilitator 140 transfers funds to destination account 175 of recipient 110 and then sends a notification message to the recipient's mobile wallet application 130

indicating success or failure of the transfer. Pet. 81–82 (citing Ex. 1005 ¶¶ 81, 82, Fig. 5 (steps 565, 570); Ex. 1003 ¶¶ 185–87).

Independent claim 1 recites limitation [1.11.8]—"updating, using the database services, a pending transaction history record to reflect the funds." Ex. 1001, 32:1–2. Apple contends that Dill teaches limitation [1.11.8] because, upon completion of a structured settlement between sender 105 and recipient 110, money transfer facilitator 140 uses information stored in mobile subscriber data 150 to transfer money to the recipient's account and updates his/her balance accordingly. Pet. 83 (citing Ex. 1005 ¶¶ 57, 82, Fig. 5 (steps 570, 575, 580, 585); Ex. 1003 ¶¶ 188–90).

During trial, Fintiv contends that Dill fails to teach the following: (1) the deposit transaction required by independent claim 1; (2) "a communication message from the mobile device . . . indicating that the subscriber desires to deposit a specified amount of funds into the subscriber's account," as recited in independent claim 1; (3) the commitment process required by independent claim 1; and (4) "the business process services operable to implement business workflows, including at least one of . . . auditing financial transactions, . . . handling errors, and logging platform objects," as recited in independent claim 1. PO Resp. 26–42; PO Sur-reply 1–8, 17–20. Notwithstanding Fintiv's arguments to the contrary, Apple has shown by a preponderance of the evidence that the combined teachings of Dill, Vadhri, Akashika, and Hansen account for all the limitations of independent claim 1. We address Fintiv's arguments in turn.

*a. deposit transaction*

In its Patent Owner Response, Fintiv contends that independent claim 1 requires a subscriber to deposit funds into his/her own account.

PO Resp. 26. Fintiv argues that, instead of explaining how Dill teaches this particular deposit transaction, Apple explains how Dill performs a transaction where a subscriber transfers funds to another party. *Id.* Fintiv argues that Apple's reliance on Figure 5 of Dill is misplaced because it merely illustrates a sender who sends money to a recipient, rather than a deposit transaction where a subscriber deposits money into his/her own account. *Id.* at 27–28 (citing Pet. 50–51; Ex. 1005, Fig. 5). Fintiv also argues that Apple's attempt to argue that sender 105 and recipient 110 in Dill are one and the same "effectively re-writes" Dill's disclosure. *Id.* at 28 (citing Pet. 48; Ex. 1005 ¶ 52). According to Fintiv, the disclosure in paragraph 52 of Dill "simply means that a party that acts as a sender in one transaction can *alternatively* act as a recipient in another (different) transaction." *Id.* (citing Ex. 2009 ¶¶ 71–73). In addition, Fintiv argues that Dill expressly precludes sender 105 and recipient 110 from being one and the same because it discloses "provid[ing] a structured settlement between *unrelated* entities *such as the sending mobile wallet 125 and receiving mobile wallet 130*, or between the sending cash retail location and receiving mobile wallet 130." *Id.* at 28–29 (quoting Ex. 1005 ¶ 57). Fintiv asserts that the disclosure in paragraph 57 of Dill is an explicit statement that sender's mobile wallet 125 is unrelated to recipient's mobile wallet 130. *Id.* at 29 (citing Ex. 2009 ¶¶ 74, 75).

In its Reply, Apple maintains that Dill teaches a subscriber depositing funds in his/her own account. Pet. Reply 20 (citing Pet. 48, 56–57). Apple contends that Dill's disclosure of "deliver[ing] funds to a funds withholding system" and then transferring those funds to an account encompasses a deposit transaction where a sender deposits funds into his/her account. *Id.*

(quoting Ex. 1005 ¶ 101) (citing Pet. 57; Ex. 1005 ¶ 3). According to Apple, Dill's system is not limited to sender/recipient transactions, but instead expressly states that any entity and/or device associated with the entity "can alternately act as sender or recipient." *Id.* at 20 (quoting Ex. 1005 ¶ 52).

Apple further contends that Fintiv's "reading of Dill is overly narrow and not supported" because the language in paragraph 52 of Dill expressly relates to "time"—not a "transaction." Pet. Reply 20–21 (quoting Ex. 1005 ¶ 52). Moreover, when considering that Dill uses the names "sender" and "recipient" interchangeably, Apple asserts that "an entity and/or device associated with that entity may act as a 'sender' ***at a first time*** in the transaction and a 'recipient' ***at a second time*** in the same transaction." *Id.* at 21 (citing Ex. 1005 ¶ 52). Lastly, Apple argues that Fintiv's reliance on paragraph 57 of Dill to support its argument that Dill precludes any interpretation where sender 105 and recipient 110 are one and the same is "wrong" because this paragraph merely discloses an example of a transaction where the sender and recipient are "unrelated entities." *Id.* at 21–22 (quoting Ex. 1005 ¶ 57). According to Apple, paragraph 57 of Dill does not mandate that sender 105 and recipient 110 are "unrelated entities" "in ***every*** situation" or "***all*** instances." *Id.* at 22.

In its Sur-reply, Fintiv reiterates its contention that Dill only discloses a transaction where one party labeled as sender 105 sends money to a different party labeled as recipient 110, rather than a deposit transaction where sender 105 deposits money into his/her own account. PO Sur-reply 1–2 (citing Pet. 50–51; Ex. 1005, Fig. 5). Fintiv argues that its declarant, Dr. Shamos, unequivocally states that "[n]owhere does Dill disclose or suggest that the 'sender' and 'receiver' or 'recipient' can be the

same party in the same transaction." *Id.* at 2 (quoting Ex. 2009 ¶ 73). Fintiv argues that Apple's Reply is based on attorney argument rather than testimony from its declarant, Dr. Houh, because both his original and reply declarations are silent as to whether the "sender" and "recipient" can be the same party in the same transaction. *Id.* at 2–4 (citing Pet. Reply 21, 24; Ex. 1003; Ex. 1017). Fintiv acknowledges that Dr. Houh's original declaration quotes disclosures in paragraph 52 of Dill, but Fintiv asserts that he stops short of testifying that sender 105 and recipient 110 can be the same party to the same transaction. *Id.* at 4–6 (citing Ex. 1003 ¶¶ 130–33, 143–45).

Fintiv also argues that Apple's reliance on the passage "delivering funds to a funds withholding system" in paragraph 101 of Dill is taken out of context because this passage refers to a transaction between sender 105 and recipient 110—it does not imply that sender 105 and recipient 110 are the same party. PO Sur-reply 6–7 (quoting Ex. 1005 ¶ 101). Lastly, Fintiv argues that the disclosure in paragraph 57 of Dill that indicates sender 105 and recipient 110 are "unrelated entities" is not characterized as an embodiment or an example, as asserted by Apple. *Id.* at 8 (quoting Ex. 1005 ¶ 57). In any event, Fintiv argues that, even if this disclosure in paragraph 57 were an example, Apple has not met its burden of demonstrating that Dill affirmatively teaches that sender 105 and recipient 110 are the same party in the same transaction. *Id.*

Based on the fully developed trial record, we agree with Apple that Dill contemplates a deposit transaction where the sender and the recipient are the same party. Pet. 48, 56–57; Pet. Reply 20–22. Dill makes clear that its use of the terms sender and recipient when describing a transaction is

only limited temporally—not by transaction type. The relevant disclosure in Dill is reproduced below:

> *the names sender and recipient are used only to illustrate a particular entity's and/or device's function at a given time* and are not intended to imply any limitations on the functions that can be performed by a given entity and/or device. That is, *any given entity* and/or device associated with that entity can *alternately act as sender or recipient*.

Ex. 1005 ¶ 52 (emphases added). Stated differently, Dill contemplates that "any given entity" such as a sender "can alternately" act as a recipient such that the sender and recipient are the same party in the same transaction. *Id.* Contrary to Fintiv's assertion, we do not read this cited disclosure in Dill as applying to different transactions where a sender in one transaction can be a recipient in another transaction. *See* PO Resp. 28. Reading Dill in this way would effectively limit Dill's use of sender and recipient in a manner not explicitly contemplated by Dill itself.

Dill further discloses that sender 105 initiates a transaction through sender's mobile wallet 125 by sending a request to mobile application 145 of money transfer facilitator 140. Ex. 1005 ¶ 77, Fig. 5, step 515. Dill discloses one or more delivery options for completing such a transaction, including "delivering funds to a funds withholding system." *Id.* ¶ 101. Apple's declarant, Dr. Houh, testifies that "delivering funds" in this particular context teaches "'deposit[ing] funds' because funds are transferred to an account." Ex. 1003 ¶ 131 (citing Ex. 1005 ¶¶ 3, 101). We credit Dr. Houh's testimony in this regard because it is consistent with the background disclosure in Dill of a sender "wiring" money to a receiver (otherwise known as the recipient) using a money order that is "deposited with the third party." Ex. 1005 ¶ 3. Taking into account our analysis above in which Dill

contemplates that the sender and recipient may be the same party in the same transaction, we find that Dill teaches or fairly suggests a deposit transaction where the sender deposits money into his/her own account, as required by independent claim 1.

We do not agree with Fintiv's reading of paragraph 57 of Dill as precluding the sender and recipient from being the same party. *See* PO Resp. 28–29; PO Sur-reply 8. For convenience, paragraph 57 of Dill is reproduced below:

> [s]uch a system 100 allows a money transfer facilitator 140, using a unique customer identifier and internal and/or external mapping database 150, to provide a structured settlement between unrelated entities such as the sending mobile wallet 125 and receiving mobile wallet 130, or between the sending cash retail location and receiving mobile wallet 130. It need not be a closed-loop system that allows mobile remittance only for consumers who are enrolled in the same mobile wallet system but rather allows entities that are unrelated to allow their enrolled consumers to send a mobile money transaction to a consumer either enrolled under another entity or not enrolled—in which case they are able to enroll in a mobile wallet service, pick up cash at a retail location of the money transfer facilitator or other cash retail outlet or designate a destination for receipt of the money transfer.

Ex. 1005 ¶ 57. This cited disclosure indicates that Dill's system 100 is not "a closed-loop system" that is restricted to just "enrolled consumers," but permits transactions with "unrelated entities" not otherwise enrolled with the system. More importantly, we agree with Apple that paragraph 57 of Dill does not mandate that a sender and recipient must be "unrelated entities." *See* Pet. Reply 22. Instead, as we explain above, Dill contemplates that "any given entity" such as a sender "can alternately" act as a recipient such that

the sender and recipient are the same party in the same transaction. Ex. 1005 ¶ 52.

Lastly, we decline to credit the testimony of Fintiv's declarant, Dr. Shamos, on this particular issue because his supporting testimony is not consistent with Dill. *See* PO Sur-reply 1–6. As one example, Dr. Shamos testifies that "[n]owhere does Dill disclose or suggest that the 'sender' and 'receiver' or 'recipient' can be the same party in the same transaction." Ex. 2009 ¶ 73. This testimony, however, is not consistent with the disclosure in Dill because, as we explain above, paragraph 52 of Dill contemplates that "any given entity" such as a sender "can alternately" act as a recipient such that the sender and recipient are the same party in the same transaction. Ex. 1005 ¶ 52. As another example, Dr. Shamos testifies that "Dill restricts its transactions [to] taking place between *unrelated entities*," which, in turn, "precludes the sender and receiver in Dill from being the same party." Ex. 2009 ¶ 75. This testimony, however, relies exclusively on paragraph 57 of Dill. *See id.* ¶ 74. Dr. Shamos's testimony in this regard is not consistent with the disclosure in Dill because, as we explain above, paragraph 57 of Dill states that system 100 is not "a closed-loop system" that is restricted to just "enrolled consumers," but permits transactions with "unrelated entities" not otherwise enrolled with the system. This paragraph does not mandate that a sender and recipient must be "unrelated entities." Ex. 1005 ¶ 57.

*b. "a communication message from the mobile device . . . indicating that the subscriber desires to deposit a specified amount of funds into the subscriber's account"*

In its Patent Owner Response, Fintiv contends that Dill fails to teach "a communication message from the mobile device . . . indicating that the subscriber desires to *deposit a specified amount of funds into the subscriber's account*," as recited in independent claim 1. PO Resp. 30. Fintiv argues that Dill's system 100 transfers funds from sender 105 to recipient 110 by transmitting a message identifying the transfer amount and the intended recipient to money transfer facilitator 140. *Id.* at 30–32 (citing Ex. 1005 ¶¶ 54–56, Fig. 1). Fintiv, however, argues that Dill is "wholly silent" with respect to sender 105 transmitting a message to money transfer facilitator 140 indicating the sender desires to deposit funds into his/her own account. *Id.* at 32 (citing Ex. 2009 ¶ 76).

In its Reply, Apple maintains that that Dill teaches sender's mobile wallet 125 executing on the sender's mobile device initiating a deposit transaction into his/her own account by sending a request that specifies the amount of the deposit to mobile application 145. Pet. Reply 22 (citing Pet. 56; Ex. 1005 ¶ 77, Fig. 5, step 515). Apple disagrees with Fintiv's argument that Dill only discloses sender 105 sending money to recipient 110 because, as it explains above with respect to the deposit transaction required by independent claim 1, Dill teaches the sender depositing funds into his/her own account. *Id.* at 22–23 (citing Pet. 48, 56–57, 81–82; Ex. 1005 ¶¶ 77, 81, 82; Ex. 1003 ¶¶ 143, 186).

Based on the fully developed trial record, we agree with Apple that Dill contemplates a deposit transaction in which sender 105 seeks to deposit

funds into his/her own account by transmitting a request indicating the amount of the transaction from sender's mobile wallet 125 executing on the sender's mobile device to mobile application 145. Pet. 48, 56–57; Pet. Reply 22–23. As we note above, Dill discloses that sender 105 initiates a transaction through sender's mobile wallet 125 executing on the sender's mobile device by sending a request to mobile application 145. Ex. 1005 ¶ 77, Fig. 5, step 515; *see also id.* at ¶¶ 10, 13, 45 ("The mobile device can execute a mobile wallet application."). This request includes, among other things, information identifying sender 105, information identifying recipient 110, and transaction information (e.g., the amount). *Id.* ¶ 77. Upon receipt of the request, Dill's money application 145 performs the transaction by transferring the funds to identified account 175 of recipient 110. *Id.* ¶ 82, Fig. 5, step 570. Taking into account our analysis above in which Dill contemplates that the sender and recipient may be the same party in the same transaction (*id.* ¶ 52), we find that Dill teaches or fairly suggests sender 105 transmitting a request from sender's mobile wallet 125 executing on the sender's mobile device to mobile application 145 indicating the sender's desire to deposit a specified amount of funds in the his/her own account, as required by independent claim 1.

Fintiv's arguments are predicated on the notion that Dill is silent with respect to sender 105 transmitting a message to money transfer facilitator 140 indicating the sender desires to deposit funds into his/her own account. *See* PO Resp. 30–32. For the same reasons we identify above in our analysis of the deposit transaction required by independent claim 1, we do not agree with Fintiv's arguments. *See supra* Section II.B.7.a.

*c. commitment process*

In its Patent Owner Response, Fintiv contends Dill fails to teach the commitment process required by independent claim 1 for two reasons: (1) the Petition fails to map Dill to the limitations of independent claim 1 using Fintiv's proposed construction of "committing a pending transaction"; and (2) Dill does not teach an explicit transmission of a "transaction commitment request" from the integration tier to the business process services, as required by limitations [1.10.5] and [1.10.6] of independent claim 1. PO Resp. 33–34. Beginning with the first argument, Fintiv asserts that "commit" is not synonymous with "perform," but in the context of the '386 patent means "saving data permanently after a set of tentative changes, rather than rolling back the tentative changes." *Id.* at 34 (citing Ex. 2009 ¶ 84). According to Fintiv, Apple does not apply the appropriate definition of "commit" in its claim mapping set forth in the Petition. *Id.* (citing Ex. 2009 ¶¶ 86–91).

Turning to the second argument, Fintiv asserts that Apple improperly maps Dill's money transfer facilitator 140 to separate elements required by independent claim 1. PO Resp. 34–35 (citing Pet. 17, 27, 35, 41; Ex. 2009 ¶ 85). After explaining how the claimed "commitment" process occurs through the business process services as reflected in the plain language of limitation [1.10.5] of independent claim 1, Fintiv argues that Dill's transfer options module 145 "providing 'a notification of the transaction to a recipient of the transaction,'" and selecting "one or more delivery options for completing the . . . transaction," does not teach the claimed "transaction commitment request" because this communication must be between the integration tier and the business service processes—not from the integration

tier to the recipient. *Id.* at 36 (quoting Ex. 1005 ¶ 101) (citing Ex. 2009 ¶ 89).

In its Reply, Apple maintains that Dill teaches "committing a pending transaction." Pet. Reply 26–27 (citing Pet. 60–62). Apple disagrees with Fintiv's first argument because it reiterates that Fintiv's proposed construction of this claim term is improper. *Id.* at 26. Apple also disagrees with Fintiv's second argument because, at step 525 of Figure 5, Dill's mobile application 145 commits a pending transaction through money transfer facilitator 140, which Apple maps to the claimed "business process services." *Id.* at 27 (citing Pet. 60; Ex. 1005 ¶¶ 78, 79; Ex. 1003 ¶ 148). Apple also argues that Dill teaches the claimed "transaction commitment request" because Dill's transfer options module 145, which it maps to the claimed "integration tier," communicates a selection of "one or more delivery" options for completing the transaction. *Id.* (quoting Ex. 1005 ¶ 101) (citing Pet. 61). Apple asserts that the selection of a delivery option in Dill teaches communicating a transaction commitment request to the business process services because it is a communication from Dill's transfer options module 145 to money transfer facilitator 140. *Id.* (citing Pet. 60–61; Ex. 1005 ¶ 49; Ex. 1003 ¶ 150).

Based on the fully developed trial record, we agree with Apple that Dill teaches "committing a pending transaction" per limitations [1.10.5] and [1.10.9] because it processes/carries out a transaction through money transfer facilitator 140 and mobile subscriber data 150 by performing the following steps required by limitations [1.11.1]–[1.11.8]: (1) "ensuring" step; (2) "validating" step; (3) "applying" step; (4) "creating" step; (5) "holding" step; (6) "loading" step; and (7) "updating" step. Pet. 60–62, 64–

84. Notably, Dill discloses that, after mobile application 145 verifies the information in sender's 105 request at step 520 of Figure 5, the mobile application processes/carries out the pending transaction through money transfer facilitator 140 by providing a response to mobile wallet application 121, of which sender's mobile wallet 125 is a part of, at step 525. Ex. 1005 ¶ 78, Fig. 5, steps 520, 525. Dill further discloses that transfer options module 145 included within money transfer facilitator 140 provides a notification of the transaction to recipient 110, which, as we explain above, may be the same party as sender 105 (*id.* ¶ 52), and then selects one or more delivery options for completing the transaction. *Id.* ¶ 101; *see also* Fig. 9 (illustrating transfer options module 145 included within and, therefore, connected to money transfer facilitator 140). After selecting a delivery option, transfer options module 145 communicates with money transfer facilitator 140, which, in turn, accesses source and destination accounts 165, 175 to affect transfer. *Id.* ¶ 49. Apple argues—and we agree—Dill's transfer options modules 145 selecting a delivery option and communicating the selection to money transfer facilitator 140 teaches the integration tier communicating a "transaction commitment request" to the business process services, as required by limitation [1.10.6] of independent claim 1. *See* Pet. 61–62; *see also* Tr. 23:20–24:6, 48:7–13 (clarifying that Dill's selection and communication of the delivery options teaches the claimed "transaction commitment request").

We do not agree with Fintiv's first argument that Apple does not apply the appropriate definition of "commit" in its claim mapping set forth in the Petition. *See* PO Resp. 34. As we explain above in our claim construction analysis, we decline to adopt Fintiv's proposed construction of

the claim term "committing a pending transaction" for the following reasons: (1) Fintiv confines its proposed construction of this claim term to the database art; and (2) Fintiv limits this claim term to specific embodiments in the specification of the '386 patent, without a clear indication in the intrinsic record that the challenged claims were meant to be so limiting. *See supra* Section II.A.1.

We also disagree with Fintiv's argument that Apple improperly maps Dill's money transfer facilitator 140 to separate elements required by independent claim 1. *See* PO Resp. 34–35. Contrary to Fintiv's argument, we understand Apple to map Dill's transfer options module 145 to the claimed "integration tier" (Pet. 17 (arguing "Dill teaches that the transfer options module 145 ('*integration tier*') *manages mobile wallet sessions*"); Dill's money transfer facilitator 140 to the claimed "business process services" (*id.* at 27 (arguing "Dill's money transfer facilitator 140 provides *business process services*")); Dill's money transfer facilitator 140 together with Vadhri's APIs to the claimed "payment handler service" (*id.* at 38 (arguing "a [person of ordinary skill in the art] would have been motivated to modify Dill's money transfer facilitator 140 ('*payment handler service*') to use *APIs* of different payment processors," as taught by Vadhri)); and Dill's transfer options module 145 together with delivery rules 151 to the claimed "*rules engine*" (*id.* at 40 (arguing "[t]he transfer options module 145 enforcing the delivery rules [151] teaches the claimed *rules engine*")). Fintiv does not direct us to, nor can we determine, any inconsistencies in Apple's explanation as to how the various components of Dill's system 100 account for the separate elements required by independent claim 1.

Lastly, Fintiv's argument that Dill's transfer options module 145 providing a notification of the transaction to recipient 110 and selecting one or more delivery options for completing the transaction does not teach the claimed "transaction commitment request" is misplaced. *See* PO Resp. 36. Fintiv's argument in this regard narrowly focuses on Dill's transfer options module 145 providing a notification of the transaction to recipient 110. Ex. 1005 ¶ 101. Fintiv, however, does not address squarely Apple's argument set forth in the Petition. That is, as we explain above, Apple relies on Dill's transfer options modules 145 selecting a delivery option and communicating the selection to money transfer facilitator 140, which, in turn, accesses the source and recipient accounts 165 and 175 to affect transfer, to teach the claimed "transaction commitment request." *See* Pet. 61–62.

*d. "auditing financial transactions"*

In its Patent Owner Response, Fintiv contends that, when applying its proposed construction of the claim term "auditing financial transaction," Dill's disclosure of using a transaction identifier "to determine delivery of the transfer" fails to teach this claim term because determining delivery does not constitute a retrospective examination and verification of a financial transaction. PO Resp. 38–39 (quoting Ex. 1005 ¶ 105) (citing Pet. 28–29; Ex. 2009 ¶¶ 94–97). According to Fintiv, auditing requires "performing retrospective inspection and verification of financial transactions," and Dill is "wholly silent" with respect to using any identifier after completing the transfer of funds from sender 105 to recipient 110. *Id.* at 39 (citing Ex. 2009 ¶¶ 96, 97).

In its Reply, Apple maintains that, when applying its ordinary and customary meaning, Dill teaches the claim term "auditing financial transactions." Pet. Reply 28 (citing Pet. 28–29). Apple contends that a transaction identifier may be used to identify sender 105, recipient 110, or both together with the delivery option. *Id.* (citing Pet. 28–29; Ex. 1005 ¶ 105). Apple further argues that Dill's money transfer facilitator 140 receives and verifies the transaction identifier, and then sends a recipient identifier to mobile wallet application 121 indicating the intended recipient. *Id.* at 28–29 (citing Pet. 29; Ex. 1005 ¶ 41). According to Apple, this is how Dill's money transfer facilitator 140 performs the function of "auditing financial transactions." *Id.* at 29 (citing Pet. 29; Ex. 1003 ¶ 97).

In its Sur-reply, Fintiv reiterates that, when applying its proposed construction of the claim term "auditing financial transaction," Dill's disclosure of using a transaction identifier "to determine delivery of the transfer" fails to teach this claim term because determining delivery does not constitute a retrospective examination and verification of a financial transaction. PO Sur-reply 18 (citing Ex. 2009 ¶¶ 94–97). Fintiv contends that, at best, Dill teaches using a transaction identifier "*prospectively* to determine the recipient of the funds transfer prior to the transferring of the funds," but "auditing is a *retrospective* process that is completed after the transaction has been performed." *Id.*

Based on the fully developed trial record, we agree with Apple that Dill's money transfer facilitator 140 performs the function of "auditing financial transactions." Pet. 28–29; Pet. Reply 28–29. As we explain above in our claim construction analysis of the claim term "auditing financial transactions," the intrinsic record does not limit in any way how the business

process services performs this function and, as a result, we accord this claim term the ordinary and customary meaning of the official examination of financial transactions. *See supra* Section II.A.3. Dill discloses assigning a transaction identifier to a transaction, which, in turn, may be used to (1) identify sender 105, recipient 110, or both; and (2) determine delivery of the transfer. Ex. 1005 ¶ 105. Dill further discloses that money transfer facilitator 140 receives and verifies the transaction identifier and, in response to verifying the transaction identifier, sends a recipient identifier to mobile wallet application 121 indicating the intended recipient. *Id.* ¶ 41. Based on these disclosures, we find that Dill's money transfer facilitator's 140 verifying a transaction by using a transaction identifier sufficiently implicates the official examination of financial transactions and, therefore, teaches "auditing financial transactions," as recited in independent claim 1.

Fintiv's arguments are predicated on us adopting its proposed construction of the claim term "auditing financial transactions." *See* PO Resp. 38–39; PO Sur-reply 18. As we explain in above in our claim construction analysis of the claim term "auditing financial transactions," we decline to adopt Fintiv's proposed construction for the following reasons: (1) it imposes a temporal restriction; and (2) it requires replacing the word "auditing" with the words "inspection and verification." *See supra* Section II.A.3.

*e. "handling errors"*

In its Patent Owner Response, Fintiv contends that, when applying its proposed construction of the claim term "handling errors," Dill's disclosure of proceeding with a transaction only after it is verified "may suggest a way of ***preventing*** errors from occurring, but it fails to teach that Dill is operable

to *handle errors* that *do occur*." PO Resp. 40. According to Fintiv, one example of handling errors in the '386 patent is the rolling back of tentative changes following an error. *Id.* (citing Ex. 2009 ¶¶ 100–02). In contrast, Fintiv asserts that Dill is "wholly silent" with respect to money transfer facilitator 140 taking any actions after an error has occurred. *Id.* at 41 (citing Ex. 2009 ¶ 102).

In its Reply, Apple maintains that it has demonstrated in the Petition how Dill's money transfer facilitator 140 performs the function of "handling errors." Pet. Reply 29 (citing Pet. 29). Apple contends that Dill's mobile application 145 of money transfer facilitator 140 only proceeds with a transaction if the information pertaining to the transaction has been verified. *Id.* (citing Ex. 1005 ¶ 78, Fig. 5, step 520). Apple, therefore, asserts that Dill's money transfer facilitator 140 "handles errors" by preventing the transaction from proceeding if the information pertaining to the transaction is not verified. *Id.* (citing Pet. 29; Ex. 1003 ¶ 98).

In its Sur-reply, Fintiv contends a person of ordinary skill in the art would have understood that "detecting errors" and "handling errors" are different. PO Sur-reply 18–19. Fintiv asserts that "[o]nly *after* an error occurs and is detected can error handling be implemented." *Id.* 19 (citing PO Resp. 40–41; Ex. 2009 ¶¶ 100–02). Fintiv then reiterates that, when applying its proposed construction of the claim term "handling errors," Dill's disclosure of proceeding with a transaction only after it is verified "may suggest a way of *preventing* errors from occurring, but it fails to teach that Dill is operable to *handle errors* that *do occur*." *Id.*

Based on the fully developed trial record, we agree with Apple that Dill's money transfer facilitator 140 performs the function of "handling

errors." Pet. 29; Pet. Reply 29. As we explain above in our claim construction analysis of the claim term "handling errors," the intrinsic record does not limit in any way how the business process services performs this function and, as a result, we accord this claim term the ordinary and customary meaning of an error handling scheme. *See supra* Section II.A.4. Dill discloses the mobile application 145 of money transfer facilitator 140 only proceeds with a transaction after verifying the information in sender's 105 request. Ex. 1005 ¶ 78, Fig. 5, step 520. By proceeding with the transaction only upon verifying the information in sender's 105 request, we find that Dill's money transfer facilitator 140 effectively prevents the transaction from proceeding if the information in sender's 105 request is unverified. In our view, this verification process sufficiently implicates an error handling scheme and, therefore, teaches "handling errors," as recited in independent claim 1.

Fintiv's arguments are predicated on us adopting its proposed construction of the claim term "handling errors." *See* PO Resp. 40–41; PO Sur-reply 18–19. As we explain above in our claim construction analysis of the claim term "handling errors," we decline to adopt Fintiv's proposed construction for the following reasons: (1) it imposes a recovery procedure; and (2) it requires replacing the words "handling errors" with the words "responding to . . . errors." *See supra* Section II.A.4.

*f. "logging platform objects"*

In its Patent Owner Response, Fintiv contends that, when applying its proposed construction of the claim term "logging platform objects," Dill's disclosure of "[a] database lookup is not the same as 'logging' — which requires the storing or recording of information in a log." PO Resp. 41–42

(citing Ex. 2009 ¶¶ 104, 105). Fintiv contends that Dill is "wholly silent" with respect to storing information about the state of money transfer facilitator 140, sender 105, recipient 110, or mobile network operator 120 in a log. *Id.* at 42 (citing Ex. 2009 ¶¶ 105, 106).

In its Reply, Apple maintains that it has demonstrated in the Petition how Dill's money transfer facilitator 140 performs the function of "'logging' platform objects." Pet. Reply 29 (citing Pet. 30–31). Apple contends that it explains how Dill's money transfer facilitator 140 "reference[s] external and/or internal databases to identify the recipient's [110] mobile network operator and country." *Id.* (emphasis omitted ) (quoting Ex. 1005 ¶ 34) (citing Pet. 30–31). Apple argues that, if this database lookup confirms "recipient [110] is a mobile subscriber for a mobile network operator with whom money transfer facilitator [140] has a relationship and is enrolled in the operator's mobile wallet," then the recipient is notified that the funds are available in recipient's mobile wallet 130. *Id.* at 29–30 (quoting Ex. 1005 ¶ 34) (citing Pet. 31). In this way, Apple asserts that Dill's money transfer facilitator 140 performs a database lookup to confirm whether recipient 110 is registered and then "logs" this information in a database. *See id.* at 30 (citing Pet. 31; Ex. 1003 ¶ 101).

In its Sur-reply, Fintiv contends that Dill "refers *only* to a database lookup." PO Sur-reply 19–20 (citing Ex. 1005 ¶ 34). Fintiv then reiterates that, when applying its proposed construction of the claim term "'logging' platform objects," Dill's disclosure of "[a] database lookup is not the same as 'logging' — which requires the storing or recording of information in a log." *Id.* at 20.

Based on the fully developed trial record, we agree with Apple that Dill's money transfer facilitator 140 performs the function of "logging platform objects." Pet. 30–31; Pet. Reply 29–30. As we explain above in our claim construction analysis of the claim term "logging platform objects," the intrinsic record does not limit in any way how the business process services performs this function and, as a result, we accord this claim term the ordinary and customary meaning of a systematic logging of events. *See supra* Section II.A.5. Dill discloses that money transfer facilitator 140 accesses both external and internal databases to perform database lookups of recipient's 110 mobile network operator and country to determine whether the recipient subscribes to a mobile network operator that has a relationship with mobile network operator 120. Ex. 1005 ¶ 34. Dill specifically contemplates, if the database lookups indicate recipient 110 is not enrolled in a mobile wallet, enrolling the recipient in a mobile wallet so that he/she can receive the funds in an associated bank account. *Id.* One example of a database internal to Dill's system 100 is mobile subscriber data 150 that is maintained in a database or other repository. *Id.* ¶ 50. By accessing both external and internal databases to perform certain database lookup operations together with the enrollment and maintenance of new recipients, it follows that money transfer facilitator 140 systematically log events to those databases (e.g., the enrollment of new recipients in mobile subscriber data 150) and, therefore, teaches "logging platform objects," as recited in independent claim 1.

Fintiv's arguments are predicated on us adopting its proposed construction of the claim term "'logging' platform objects." *See* PO Resp. 41–42; PO Sur-reply 19–20. As we explain in above in our claim

construction analysis of the claim term "logging platform objects," we decline to adopt Fintiv's proposed construction for the following reasons: (1) it imposes a requirement of logging platform objects "in a log"; and (2) it requires replacing the word "logging" with the synonymous functions of "storing or recording." *See supra* Section II.A.5.

*g. Summary*

In summary, Apple has demonstrated by a preponderance of the evidence that the subject matter of independent claim 1 would have been obvious over the combined teachings of Dill, Vadhri, Akashika, and Hansen.

*8. Claim 3*

With the exception of a few limitations, independent claim 3 includes the same limitations as independent claim 1. *Compare* Ex. 1001, 30:54–32:2, *with id.* at 33:34–34:59. For the most part, Apple's arguments and evidence with respect to independent claim 1 equally apply to independent claim 3. Pet. 84–86. We address the unique limitations of independent claim 3 in turn.

Independent claim 3 recites limitation [3.1.1]—"an integration tier operable to manage mobile wallet sessions and maintain the integrity of financial transactions." Ex. 1001, 33:37–38. Apple contends that Dill teaches the additional limitation of "maintain[ing] the integrity of financial transactions" because it discloses that transfer options module 145 selects one or more delivery options for completing a transaction, which includes delivering funds to destination account 175 of recipient 110. Pet. 86 (citing Ex. 1005 ¶ 101). According to Apple, by transferring money from the account of sender 105 to the account of recipient 110, Dill's transfer options

module 145 is "operable to maintain the integrity of financial transactions." *Id.* (emphasis omitted) (citing Ex. 1003 ¶¶ 196–98).

Independent claim 3 recites limitation [3.5.1]—"a monetary transaction system subscriber that has a profile with the monetary transaction system the subscriber profile stored in the database of the monetary transaction system." Ex. 1001, 33:55–57. Apple contends that Dill teaches limitation [3.5.1] because it discloses that sender 105 and recipient 110 each amount to a "subscriber" in "monetary transaction system" 100. Pet. 87 (citing Ex. 1005 ¶ 51; Ex. 1003 ¶ 223). Apple further argues that Dill discloses storing profile information for sender 105 and recipient 110 as mobile subscriber data 150 maintained in a database, which, according to Apple, teaches the claimed "database." *Id.* at 88–89 (citing Ex. 1005 ¶ 50, Fig. 9; Ex. 1003 ¶¶ 223–25).

Independent claim 3 recites limitation [3.5.2]—"wherein the subscriber indicates, via the monetary transaction system application, one or more specified transactions that are to be performed using the monetary transaction system." Ex. 1001, 33:57–60. Apple contends that Dill teaches limitation [3.5.2] because it discloses that sender 105 requests a transaction using its mobile wallet 125 and, upon completion of the transaction, money transfer facilitator 140 provides a structured settlement between sender 105 and recipient 110 to their mobile wallets 125 and 130, respectively. Pet. 89 (citing Ex. 1005 ¶ 57; Ex. 1003 ¶¶ 226, 227).

Independent claim 3 recites limitation [3.7]—"a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce business constraints including transaction constraints." Ex. 1001, 34:5–8. Apple relies on the same arguments and

evidence it identifies above with respect to limitation [1.6] to argue that Dill teaches limitation [3.7]. Pet. 86. Apple also asserts that "[t]he constraints are 'business' constraints (i.e., constraints relating to money transfer)." *Id.* at 86–87 (citing Ex. 1003 ¶ 205).

Independent claim 3 recites limitation [3.10.1]—"wherein the monetary transaction system is implemented to transfer funds using the mobile device configured to run a monetary transaction system application, including performing the following steps." Ex. 1001, 34:15–19. Apple contends that Dill teaches limitation [3.10.1] because it discloses that money transfer facilitator 140 accesses source account 165 of financial institution 160 and destination account 175 of financial institution 170 to transfer funds between these two accounts via financial transfer network 155. Pet. 90 (citing Ex. 1005 ¶ 49; Ex. 1003 ¶ 228). Apple further argues that Dill's sender 105 uses his/her mobile device to interact with sender's mobile wallet 125, which, in turn, interacts with mobile wallet application 121 to send a transfer request to money transfer facilitator 140. *Id.* at 90–92 (citing Ex. 1005 ¶ 53, Figs. 5 (step 515), 9; Ex. 1003 ¶¶ 229–32).

Independent claim 3 recites limitation [3.10.4]—"the communication message indicating that the subscriber desires to transfer a specified amount of funds from the subscriber's account to a recipient." Ex. 1001, 34:24–26. Apple contends that Dill teaches the additional limitation of the "subscriber desires to transfer a specified amount of funds from the subscriber's account to a recipient" because it discloses that sender 105 initiates a transaction to send money from its source account 165 to destination account 175 of recipient 110. Pet. 92–93 (citing Ex. 1005 ¶ 51, Fig. 9; Ex. 1003 ¶ 233). Apple further contends that Dill teaches the claimed "communication

message indicating" the desired transfer amount because it discloses that the sender's mobile wallet 125 initiates a transaction by sending the request to mobile wallet application 121. *Id.* at 93–94 (citing Ex. 1005 ¶ 77, Fig. 5 (step 515); Ex. 1003 ¶¶ 233, 234).

During trial, Fintiv relies on the same arguments presented above with respect to independent claim 1 to rebut Apple's explanation as to how the teachings of Dill account for the following: (1) the commitment process required by independent claim 3; and (2) the "business process services operable to implement business workflows, including at least one of . . . auditing financial transactions, . . . handling errors, and logging platform objects," as recited in independent claim 3. PO Resp. 44–45; PO Sur-reply 17–20. For the same reasons we identify above in our analysis of independent claim 1, we do not agree with Fintiv's arguments. *See supra* Section II.B.7.c–f. Accordingly, Apple has demonstrated by a preponderance of the evidence that the subject matter of independent claim 3 would have been obvious over the combined teachings of Dill, Vadhri, Akashika, and Hansen.

### *C. Obviousness Over the Combined Teachings of Dill, Vadhri, Akashika, Hansen, and Liao*

Apple also contends that independent claim 2 of the '386 patent is unpatentable under § 103(a) as obvious over the combined teachings of Dill, Vadhri, Akashika, Hansen, and Liao. Pet. 84–89, 95–109. Apple contends that the teachings of Dill, Vadhri, Akashika, Hansen, and Liao account for the subject matter of independent claim 2, and provides reasoning as to why a person of ordinary skill in the art would have been prompted to combine the teachings of these references. *Id.* During trial, Fintiv presents the

following arguments: (1) Dill alone, or in combination with Liao, fails to teach the withdrawal transaction required by independent claim 2; (2) Dill fails to teach the commitment process required by independent claim 2; and (3) Dill fails to teach the "business process services operable to implement business workflows, including at least one of . . . auditing financial transactions, . . . handling errors, and logging platform objects," as recited in independent claim 2. PO Resp. 43–45; PO Sur-reply 9–10, 17–20.

Based on the fully developed trial record, we determine that Apple has shown by a preponderance of the evidence that independent claim 2 of the '386 patent is unpatentable as obvious over the combined teachings of Dill, Vadhri, Akashika, Hansen, and Liao. We begin our analysis with a brief overview of Liao, and then we address the parties' contentions with respect to this challenged claim.

*1. Overview of Liao*

Liao generally relates to "a chipset for a mobile wallet system" and, in particular, "to a chipset implemented into a [subscriber identity module] card in a communication terminal," which, in turn, communicates "with a contactless reader." Ex. 1009, 1:17–20. Figure 3 of Liao, reproduced below, illustrates "a preferred architecture of a chipset" according to one embodiment. *Id.* at 4:7–8.




Figure 3 of Liao illustrates chipset 20 that includes, among other things, mobile wallet application software running on controller module 200 to "withdraw money from a bank account." Ex. 1009, 5:44–55.

*2. Claim 2*

With the exception of a few limitations, independent claim 2 includes the same limitations as independent claims 1 and 3. *Compare* Ex. 1001, 30:54–32:2, *with id.* at 32:3–34:59. For the most part, Apple's arguments and evidence with respect to independent claims 1 and 3 equally apply to independent claim 2. Pet. 84–89. We address the unique limitations of independent claim 2 in turn.

Independent claim 2 recites limitation [2.6]—"a mobile device configured to run a monetary transaction system application." Ex. 1001, 32:27–28. Apple contends that Dill teaches limitation [2.6] because it discloses that sender 105 and recipient 110 each have a mobile device. Pet. 95 (citing Ex. 1005 ¶ 52; Ex. 1003 ¶ 235). Apple also argues that Dill discloses that sender 105 and recipient 110 use their mobile wallets 125 and

130, respectively, both of which are examples of a "monetary transaction system application." *Id.* at 95–96 (citing Ex. 1005 ¶ 53, Fig. 9; Ex. 1003 ¶¶ 236, 237).

Independent claim 2 recites limitation [2.12.1]—"wherein the monetary transaction system is implemented to withdraw funds at an agent branch using the mobile device configured to run a monetary transaction system application, including performing the following steps." Ex. 1001, 32:51–54. Apple contends that the combination of Dill and Liao teaches limitation [2.12.1]. Pet. 96. More specifically, Apple argues that Dill teaches "the monetary transaction system is implemented at an agent branch" because it discloses that sender 105 may complete a transfer by visiting the branch of agent 135 and paying the transfer amount. *Id.* at 96–97 (emphasis omitted) (citing Ex. 1005 ¶¶ 33, 51; Ex. 1003 ¶ 238). Apple also argues that Dill contemplates a "withdraw" transaction because it discloses (1) delivering funds to destination account 175 of financial institution 170, and (2) making funds available for pick up at the branch of agent 135. *Id.* at 97 (citing Ex. 1005 ¶ 101). Relying on the testimony of Dr. Houh, Apple asserts that a person of ordinary skill in the art would have understood that these two types of transactions involve withdrawing funds. *Id.* (citing Ex. 1003 ¶ 239).

Apple turns to Liao's mobile wallet application software running on controller module 200, which is used to withdraw money from a bank account, as evidence that withdrawing funds from an account associated with a mobile device user was well-known in the art. Pet. 97–98 (citing Ex. 1009, 5:44–55; Ex. 1003 ¶¶ 241–43). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill so that

sender 105 (or recipient 110) may withdraw funds because Dill's stated objective is to use mobile devices to conduct "money transfer services" and, as evidenced by Liao, using a mobile device to make a withdrawal is one type of "money transfer service[]" that would be desirable to provide "improved methods and systems for performing money transfers to facilitate flexible payment options for the transactions." *Id.* at 98–99 (quoting Ex. 1005 ¶ 4) (citing Ex. 1003 ¶ 245).

Apple contends that combining the teachings of Dill and Liao in this way would have been the combination of prior art elements (i.e., combining "Dill's money transfer facilitation system with Liao's withdrawal using a mobile phone") according to known methods (i.e., "withdrawing funds with a mobile phone, as taught by Liao") to yield the predictable result of "permitting Dill's sender [105] (or [recipient 110]) to withdraw funds from her account." Pet. 99 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶ 246). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in modifying Dill's "money transfer" transactions to include a withdrawal of funds by sender 105 (or recipient 110) because Liao teaches that the mobile device user employs "mobile wallet application software" to "withdraw money from a bank account." *Id.* (quoting Ex. 1009, 5:44–55) (citing Ex. 1003 ¶ 247).

Independent claim 2 recites limitation [2.12.4]—"the communication message indicating that the subscriber desires to withdraw a specified amount of funds from an account associated with the subscriber." Ex. 1001, 32:60–63. Apple contends that the combination of Dill and Liao teaches limitation [2.12.4]. Pet. 100. More specifically, Apple argues that Dill teaches the "communication message indicating that the subscriber desires

[to authorize a transaction for] a specified amount of funds" because it discloses that sender's mobile wallet 125 initiates a transaction by sending a request, including the amount, to mobile application 145. *Id.* at 100–01 (citing Ex. 1005 ¶ 77, Fig. 5 (step 515); Ex. 1003 ¶ 249). Apple further argues that the combination of Dill and Liao teaches "withdraw[ing] . . . funds" at the branch of agent 135 because, as it identifies above with respect to limitation [2.12.1], a person of ordinary skill in the art would have been motivated to modify Dill so that sender 105 (or recipient 110) may withdraw funds from an account associated with the sender (or recipient), as taught by Liao. *Id.* at 101 (citing Ex. 1003 ¶ 250).

Independent claim 2 recites limitation [2.12.5]—"the communication comprising a secure, perishable code." Ex. 1001, 32:63–64. Apple contends that the combination of Dill and Vadhri teaches limitation [2.12.5] because, as it identifies above with respect to limitation [2.12.4], Dill discloses the claimed "communication." Pet. 101 (emphasis omitted) (citing Ex. 1003 ¶ 251). Apple turns to Vadhri's temporary code 103 as evidence that a secure, perishable code was well-known in the art. *Id.* at 102 (citing Ex. 1006 ¶¶ 15, 46; Fig. 1; Ex. 1003 ¶¶ 252–53). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill so that the money transfer request of sender 105 includes a secure, perishable code, as taught by Vadhri, "to enhance security by limiting the amount of time that the transaction message is valid" and "to reduce the risk of fraud." *Id.* at 103 (citing Ex. 1006 ¶ 15).

Apple contends that combining the teachings of Dill and Vadhri in this way would have been the combination of prior art elements (i.e., combining "Dill's sender-initiated transfer request with Vadhri's temporary

code [103]") according to known methods (i.e., "including the temporary code [103] in a communication, as taught by Vadhri") to yield the predictable result of "reducing the risk of fraud by incorporating the temporary code [103] in the sender-initiated transfer request." Pet. 103 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶ 254). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in modifying Dill's sender-initiated transfer request to include Vadhri's temporary code 103 because Vadhri discloses including the temporary code in a communication message, and the temporary code is used to "purchase goods and/or services." *Id.* (quoting Ex. 1006 ¶ 46) (citing Ex. 1006 ¶ 23; Ex. 1003 ¶ 255).

Independent claim 2 recites limitation [2.12.6]—"determining that the transaction is valid and in progress." Ex. 1001, 32:65–66. Apple contends that Dill teaches "determining that the transaction is valid" because it discloses that, upon receiving a money transfer request from sender 105, mobile application 145 verifies that the data in the request provided by mobile wallet application 121 is valid. Pet. 104 (citing Ex. 1005 ¶ 78, Fig. 5 (steps 515, 520); Ex. 1003 ¶ 257). Apple also argues that Dill teaches "determining that the transaction is . . . in progress" because it discloses that, upon receiving a second money transfer request after a confirmation, mobile application 145 returns a MTCN to mobile wallet application 121, indicating that the transaction is available for payout to recipient 110. *Id.* at 104–05 (emphasis omitted) (citing Ex. 1005 ¶ 80, Fig. 5 (step 545); Ex. 1003 ¶¶ 258, 259).

Independent claim 2 recites limitation [2.12.7]—"wherein determining that the transaction is valid comprises validating the secure,

perishable code and communicating from the integration tier to the database services to query attributes of the subscriber's account." Ex. 1001, 32:66–33:3. Apple contends that the combination of Dill and Vadhri teaches limitation [2.12.7]. Pet. 105. More specifically, Apple argues that, as it identifies above with respect to limitation [2.12.5], the combination of Dill and Vadhri teaches a money transfer request that includes a "secure, perishable code" and, as it identifies above with respect to limitation [2.12.6], Dill teaches "determining that the transaction is valid." *Id.* Apple also argues that, as it identifies above with respect to limitation [1.10.4], Dill teaches "communicating from the integration tier to the database services to query attributes of the subscriber's account" because it discloses that validating the status of a subscriber's account includes communications between money transfer facilitator 140, of which transfer options module 145 is a part, and mobile subscriber data 150 to query the attributes of the subscriber's account. *Id.* at 105–06 (citing Ex. 1003 ¶ 260).

Apple turns to Vadhri's disclosure of validating temporary code 103/203[10] as evidence that validating a secure, perishable code was well-known in the art. Pet. 106–07 n.5 (citing Ex. 1006 ¶¶ 27, 45, Fig. 4 (step 406); Ex. 1003 ¶ 261). According to Apple, a person of ordinary skill in the art would have been motivated to modify Dill to determine that a transaction is valid by validating Vadhri's temporary code 103/203 because, as it identifies above with respect to limitation [2.12.5], Vadhri discloses that

---

[10] Apple asserts that "Vadhri's temporary account code 203 in Figure 2 corresponds to the temporary account code 103 in Figure 1." Pet. 106 n.5 (citing Ex. 1006 ¶ 27).

temporary code 103/203 may be used to authorize the purchase of goods and/or services. *Id.* at 108–09 (citing Ex. 1006 ¶ 46).

Apple contends that combining the teachings of Dill and Vadhri in this way would have been the combination of prior art elements (i.e., combining "Dill's transaction validation with account/subscriber information using Vadhri's temporary code [103/203]") according to known methods (i.e., "validating . . . temporary code [103/203], as taught by Vadhri") to yield the predictable result of "validating a transaction based on account information, subscriber information, and a temporary code." Pet. 109 (citing *KSR*, 550 U.S. at 401; Ex. 1003 ¶ 263). Apple asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in making this modification because Dill discloses validating a transaction by using a look-up operation to verify subscriber and account information and, in the same vein, Vadhri discloses associating temporary code 103/203 with a subscriber and an account. *Id.* (citing Ex. 1005 ¶ 78; Ex. 1006 ¶¶ 79, 80; Ex. 1003 ¶ 264).

During trial, Fintiv presents the following arguments: (1) Dill alone, or in combination with Liao, fails to teach the withdrawal transaction required by independent claim 2; (2) Dill fails to teach the commitment process required by independent claim 2; and (3) Dill fails to teach the "business process services operable to implement business workflows, including at least one of . . . auditing financial transactions, . . . handling errors, and logging platform objects," as recited in independent claim 2. PO Resp. 43–45; PO Sur-reply 9–10, 17–20. Notwithstanding Fintiv's arguments to the contrary, Apple has shown by a preponderance of the evidence that the combined teachings of Dill, Vadhri, Akashika, Hansen,

and Liao account for all the limitations of independent claim 2. We address Fintiv's arguments in turn.

*a. withdrawal transaction*

In its Patent Owner Response, Fintiv contends that Dill does not contemplate the withdrawal transaction required by independent claim 2 because, as it explains above with respect to independent claim 1, Dill only discloses a transaction where one party labeled as sender 105 sends money to another party labeled as recipient 110. PO Resp. 43–44. According to Fintiv, a person of ordinary skill in the art would not characterize Dill's money transfer from sender 105 to recipient 110 as a withdrawal transaction, but rather would have understood that, in a withdrawal transaction, "*the funds being withdrawn go to the party withdrawing the funds*" instead of an unrelated party like recipient 110. *Id.* at 44 (citing Ex. 2009 ¶¶ 109–111). To the extent Apple relies on the combined teachings of Dill and Liao to account for the withdrawal transaction required by independent claim 2, Fintiv contends that Apple's argument is, once again, predicated on the notion that Dill contemplates a withdrawal transaction. *Id.* (citing Ex. 2009 ¶¶ 109–111). Because of this purported "erroneous foundation," Fintiv argues that Apple does not articulate a sufficient rationale for combining the teachings of Dill with those of Liao to teach the withdrawal transaction required by independent claim 2. *Id.*

In its Reply, Apple maintains that Dill contemplates the withdrawal transaction required by independent claim 2. Pet. Reply 23 (citing Pet. 97). Apple contends that Dill discloses "delivering funds to a bank account of a recipient" and "making funds available for pick up at an agent location," both of which are transactions that involve withdrawing funds. *Id.* at 23–24

(quoting Ex. 1005 ¶ 101) (citing Pet. 97; Ex. 1003 ¶ 239). Apple also disagrees with Fintiv's argument that Dill only discloses transferring funds from sender 105 to recipient 110 because, according to Apple, Fintiv fails to consider that Dill discloses that sender 105 and recipient 110 can be the same party in the same transaction. *Id.* at 24 (citing Ex. 1005 ¶ 52).

Alternatively, Apple contends that Liao discloses using a mobile wallet "to withdraw funds from an account of the mobile device user." Pet. Reply 24 (quoting Pet. 97) (citing Ex. 1009, 5:44–55). Apple argues that Fintiv does not address the substance of Liao's disclosures, but instead nakedly asserts that Apple fails to articulate a sufficient rationale for combining the teachings of Dill with those of Liao. *Id.* at 24–25. Apple argues that Fintiv improperly attacks Dill in isolation. *Id.* at 25. Apple also argues that modifying Dill's money transfer transactions to include a withdrawal transaction, as taught by Liao, would have been desirable because Dill emphasizes the importance of providing "improved methods and systems for performing money transfers to facilitate flexible payment options for the transactions." *Id.* (quoting Ex. 1005 ¶ 4) (citing Pet. 99; Ex. 1003 ¶ 245). Apple asserts that there would have been a reasonable expectation of success modifying Dill in this way because Liao teaches that a mobile device use may use "mobile wallet application software" to "withdraw money from a bank account." *Id.* at 25–26 (quoting Ex. 1009, 5:54–55) (citing Pet. 98; Ex. 1003 ¶ 247).

In its Sur-reply, Fintiv reiterates that Apple's proposed rationale for combining the teachings of Dill with those of Liao is based on Apple's erroneous assertion that Dill contemplates a withdrawal transaction. PO Sur-reply 9 (citing Pet. 96–97). Fintiv, however, maintains that Dill does

not contemplate a withdrawal transaction because all the transactions in Dill are between sender 105 and unrelated recipient 110. *Id.* at 9–10 (citing PO Resp. 43–44; Ex. 2009 ¶¶ 109–111). Fintiv also asserts that it is not attacking Dill in isolation, but rather it is attacking "the premise that Dill 'contemplates a withdrawal transaction.'" *Id.* at 10.

Based on the fully developed trial record, we agree with Apple that Dill contemplates the withdrawal transaction required by independent claim 2. Pet. 97; Pet. Reply 23–24. Dill discloses various delivery options for completing a transaction, including "delivering funds to a bank account of . . . recipient [110] such as destination account 175 of . . . recipient's financial institution 170" and "making funds available for pick up at an agent location." Ex. 1005 ¶ 101. Apple's declarant, Dr. Houh, testifies that a person of ordinary skill in the art "would have understood that these types of transactions involve withdrawing funds." Ex. 1003 ¶ 239. We credit Dr. Houh's testimony in this regard because it is consistent with Dill's disclosure, particularly its objective that "there is a need in the art for improved methods and systems for performing money transfers to facilitate flexible payment options for the transactions." Ex. 1005 ¶ 4. Moreover, as we explain above, Dill contemplates that the sender and recipient may be the same party in the same transaction. *See supra* Section II.B.7.a (citing Ex. 1005 ¶ 52). With this in mind, we find that Dill teaches or fairly suggests a withdrawal transaction where sender 105 (or recipient 110) withdraws money from his/her own account, as required by independent claim 2.

Alternatively, we also agree with Apple that Liao teaches that it is well-known to use a mobile wallet to withdraw funds from an account of a mobile device user. Indeed, Liao discloses using mobile wallet application

software running on controller module 200 to withdraw money from a bank account of a mobile device user. Ex. 1009, 5:44–55. We also agree with Apple that a person of ordinary skill in the art would have been motivated to modify Dill so that sender 105 (or recipient 110) may withdraw funds from his/her own account because Dill's stated objective is to use mobile devices to conduct "money transfer services" and, as evidenced by Liao, using a mobile device to make a withdrawal is one type of "money transfer service[]" that would be desirable to provide "improved methods and systems for performing money transfers to facilitate flexible payment options for the transactions." Ex. 1005 ¶ 4; Ex. 1003 ¶ 245. In our view, there would have been a reasonable expectation of success in modifying Dill in this way because Liao teaches that the mobile device user employs "mobile wallet application software" to "withdraw money from a bank account." Ex. 1009, 5:44–55; Ex. 1003 ¶ 247.

We do not agree with Fintiv's argument that all the transactions in Dill are between one party labeled sender 105 and an unrelated party labeled recipient 110. *See* PO Resp. 43–44; PO Sur-reply 9–10. Once again, Fintiv's argument in this regard is predicated on the notion that sender 105 and recipient 110 are different, unrelated parties. As we explain above in our analysis of independent claim 1, Dill contemplates that the sender and recipient may be the same party in the same transaction. *See supra* Section II.B.7.a.

We also do not agree with Fintiv's argument that Apple does not articulate a sufficient rationale for combining the teachings of Dill with those of Liao to teach the withdrawal transaction required by independent claim 2. *See* PO Resp. 44; PO Sur-reply 9–10. Fintiv acknowledges this

argument turns on whether Dill contemplates a withdrawal transaction. PO Sur-reply 10 ("[Fintiv] is attacking . . . the premise that Dill 'contemplates a withdrawal transaction'"). As we explain above, taking into account that Dill contemplates that the sender and recipient may be the same party in the same transaction, we find that Dill teaches or fairly suggests a withdrawal transaction where sender 105 (or recipient 110) withdraws money from his/her own account, as required by independent claim 2.

*b. Remaining arguments*

During trial, Fintiv relies on the same arguments presented above with respect to independent claim 1 to rebut Apple's explanation as to how the teachings of Dill account for the following: (1) the commitment process required by independent claim 2; and (2) the "business process services operable to implement business workflows, including at least one of . . . auditing financial transactions, . . . handling errors, and logging platform objects," as recited in independent claim 2. PO Resp. 44–45; PO Sur-reply 17–20. For the same reasons we identify above in our analysis of independent claim 1, we do not agree with Fintiv's arguments. *See supra* Section II.B.7.c–f.

*c. Summary*

In summary, Apple has demonstrated by a preponderance of the evidence that the subject matter of independent claim 2 would have been obvious over the combined teachings of Dill, Vadhri, Akashika, Hansen, and Liao.

## III. CONCLUSIONS[11]

Based on the fully developed record, Apple has demonstrated by a preponderance of the evidence that claims 1–3 of the '386 patent are unpatentable under § 103(a) as obvious. A summary of our conclusions is set forth in the table below.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 3 | 103(a) | Dill, Vadhri, Akashika, Hansen | 1, 3 | |
| 2 | 103(a) | Dill, Vadhri, Akashika, Hansen, Liao | 2 | |
| **Overall Outcome** | | | 1–3 | |

[11] Should Fintiv wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Fintiv's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Fintiv chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Fintiv of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–3 of the '386 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Andrew Ehmke
Jonathan Bowser
Angela Oliver
Eugene Goryunov
Michael Parsons
HAYNES AND BOONE, LLP
andy.ehmke.ipr@haynesboone.com
jon.bowser.ipr@haynesboone.com
angela.oliver.ipr@haynesboone.com
eugene.goryunov.ipr@haynesboone.com
michael.parsons.ipr@haynesboone.com

For PATENT OWNER:

Jonathan Waldrop
John Downing
KASOWITZ BENSON TONES LLP
jwaldrop@kasowitz.com
jdowning@kasowitz.com

US009892386B2

(12) **United States Patent**
**Liberty**

(10) **Patent No.: US 9,892,386 B2**
(45) **Date of Patent: Feb. 13, 2018**

(54) **MONETARY TRANSACTION SYSTEM**

(71) Applicant: **Mozido, Inc.**, Austin, TX (US)

(72) Inventor: **Michael A. Liberty**, Orlando, FL (US)

(73) Assignee: **MOZIDO, INC.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/201,152**

(22) Filed: **Jul. 1, 2016**

(65) **Prior Publication Data**

US 2016/0314443 A1 Oct. 27, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/213,543, filed on Mar. 14, 2014, now abandoned, which is a

(Continued)

(51) **Int. Cl.**

*G06Q 40/00* (2012.01)
*G06Q 20/00* (2012.01)

(Continued)

(52) **U.S. Cl.**

CPC ......... ***G06Q 20/10*** (2013.01); ***G06Q 20/0855*** (2013.01); ***G06Q 20/322*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .................................................. G06Q 20/0855
USPC ..................................................... 705/40, 78
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,717,374 A 2/1998 Smith
5,828,739 A 10/1998 Nakanishi

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2666616 4/2008
CN 101606400 12/2009

(Continued)

OTHER PUBLICATIONS

Chen, Jiajun Jim et al, Short-Range Wireless Technologies with Mobile Payments Systems. Proceedings of the 6th International Conference on Electronic Commerce [Online] 2004, pp. 649-656.

(Continued)

*Primary Examiner* — Edward Chang
(74) *Attorney, Agent, or Firm* — Workman Nydegger

(57) **ABSTRACT**

Embodiments are directed to monetary transaction system for conducting monetary transactions between transaction system subscribers and other entities. In one scenario, the monetary transaction system includes a mobile device that runs a monetary transaction system application. The monetary transaction system also includes a subscriber that has a profile with the system. The subscriber indicates a transaction that is to be performed with the monetary transaction system. The system further includes a monetary transaction system processor that performs the transactions specified by the subscriber including communicating with a monetary transaction database to determine whether the transaction is permissible based on data indicated in the subscriber's profile. The monetary transaction system also includes at least one entity that is to be involved in the specified transaction, where the entity has a profile with the monetary transaction system. This entity may be a person, a retail store, an agent or other entity.

**3 Claims, 46 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 13/964,707, filed on Aug. 12, 2013, now abandoned, which is a continuation of application No. 13/484,199, filed on May 30, 2012, now Pat. No. 8,538,845.

(60) Provisional application No. 61/522,099, filed on Aug. 10, 2011, provisional application No. 61/493,064, filed on Jun. 3, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06Q 20/10*** | (2012.01) |
| ***G06Q 20/08*** | (2012.01) |
| ***G06Q 40/02*** | (2012.01) |
| ***G06Q 20/32*** | (2012.01) |
| ***G06Q 20/40*** | (2012.01) |
| ***G06Q 20/36*** | (2012.01) |
| ***H04L 29/06*** | (2006.01) |

(52) **U.S. Cl.**

CPC ......... ***G06Q 20/3255*** (2013.01); ***G06Q 20/36*** (2013.01); ***G06Q 20/405*** (2013.01); ***G06Q 40/02*** (2013.01); ***H04L 63/101*** (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 5,991,749 | A | 11/1999 | Morrill | |
| 6,021,397 | A | 2/2000 | Jones et al. | |
| 6,175,823 | B1 | 1/2001 | Van Dusen | |
| 6,185,545 | B1 | 2/2001 | Resnick | |
| 6,250,557 | B1 | 6/2001 | Forslund | |
| 6,415,156 | B1 | 7/2002 | Stadelmann | |
| 6,622,015 | B1 | 9/2003 | Himmel | |
| 6,697,839 | B2 | 2/2004 | Sini | |
| 6,714,797 | B1 | 3/2004 | Rautila | |
| 6,736,322 | B2 | 5/2004 | Gobburu | |
| 6,819,219 | B1 | 11/2004 | Bolle | |
| 6,840,448 | B2 | 1/2005 | Fukushima | |
| 6,862,575 | B1 | 3/2005 | Antilla et al. | |
| 6,873,974 | B1 | 3/2005 | Schutzer | |
| 6,957,342 | B2 | 10/2005 | Vatanen | |
| 7,016,532 | B2 | 3/2006 | Boncyk | |
| 7,024,174 | B2 * | 4/2006 | Nagy | G06Q 20/04 455/408 |
| 7,054,430 | B2 | 5/2006 | Lynam | |
| 7,069,001 | B2 | 6/2006 | Rupp | |
| 7,089,208 | B1 | 8/2006 | Levchin | |
| 7,099,850 | B1 | 8/2006 | Mann | |
| 7,100,821 | B2 | 9/2006 | Rasti | |
| 7,107,247 | B2 | 9/2006 | Kinoshita | |
| 7,110,972 | B1 | 9/2006 | Handa | |
| 7,221,939 | B2 | 5/2007 | Ylitalo | |
| 7,240,836 | B2 | 7/2007 | Vrotsos | |
| 7,248,855 | B2 | 7/2007 | Joyce | |
| 7,255,264 | B2 | 8/2007 | De Leon | |
| 7,275,685 | B2 | 10/2007 | Gray | |
| 7,322,043 | B2 | 1/2008 | Letsinger | |
| 7,325,132 | B2 | 1/2008 | Takayama | |
| 7,334,720 | B2 | 2/2008 | Hulst et al. | |
| 7,347,361 | B2 | 3/2008 | Lovett | |
| 7,349,871 | B2 | 3/2008 | Labrou | |
| 7,353,382 | B2 | 4/2008 | Labrou | |
| 7,363,261 | B2 | 4/2008 | Whitehead | |
| 7,370,017 | B1 | 5/2008 | Lindeman | |
| 7,403,652 | B2 | 7/2008 | Boncyk | |
| 7,421,410 | B1 | 9/2008 | Schechtman et al. | |
| 7,461,010 | B2 | 12/2008 | Kwan | |
| 7,461,028 | B2 | 12/2008 | Wronski | |
| 7,477,780 | B2 | 1/2009 | Boncyk | |
| 7,494,055 | B2 | 2/2009 | Fernandes | |
| 7,512,098 | B2 | 3/2009 | Jiang | |
| 7,527,194 | B2 | 5/2009 | Truitt | |
| 7,548,915 | B2 | 6/2009 | Ramer | |
| 7,562,818 | B1 | 7/2009 | Bierbaum | |
| 7,564,469 | B2 | 7/2009 | Cohen | |
| 7,565,008 | B2 | 7/2009 | Boncyk | |
| 7,606,560 | B2 | 10/2009 | Labrou | |
| 7,657,489 | B2 | 2/2010 | Stambaugh | |
| 7,677,973 | B2 | 3/2010 | Van Luchene | |
| 7,680,324 | B2 | 3/2010 | Boncyk | |
| 7,689,506 | B2 | 3/2010 | Fei et al. | |
| 7,694,876 | B2 | 4/2010 | Barnes et al. | |
| 7,699,218 | B2 | 4/2010 | Garcia | |
| 7,708,194 | B2 | 5/2010 | Vawter | |
| 7,729,963 | B1 | 6/2010 | Lego | |
| 7,729,987 | B1 | 6/2010 | Wakim | |
| 7,748,618 | B2 | 7/2010 | Vawter | |
| 7,774,076 | B2 | 8/2010 | Skowronek | |
| 7,774,231 | B2 | 8/2010 | Pond | |
| 7,775,437 | B2 | 8/2010 | Cohen | |
| 7,784,684 | B2 | 8/2010 | Labrou | |
| 7,801,826 | B2 | 9/2010 | Labrou | |
| 7,819,307 | B2 | 10/2010 | Lyons | |
| 7,822,688 | B2 | 10/2010 | Labrou | |
| 7,823,772 | B2 | 11/2010 | Vawter | |
| 7,848,500 | B2 | 12/2010 | Lynam | |
| 7,848,504 | B2 | 12/2010 | Lynam | |
| 7,865,414 | B2 | 1/2011 | Fung | |
| 7,865,431 | B2 | 1/2011 | Takayama | |
| 7,877,605 | B2 | 1/2011 | Labrou | |
| 7,881,529 | B2 | 2/2011 | Boncyk | |
| 7,886,962 | B2 | 2/2011 | Vawter | |
| 7,890,424 | B1 | 2/2011 | Wakim | |
| 7,899,243 | B2 | 3/2011 | Boncyk | |
| 7,899,252 | B2 | 3/2011 | Boncyk | |
| 7,937,302 | B1 | 5/2011 | Lego | |
| 7,937,305 | B1 | 5/2011 | Lego | |
| 7,942,317 | B2 | 5/2011 | Racz et al. | |
| 7,958,052 | B2 | 6/2011 | Powell | |
| 7,967,196 | B1 | 6/2011 | Bierbaum | |
| 7,979,026 | B2 | 7/2011 | Hulvey | |
| 7,988,060 | B2 | 8/2011 | Killian | |
| 8,016,185 | B2 | 9/2011 | Modi | |
| 8,019,365 | B2 | 9/2011 | Fisher | |
| 8,033,458 | B2 | 10/2011 | Hulst et al. | |
| 8,041,338 | B2 | 10/2011 | Chen | |
| 8,052,042 | B2 | 11/2011 | Kolinski-Schultz | |
| 8,060,012 | B2 | 11/2011 | Sklovsky | |
| 8,061,598 | B2 | 11/2011 | Racz et al. | |
| 8,073,783 | B2 | 12/2011 | Felsted | |
| 8,077,042 | B2 | 12/2011 | Peeters | |
| 8,090,945 | B2 | 1/2012 | Singhal | |
| 8,095,113 | B2 | 1/2012 | Kean | |
| 8,116,734 | B2 | 2/2012 | Vawter | |
| 8,116,773 | B2 | 2/2012 | Chitrapu | |
| 8,118,221 | B2 | 2/2012 | Racz et al. | |
| 8,121,945 | B2 | 2/2012 | Rackley | |
| 8,130,242 | B2 | 3/2012 | Cohen | |
| 8,145,568 | B2 | 3/2012 | Rackley | |
| 8,160,959 | B2 | 4/2012 | Rackley | |
| 8,170,485 | B2 | 5/2012 | Hulvey | |
| 8,190,087 | B2 | 5/2012 | Fisher | |
| 8,195,576 | B1 | 6/2012 | Grigg | |
| 8,196,131 | B1 | 6/2012 | von Behren | |
| 8,213,470 | B2 | 7/2012 | Gu | |
| 8,218,873 | B2 | 7/2012 | Boncyk | |
| 8,229,354 | B2 | 7/2012 | Sklovsky | |
| 8,239,325 | B2 | 8/2012 | Schwarz | |
| 8,275,312 | B2 | 9/2012 | Fisher | |
| 8,290,433 | B2 | 10/2012 | Fisher | |
| 8,332,272 | B2 | 12/2012 | Fisher | |
| 8,333,319 | B2 | 12/2012 | Roth | |
| 8,336,772 | B2 | 12/2012 | Racz et al. | |
| 8,352,323 | B2 | 1/2013 | Fisher | |
| 8,355,670 | B2 | 1/2013 | White | |
| 8,359,265 | B2 | 1/2013 | Van Rensburg | |
| 8,360,329 | B2 | 1/2013 | Grigg | |
| 8,374,916 | B2 | 2/2013 | White | |
| 8,380,177 | B2 | 2/2013 | Laracey | |
| 8,396,793 | B2 | 3/2013 | Hill | |
| 8,487,771 | B2 | 7/2013 | Hsieh et al. | |
| 8,538,845 | B2 | 9/2013 | Liberty | |

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 8,577,803 | B2 | 11/2013 | Chatterjee et al. |
| 8,612,325 | B2 | 12/2013 | Stacy et al. |
| 8,632,000 | B2 | 1/2014 | Laracey |
| 9,208,488 | B2 | 12/2015 | Liberty |
| 2001/0011248 | A1 | 8/2001 | Himmel |
| 2001/0037264 | A1 | 11/2001 | Husemann |
| 2001/0042785 | A1 | 11/2001 | Walker et al. |
| 2002/0042776 | A1 | 4/2002 | Woo |
| 2002/0052754 | A1 | 5/2002 | Joyce |
| 2002/0060246 | A1 | 5/2002 | Gobburu |
| 2002/0065774 | A1 | 5/2002 | Young |
| 2002/0069123 | A1 | 6/2002 | Soderlind |
| 2002/0131404 | A1 | 9/2002 | Mehta |
| 2002/0141586 | A1 | 10/2002 | Margalit |
| 2002/0152177 | A1 | 10/2002 | Wolf |
| 2002/0161708 | A1 | 10/2002 | Offer |
| 2003/0001010 | A1 | 1/2003 | Schmidt |
| 2003/0026404 | A1 | 2/2003 | Joyce |
| 2003/0055735 | A1 | 3/2003 | Cameron |
| 2003/0071115 | A1 | 4/2003 | Horn |
| 2003/0154165 | A1 | 8/2003 | Horn |
| 2003/0195842 | A1 | 10/2003 | Reece |
| 2004/0117302 | A1 | 6/2004 | Weichert et al. |
| 2004/0181531 | A1 | 9/2004 | Becker |
| 2004/0205618 | A1 | 10/2004 | Sini |
| 2004/0235450 | A1 | 11/2004 | Rosenberg |
| 2004/0248554 | A1 | 12/2004 | Khan |
| 2005/0070265 | A1 | 3/2005 | Korpinen |
| 2005/0071512 | A1 | 3/2005 | Kim et al. |
| 2005/0080697 | A1 | 4/2005 | Foss |
| 2005/0199709 | A1 | 9/2005 | Linior |
| 2005/0222961 | A1 | 10/2005 | Staib |
| 2005/0283434 | A1 | 12/2005 | Hahn-Carlson |
| 2006/0116892 | A1 | 6/2006 | Grimes |
| 2006/0136901 | A1 | 6/2006 | Nichols |
| 2006/0165060 | A1 | 7/2006 | Dua |
| 2006/0179452 | A1 | 8/2006 | Amodeo |
| 2006/0200427 | A1 | 9/2006 | Morrison |
| 2006/0253335 | A1 | 11/2006 | Keena et al. |
| 2006/0287004 | A1 | 12/2006 | Fuqua |
| 2007/0006327 | A1 | 1/2007 | Lal et al. |
| 2007/0033285 | A1 | 2/2007 | Shiigi |
| 2007/0106564 | A1 | 5/2007 | Matotek |
| 2007/0123305 | A1 | 5/2007 | Chen |
| 2007/0125838 | A1 | 6/2007 | Law |
| 2007/0125840 | A1 | 6/2007 | Law |
| 2007/0162471 | A1 | 7/2007 | Samuelsson |
| 2007/0179885 | A1 | 8/2007 | Bird |
| 2007/0198432 | A1 | 8/2007 | Pitroda |
| 2007/0203850 | A1 | 8/2007 | Singh |
| 2007/0241189 | A1 | 10/2007 | Slavin |
| 2007/0244811 | A1 | 10/2007 | Tumminaro |
| 2007/0255620 | A1 | 11/2007 | Tumminaro et al. |
| 2007/0255652 | A1 | 11/2007 | Tumminaro et al. |
| 2007/0255653 | A1 | 11/2007 | Tumminaro |
| 2007/0265984 | A1 | 11/2007 | Santhana |
| 2008/0006685 | A1 | 1/2008 | Rackley |
| 2008/0010191 | A1 | 1/2008 | Rackley |
| 2008/0010196 | A1 | 1/2008 | Rackley |
| 2008/0010204 | A1 | 1/2008 | Rackley |
| 2008/0010215 | A1 | 1/2008 | Rackley |
| 2008/0011825 | A1 | 1/2008 | Giordano |
| 2008/0017704 | A1 | 1/2008 | VanDeburg |
| 2008/0040265 | A1 | 2/2008 | Rackley |
| 2008/0040285 | A1 | 2/2008 | Wankmueller |
| 2008/0052192 | A1 | 2/2008 | Fisher |
| 2008/0065490 | A1 | 3/2008 | Novick et al. |
| 2008/0097851 | A1 | 4/2008 | Bemmel |
| 2008/0126145 | A1 | 5/2008 | Rackley |
| 2008/0126929 | A1 | 5/2008 | Bykov |
| 2008/0143487 | A1 | 6/2008 | Hulvey |
| 2008/0197190 | A1 | 8/2008 | Fujita |
| 2008/0204358 | A1 | 8/2008 | Sato |
| 2008/0208743 | A1 | 8/2008 | Arthur |
| 2008/0208744 | A1 | 8/2008 | Arthur |
| 2008/0208762 | A1 | 8/2008 | Arthur |
| 2008/0210751 | A1 | 9/2008 | Kim |
| 2008/0249927 | A1 | 10/2008 | Rethorn |
| 2008/0249928 | A1 | 10/2008 | Hill |
| 2008/0249930 | A1 | 10/2008 | Hill |
| 2008/0249933 | A1 | 10/2008 | Rethorn |
| 2008/0255947 | A1 | 10/2008 | Friedman |
| 2008/0275779 | A1 | 11/2008 | Lakshminarayanan |
| 2008/0281737 | A1 | 11/2008 | Fajardo |
| 2009/0024526 | A1 | 1/2009 | Erickson |
| 2009/0037326 | A1 | 2/2009 | Chitti |
| 2009/0055322 | A1 | 2/2009 | Bykov |
| 2009/0063312 | A1 | 3/2009 | Hurst |
| 2009/0081989 | A1 | 3/2009 | Wuhrer |
| 2009/0098854 | A1 | 4/2009 | Park |
| 2009/0104888 | A1 | 4/2009 | Cox |
| 2009/0106148 | A1 | 4/2009 | Prada |
| 2009/0108015 | A1 | 4/2009 | Kreamer |
| 2009/0119190 | A1 | 5/2009 | Realini |
| 2009/0132362 | A1 | 5/2009 | Fisher |
| 2009/0132392 | A1 | 5/2009 | Davis |
| 2009/0138366 | A1 | 5/2009 | Bemmel |
| 2009/0144161 | A1 | 6/2009 | Fisher |
| 2009/0156190 | A1 | 6/2009 | Fisher |
| 2009/0157546 | A1 | 6/2009 | Garcia |
| 2009/0177578 | A1 | 7/2009 | Garcia |
| 2009/0177581 | A1 | 7/2009 | Garcia |
| 2009/0210308 | A1 | 8/2009 | Toomer |
| 2009/0222353 | A1 | 9/2009 | Guest |
| 2009/0222358 | A1 | 9/2009 | Bednarek |
| 2009/0234751 | A1 | 9/2009 | Chan et al. |
| 2009/0248537 | A1 | 10/2009 | Sarkeshik |
| 2009/0254440 | A1 | 10/2009 | Pharris |
| 2009/0254479 | A1 | 10/2009 | Pharris |
| 2009/0265272 | A1 | 10/2009 | Dill et al. |
| 2009/0281904 | A1 | 11/2009 | Pharris |
| 2009/0288012 | A1 | 11/2009 | Hertel |
| 2009/0299844 | A1 | 12/2009 | Reilly |
| 2009/0307132 | A1 | 12/2009 | Phillips |
| 2010/0010964 | A1 | 1/2010 | Skowronek |
| 2010/0023449 | A1 | 1/2010 | Skowronek |
| 2010/0030651 | A1 | 2/2010 | Matotek et al. |
| 2010/0044430 | A1 | 2/2010 | Song |
| 2010/0048226 | A1 | 2/2010 | Owen |
| 2010/0049599 | A1 | 2/2010 | Owen |
| 2010/0051685 | A1 | 3/2010 | Royyuru |
| 2010/0057614 | A1 | 3/2010 | Rainey |
| 2010/0057619 | A1 | 3/2010 | Weller |
| 2010/0057624 | A1 | 3/2010 | Hurt |
| 2010/0063895 | A1 | 3/2010 | Dominguez |
| 2010/0088188 | A1 | 4/2010 | Kumar |
| 2010/0114739 | A1 | 5/2010 | Johnston |
| 2010/0125495 | A1 | 5/2010 | Smith |
| 2010/0125510 | A1 | 5/2010 | Smith |
| 2010/0146607 | A1 | 6/2010 | Piepenbrink et al. |
| 2010/0151790 | A1 | 6/2010 | Hoeksel et al. |
| 2010/0197326 | A1 | 8/2010 | Ngo |
| 2010/0223110 | A1 | 9/2010 | Slavin |
| 2010/0235283 | A1 | 9/2010 | Gerson |
| 2010/0248710 | A1 | 9/2010 | Sklovsky |
| 2010/0250356 | A1 | 9/2010 | Gillenson |
| 2010/0250436 | A1 | 9/2010 | Loevenguth |
| 2010/0260388 | A1 | 10/2010 | Garrett |
| 2010/0333129 | A1 | 12/2010 | Alhadeff et al. |
| 2011/0047016 | A1 | 2/2011 | Cook |
| 2011/0057025 | A1 | 3/2011 | Denzer |
| 2011/0087529 | A1 | 4/2011 | Angell |
| 2011/0087610 | A1 | 4/2011 | Batada |
| 2011/0105022 | A1 | 5/2011 | Vawter |
| 2011/0113473 | A1 | 5/2011 | Corda |
| 2011/0145049 | A1 | 6/2011 | Hertel |
| 2011/0145149 | A1 | 6/2011 | Valdes |
| 2011/0179113 | A1 | 7/2011 | Thomas |
| 2011/0196788 | A1 | 8/2011 | Lu et al. |
| 2011/0218911 | A1 | 9/2011 | Spodak |
| 2011/0246284 | A1 | 10/2011 | Chaikin |
| 2011/0250866 | A1 | 10/2011 | Fisher |
| 2011/0251941 | A1 | 10/2011 | Dunwoody |
| 2011/0258024 | A1 | 10/2011 | Prince |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2011/0258115 | A1 | 10/2011 | Mulhim |
| 2011/0276417 | A1 | 11/2011 | Campbell |
| 2011/0295750 | A1 | 12/2011 | Rammal |
| 2011/0302016 | A1 | 12/2011 | Haddad |
| 2011/0302406 | A1 | 12/2011 | Machani |
| 2011/0313924 | A1 | 12/2011 | Carell |
| 2011/0320243 | A1 | 12/2011 | Khan |
| 2011/0320293 | A1 | 12/2011 | Khan |
| 2011/0320294 | A1 | 12/2011 | Votaw |
| 2011/0320345 | A1 | 12/2011 | Taveau |
| 2012/0005076 | A1 | 1/2012 | Dessert |
| 2012/0011058 | A1 | 1/2012 | Pitroda et al. |
| 2012/0011063 | A1 | 1/2012 | Killian |
| 2012/0028612 | A1 | 2/2012 | Hurst |
| 2012/0029990 | A1 | 2/2012 | Fisher |
| 2012/0047070 | A1 | 2/2012 | Pharris |
| 2012/0074232 | A1 | 3/2012 | Spodak |
| 2012/0078735 | A1 | 3/2012 | Bauer |
| 2012/0079521 | A1 | 3/2012 | Garg et al. |
| 2012/0084203 | A1 | 4/2012 | Mehew |
| 2012/0095855 | A1 | 4/2012 | Sterling |
| 2012/0095856 | A1 | 4/2012 | Sanjeev |
| 2012/0122447 | A1 | 5/2012 | Craft |
| 2012/0123841 | A1 | 5/2012 | Taveau |
| 2012/0123868 | A1 | 5/2012 | Brudnicki |
| 2012/0123880 | A1 | 5/2012 | Craft |
| 2012/0123935 | A1 | 5/2012 | Brudnicki |
| 2012/0123937 | A1 | 5/2012 | Spodak |
| 2012/0131653 | A1 | 5/2012 | Pasquero |
| 2012/0143752 | A1 | 6/2012 | Wong |
| 2012/0150669 | A1 | 6/2012 | Langley |
| 2012/0158589 | A1 | 6/2012 | Katzin |
| 2012/0166311 | A1 | 6/2012 | Dwight |
| 2012/0171992 | A1 | 7/2012 | Cheong |
| 2012/0172026 | A1 | 7/2012 | Kwon |
| 2012/0172089 | A1 | 7/2012 | Bae |
| 2012/0174189 | A1 | 7/2012 | Lim |
| 2012/0191557 | A1 | 7/2012 | Fisher |
| 2012/0191612 | A1 | 7/2012 | Spodak |
| 2012/0196586 | A1 | 8/2012 | Grigg |
| 2012/0197691 | A1 | 8/2012 | Grigg |
| 2012/0197740 | A1 | 8/2012 | Grigg |
| 2012/0197743 | A1 | 8/2012 | Grigg |
| 2012/0197745 | A1 | 8/2012 | Fisher |
| 2012/0197787 | A1 | 8/2012 | Grigg |
| 2012/0203610 | A1 | 8/2012 | Grigg et al. |
| 2012/0203632 | A1 | 8/2012 | Blum |
| 2012/0209688 | A1 | 8/2012 | Lamothe |
| 2012/0209749 | A1 | 8/2012 | Hammad |
| 2012/0215701 | A1 | 8/2012 | Mehta |
| 2012/0221421 | A1 | 8/2012 | Hammad |
| 2012/0221475 | A1 | 8/2012 | Grigg |
| 2012/0226610 | A1 | 9/2012 | Gill |
| 2012/0229647 | A1 | 9/2012 | Calman |
| 2012/0229657 | A1 | 9/2012 | Calman |
| 2012/0231424 | A1 | 9/2012 | Calman |
| 2012/0231425 | A1 | 9/2012 | Calman |
| 2012/0232937 | A1 | 9/2012 | Calman |
| 2012/0232977 | A1 | 9/2012 | Calman |
| 2012/0232983 | A1 | 9/2012 | Bertha |
| 2012/0245986 | A1 | 9/2012 | Regan |
| 2012/0253852 | A1 | 10/2012 | Pourfallah |
| 2012/0259686 | A1 | 10/2012 | Yurrow |
| 2012/0259698 | A1 | 10/2012 | Yurrow |
| 2012/0259732 | A1 | 10/2012 | Sasankan |
| 2012/0265677 | A1 | 10/2012 | Rackley |
| 2012/0265685 | A1 | 10/2012 | Brudnicki |
| 2012/0271712 | A1 | 10/2012 | Katzin |
| 2012/0284131 | A1 | 11/2012 | Soffer |
| 2012/0286928 | A1 | 11/2012 | Mullen |
| 2012/0290376 | A1 | 11/2012 | Dryer |
| 2012/0290449 | A1 | 11/2012 | Mullen |
| 2012/0290478 | A1 | 11/2012 | Crofts et al. |
| 2012/0293303 | A1 | 11/2012 | Khan |
| 2012/0296708 | A1 | 11/2012 | Bachmann |
| 2012/0296720 | A1 | 11/2012 | Pirillo |
| 2012/0296722 | A1 | 11/2012 | Gosavi |
| 2012/0296741 | A1 | 11/2012 | Dykes |
| 2012/0297204 | A1 | 11/2012 | Buer |
| 2012/0302204 | A1 | 11/2012 | Gupta |
| 2012/0303425 | A1 | 11/2012 | Katzin |
| 2012/0310720 | A1 | 12/2012 | Balsan |
| 2012/0310760 | A1 | 12/2012 | Phillips |
| 2012/0310824 | A1 | 12/2012 | Liberty |
| 2012/0310826 | A1 | 12/2012 | Chatterjee |
| 2012/0316950 | A1 | 12/2012 | LaPorte |
| 2012/0316951 | A1 | 12/2012 | Fisher |
| 2012/0316992 | A1 | 12/2012 | Oborne |
| 2012/0317019 | A1 | 12/2012 | Carnes |
| 2012/0323653 | A1 | 12/2012 | Fisher |
| 2012/0323664 | A1 | 12/2012 | Klems |
| 2012/0323670 | A1 | 12/2012 | Fisher |
| 2012/0323777 | A1 | 12/2012 | Liberty |
| 2012/0329394 | A1 | 12/2012 | Fisher |
| 2012/0330737 | A1 | 12/2012 | Liberty |
| 2012/0330792 | A1 | 12/2012 | Kashanian |
| 2013/0012125 | A1 | 1/2013 | Fisher |
| 2013/0012126 | A1 | 1/2013 | Fisher |
| 2013/0012131 | A1 | 1/2013 | Fisher |
| 2013/0013352 | A1 | 1/2013 | Fisher |
| 2013/0013353 | A1 | 1/2013 | Fisher |
| 2013/0013355 | A1 | 1/2013 | Fisher |
| 2013/0013432 | A1 | 1/2013 | Fisher |
| 2013/0013434 | A1 | 1/2013 | Fisher |
| 2013/0013490 | A1 | 1/2013 | Keller |
| 2013/0013498 | A1 | 1/2013 | Fisher |
| 2013/0013499 | A1 | 1/2013 | Kalgi |
| 2013/0013501 | A1 | 1/2013 | Rackley |
| 2013/0017784 | A1 | 1/2013 | Fisher |
| 2013/0018738 | A1 | 1/2013 | Faires |
| 2013/0018740 | A1 | 1/2013 | Fisher |
| 2013/0018742 | A1 | 1/2013 | Fisher |
| 2013/0018793 | A1 | 1/2013 | Wong |
| 2013/0023209 | A1 | 1/2013 | Fisher |
| 2013/0023294 | A1 | 1/2013 | Singh |
| 2013/0024220 | A1 | 1/2013 | Fisher |
| 2013/0024221 | A1 | 1/2013 | Fisher |
| 2013/0024223 | A1 | 1/2013 | Thomas |
| 2013/0024280 | A1 | 1/2013 | Fisher |
| 2013/0024364 | A1 | 1/2013 | Shrivastava et al. |
| 2013/0024371 | A1 | 1/2013 | Hariramani |
| 2013/0024372 | A1 | 1/2013 | Spodak |
| 2013/0024377 | A1 | 1/2013 | Stong |
| 2013/0029646 | A1 | 1/2013 | Chowdhury |
| 2013/0030828 | A1 | 1/2013 | Pourfallah |
| 2013/0030960 | A1 | 1/2013 | Kashanian |
| 2013/0030997 | A1 | 1/2013 | Spodak |
| 2013/0035035 | A1 | 2/2013 | Fisher |
| 2013/0035036 | A1 | 2/2013 | Fisher |
| 2013/0035037 | A1 | 2/2013 | Fisher |
| 2013/0035068 | A1 | 2/2013 | Fisher |
| 2013/0035069 | A1 | 2/2013 | Fisher |
| 2013/0035070 | A1 | 2/2013 | Fisher |
| 2013/0035071 | A1 | 2/2013 | Fisher |
| 2013/0035072 | A1 | 2/2013 | Fisher |
| 2013/0035087 | A1 | 2/2013 | Fisher |
| 2013/0035967 | A1 | 2/2013 | Fisher |
| 2013/0035968 | A1 | 2/2013 | Fisher |
| 2013/0035969 | A1 | 2/2013 | Fisher |
| 2013/0035970 | A1 | 2/2013 | Fisher |
| 2013/0040568 | A1 | 2/2013 | Fisher |
| 2013/0040569 | A1 | 2/2013 | Fisher |
| 2013/0041699 | A1 | 2/2013 | Fisher |
| 2013/0041700 | A1 | 2/2013 | Fisher |
| 2013/0041701 | A1 | 2/2013 | Roth |
| 2013/0041736 | A1 | 2/2013 | Coppinger |
| 2013/0041743 | A1 | 2/2013 | Coppinger |
| 2013/0041744 | A1 | 2/2013 | Coppinger |
| 2013/0041745 | A1 | 2/2013 | Coppinger |
| 2013/0041769 | A1 | 2/2013 | Fisher |
| 2013/0046608 | A1 | 2/2013 | Coppinger |
| 2013/0046634 | A1 | 2/2013 | Grigg |
| 2013/0046645 | A1 | 2/2013 | Grigg |
| 2013/0048723 | A1 | 2/2013 | King |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2013/0052952 | A1 | 2/2013 | Fisher |
| 2013/0054336 | A1 | 2/2013 | Graylin |
| 2013/0054337 | A1 | 2/2013 | Brendell |
| 2013/0054412 | A1 | 2/2013 | Brendell |
| 2013/0054441 | A1 | 2/2013 | Kamdar |
| 2013/0057392 | A1 | 3/2013 | Bullock |
| 2013/0060618 | A1 | 3/2013 | Barton |
| 2013/0073373 | A1 | 3/2013 | Fisher |
| 2013/0073377 | A1 | 3/2013 | Heath |
| 2013/0073458 | A1 | 3/2013 | Sherwin |
| 2013/0080228 | A1 | 3/2013 | Fisher |
| 2013/0080229 | A1 | 3/2013 | Fisher |
| 2013/0080230 | A1 | 3/2013 | Fisher |
| 2013/0080231 | A1 | 3/2013 | Fisher |
| 2013/0080232 | A1 | 3/2013 | Fisher |
| 2013/0080233 | A1 | 3/2013 | Fisher |
| 2013/0080240 | A1 | 3/2013 | Fisher |
| 2013/0080241 | A1 | 3/2013 | Fisher |
| 2013/0080329 | A1 | 3/2013 | Royyuru |
| 2013/0091012 | A1 | 4/2013 | Liberty |
| 2013/0132219 | A1 | 5/2013 | Liberty |
| 2013/0238455 | A1 | 9/2013 | Laracey |
| 2013/0246141 | A1 | 9/2013 | Liberty |
| 2013/0246203 | A1 | 9/2013 | Laracey |
| 2013/0317928 | A1 | 11/2013 | Laracey |
| 2013/0332347 | A1 | 12/2013 | Liberty |
| 2013/0346309 | A1 | 12/2013 | Giori |
| 2014/0006048 | A1 | 1/2014 | Liberty |
| 2014/0014721 | A1 | 1/2014 | Lindeman |
| 2014/0201070 | A1 | 7/2014 | Liberty |
| 2015/0039517 | A1 | 2/2015 | Liberty |
| 2016/0055483 | A1 | 2/2016 | Liberty |
| 2016/0055583 | A1 | 2/2016 | Liberty |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102073958 | 5/2011 |
| DE | 10119808 | 9/2002 |
| EP | 1280115 | 1/2003 |
| JP | 2001-297198 | 10/2001 |
| JP | 2001357164 | 12/2001 |
| JP | 2002-99716 | 4/2002 |
| KR | 10-2002-0065989 | 8/2002 |
| KR | 10-2003-0068603 | 8/2003 |
| KR | 10-2007-0092400 | 9/2007 |
| WO | 9834203 | 8/1998 |
| WO | 9913636 | 3/1999 |
| WO | 0171627 | 9/2001 |
| WO | 0197118 | 12/2001 |
| WO | 02071354 | 9/2002 |
| WO | 03012717 | 2/2003 |
| WO | 2004010393 | 1/2004 |
| WO | 2004023353 | 3/2004 |
| WO | 2004053640 | 6/2004 |
| WO | 2004088641 | 10/2004 |
| WO | 2005079254 | 9/2005 |
| WO | 2005086593 | 9/2005 |
| WO | 2007145500 | 12/2007 |
| WO | 2008008735 | 1/2008 |
| WO | 2012025824 | 3/2012 |
| WO | 2013009444 | 1/2013 |
| WO | 2013009446 | 1/2013 |
| WO | 2013025273 | 2/2013 |
| WO | 2013078176 | 5/2013 |
| WO | 2013166174 | 11/2013 |

OTHER PUBLICATIONS

Labrou, Yannis et al, Wireless Wallet. Proceedings of the First Annual International Conference on Mobile and Ubiquitous Systems: Networking and Services [Online] 2004, pp. 1-10.

Motorola, Motorola M-Wallet Solution. [Online] 2006 http://www.motorola.com/networkoperators/pdfs/M-Wallet-Brochure.pdf (Accessed Oct. 4, 2012).

Valcourt, E. et al., “Investigating Mobile Payment,” Wireless And Mobile Computing, Networking and Communications, 2005. (WiMob’2005), IEEE International Conference on Aug. 22-24, 2005, Aug. 2005, vol. 4, pp. 29-36.

Gao, Jerry, et al., “P2P-Paid: A Peer-to-Peer Wireless Payment System,” Proceedings of the 2005 Second IEEE International Workshop on Mobile Commerce and Services (WMCS’05) Jul. 2005, 10 pages.

Edwin, et al., “Technobiography,” Oct. 2004, 29 pages.

International Search Report and Written Opinion for PCT/US2012/066013 dated Jan. 29, 2013.

International Search Report and Written Opinion for PCT/US2012/040131 dated Jan. 29, 2013.

International Search Report and Written Opinion for PCT/US2012/043321 dated Sep. 6, 2012.

International Search Report and Written Opinion for PCT/US2012/058849 dated Jan. 4, 2013.

International Search Report and Written Opinion for PCT/US2013/039100 dated Aug. 23, 2013.

European Search Report for EP12824344 dated Sep. 29, 2014.

Sykes, et al. “Securing Mobile Banking,” Credit Union Management, Nov. 2010, vol. 33 No. 11; ISSN 0273-9267.

Clarke, Irvine III, “Emerging Value Propositions for M-commerce,” *Journal of Business Strategies,* vol. 25, Issue 2, Fall 2008, p. 41-57; ISSN: 0887-2058.

Wei, et al., “Development of a Web-Based Mobile Airline Ticketing Model with Usability Features,” 2005, Industrial Management + Data Systems; vol. 105 No. 9, ISSN: 0263-5577.

International Search Report and Written Opinion for PCT/US2012/43458 dated Aug. 17, 2012.

International Search Report and Written Opinion for PCT/US2015/58886 dated Feb. 4, 2016.

European Search Report for EP12851211 dated Feb. 18, 2016.

U.S. Appl. No. 13/484,199, Dec. 26, 2012, Office Action.

U.S. Appl. No. 13/484,199, Jun. 7, 2013, Notice of Allowance.

U.S. Appl. No. 13/527,466, Apr. 15, 2013, Office Action.

U.S. Appl. No. 13/527,466, Dec. 4, 2013, Final Office Action.

U.S. Appl. No. 13/964,707, Feb. 24, 2014, Office Action.

U.S. Appl. No. 14/213,543, May 6, 2014, Office Action.

U.S. Appl. No. 13/680,824, Jun. 16, 2014, Office Action.

U.S. Appl. No. 13/528,720, Jun. 25, 2014, Office Action.

U.S. Appl. No. 13/964,707, Jul. 10, 2014, Office Action.

U.S. Appl. No. 13/527,466, Aug. 1, 2014, Office Action.

U.S. Appl. No. 14/012,822, Aug. 7, 2014, Office Action.

U.S. Appl. No. 13/528,720, Dec. 10, 2014, Final Office Action.

U.S. Appl. No. 14/012,822, Jan. 7, 2015, Final Office Action.

U.S. Appl. No. 13/680,824, Feb. 6, 2015, Final Office Action.

U.S. Appl. No. 13/964,707, Mar. 16, 2015, Final Office Action.

U.S. Appl. No. 14/213,543, Apr. 8, 2015, Office Action.

U.S. Appl. No. 13/874,192, Jul. 14, 2015, Office Action.

U.S. Appl. No. 13/527,466, Jul. 16, 2015, Office Action.

U.S. Appl. No. 13/528,720, Jul. 22, 2015, Office Action.

U.S. Appl. No. 14/012,822, Sep. 11, 2015, Office Action.

U.S. Appl. No. 13/680,824, Sep. 18, 2015, Notice of Allowance.

U.S. Appl. No. 14/213,543, Jan. 6, 2016, Final Office Action.

U.S. Appl. No. 13/528,720, Mar. 2, 2016, Final Office Action.

U.S. Appl. No. 13/527,466, Apr. 1, 2016, Office Action.

U.S. Appl. No. 13/874,192, Apr. 18, 2016, Final Office Action.

U.S. Appl. No. 14/012,822, May 6, 2016, Final Office Action.

U.S. Appl. No. 13/527,466, Dec. 14, 2016, Office Action.

Office Action U.S. Appl. No. 13/527,466, dated Aug. 9, 2017.

Ron White, How Computers Work, Oct. 15, 2003, Paul Boger, Illustrated by Timothy Edward Dwons, 7th Edition (Year: 2003).

U.S. Appl. No. 14/341,605, dated Nov. 27, 2017, Office Action.

* cited by examiner


Channels
111
SSH
STK
Web
POS
IVR
WGW
WAP
USS
USSD
iPhone
Android
Blackberry
J2ME
Notifications 112
SMPP
SMTP
Voice
3rd Party Systems
113
Remittance (MGI & WU)
Ext. Processor (CDS & UCP)
Bank (Bancorp/Meta)
GreenDot (MoneyPak Val)
MNO/MVNO (Billing System)
Bill Payment (Direct & Fiserv)
Airtime Topup
Payment GW (Credit/Debt)
Mobile Wallets
Integration Tier 101
Notification Services 102
Service Connectors 103
Business Process Services 104
Payment Handler 105
Security Services 106
Authorization Services 107
Database 108
Person Mgmt
Company Mgmt
Tx History
Profile Objects
Money Container
Rules Engine 109
Name Matching Engine 110
Processor 121
Clearing House (Web Svc)
Clearing House (Batch)

*Figure 1*


200
(Unbanked) Subscriber 205
Mobile Device
206
Application
207
Indicated Transaction
208
Monetary Transaction System
210
Subscriber Profile
211
(Wireless) Communication Module
215
Transaction Processor
216
Memory
217
Rules Engine
220
Money/eMoney
222
Entity 222
Entity 223

FIG. 2


302
301
Subscriber Cash
$C
Agent Branch
Agent Mgr. Or Agent
mFS Cash Register
$C
Branch EMoney Balance
$E
303
Subscriber eMoney Balance
$E
Subscriber Deposit
310
320
330
340
350
360
370

FIG. 3


401
Subscriber eMoney Balance
$E
402
Agent Branch
Agent Mgr. Or Agent
mFS Cash Register
$C
Branch EMoney Balance
$E
403
Subscriber Cash
$C
Subscriber Withdrawal
410
420
430
440
450
460
470
480
490

FIG. 4




Subscriber -To- Subscriber
eMoney Transfer

*FIG. 5A*




Subscriber -To- Non Subscriber
eMoney Transfer

*FIG. 5B*




Subscriber -To- Subscriber
International eMoney Transfer

*FIG. 6A*




Subscriber -To- Non Subscriber
International eMoney Transfer

*FIG. 6B*


702
mWallet Owner eMoney Balance
$E
704
Subscriber eMoney Balance
$E
703
Subscriber eMoney Balance
Airtime
Subscriber Buys Airtime
710
720
730
740
750
760

FIG. 7


801
Subscriber eMoney Balance
$E
802
Bill Pay Company eMoney Balance
$E
Subscriber Pays Bill
810
820
830
840
850
860

FIG. 8


901
Subscriber eMoney Balance
$E
902
Agent Branch eMoney Balance
$E
Subscriber Makes Retail Purchase
910
920
930
940
950
960
970
980

FIG. 9




Subscriber Requests Micro-Loan

*FIG. 10A*




Subscriber Repays Micro-Loan

*FIG. 10B*


1101
Employer Bank Account
$C
1102
Employer Bank Account (At Program Bank)
Bank
$C
Automated Sweep
Employer Bank Account (At Program Bank)
Bank
$C
1103
1104
mFS Program Master Bank Account
Bank
$C
1105
Subscriber eMoney Balance
$E
Subscriber Receives Direct Deposit

FIG. 11A




Subscriber Receives Government
Welfare Payment

*FIG. 11B*


1202
Agent Branch A
Agent Mgr. Or Agent
Branch eMoney Balance
$E
Agent Branch B
Agent Mgr. Or Agent
Branch eMoney Balance
$E
Agent Branch C
Agent Mgr. Or Agent
Branch eMoney Balance
$E
1201
Agent Company eMoney Balance
$E
Agent Administrator Distributes eMoney

*FIG. 12A*


1205
Agent Administrator Cash
$C
1206
Agent Company Bank Account
Bank
$C
1209
Automated Sweep
Agent Company Bank Account
Bank
$C
1207
1208
mWallet Owner Master Bank Account
Bank
$C
1210
Agent Company eMoney Balance
$E
Agent Company Deposit

*FIG. 12B*




Agent Company Withdrawal

*FIG. 13*


1401
Subscriber Cash
$C
1402
Agent Branch
Agent Mgr. Or Agent
mFS Cash Register
$C
1403
Subscriber eMoney Balance
$DC
Subscriber Deposit At Agent Branch
1410
1420
1430
1440
1450
1460
1470

FIG. 14




Subscriber Deposit (Non-Agent)

*FIG. 15*


1601
Subscriber eMoney Balance
$DC
1602
Agent Branch
Agent Mgr. Or Agent
mFS Cash Register
$C
1603
Subscriber Cash
$C
Subscriber Withdrawal (Agent)
1610
1620
1630
1640
1650
1660
1670
1680
1690

FIG. 16




*FIG. 17A*

*FIG. 17B*

*FIG. 17C*




FIG. 18A




FIG. 18B




Subscriber -To- Subscriber International Money Transfer

*FIG. 19A*




Non-Subscriber -To- Subscriber International Money Transfer

*FIG. 19B*



Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
User initiates deposit by querying fee
Get Fee
Get Fee
Get Fee
Start Transaction
Check ACL For The Caller
Permitted Or Error
Ensure That Caller Is Active
Caller Is Ok Or Error
Ensure That Recipient Is Active
Recipient Is Ok Or Error
Ensure That Recipient Has SVA
Ensured Or Error
Get Fee For Agent Depositing Funds Into Subscriber Account
Fee
Get Fee For Subscriber Depositing Funds Into His Account
Fee
Store Transaction Data (recipient, Amount, Other Data)
Fee, Transaction ID
Fee, Transaction ID
Suspend Transaction
Rollback Transaction
Fee, Transaction ID
[Caller Is Agent]
[Caller Is Subscriber]
[On Success]
[On Error]


Figure 20A


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
User reviews fee and confirms transaction
Commit Transaction
Ensure That Transaction Is Valid And Has In-Progress Status
Find Transaction By ID
Transaction Info Or Error
Commit Transaction
Commit Transaction
Check ACL For The Caller
Permitted Or Error
Ensure That Caller Is Active
Caller Is Ok Or Error
Ensure That Recipient Is Active
Recipient Is Ok Or Error
Ensure That Recipient Has SVA
Ensured Or Error
Check PIN
Valid Or Error

*Figure 20B*



Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
[Caller Is Agent]
Apply Velocity Rules For The Caller
Confirmation Or Error
Check Program Operator License And Update Stats
License Is Valid Or Error
Create New Pending Transaction History Record
Transaction History ID
Hold Funds From Agent Balance (Amount + Fee)
Sender Hold ID
Load Funds To Subscriber Account (Amount)
Authorization Info Or Error
Load Funds To Program Operator Account (Fee)
Authorization Info Or Error
Settle Finds From Agent Balance (Sender Hold ID)
Authorization Info Or Error
Update Transaction History Record With Money Flows
[On Error]
Rollback Velocity Rules For Agent
Rollback Stats For Program Operator License
Mark Transaction History As Failed
Rollback Agent Balance
Rollback Program Operator Balance
Rollback Recipient Balance
Propagate Error


*Figure 20C*


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
Apply Velocity Rules For The Caller
Confirmation Or Error
Check Program Operator License And Update Stats
License Is Valid Or Error
Create New Pending Transaction History Record
Transaction History ID
Hold Funds From Caller Balance (Amount + Fee)
Sender Hold ID
Load Funds To Subscriber Account (Amount)
Authorization Info Or Error
Load Funds To Program Operator Account (Fee)
Authorization Info Or Error
Settle Finds From Caller Balance (Sender Hold ID)
Authorization Info Or Error
Update Transaction History Record With Money Flows

Figure 20D


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
[On Error]
Rollback Velocity Rules For Agent
Rollback Stats For Program Operator License
Mark Transaction History As Failed
Rollback Agent Balance
Rollback Program Operator Balance
Rollback Recipient Balance
Propagate Error
Generate Confirmation Info
Confirmation Info
Sends Receipt Notification(s) To Caller
Sends Receipt Notification(s) To Recipient
Confirmation Info
[On Success]
Commit Transaction
[On Error]
Rollback Transaction
Confirmation Info

Figure 20E


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
User reviews fee and cancels transaction
Cancel Transaction
Ensure That Transaction Is Valid And Has In-Progress Status
Find Transaction By ID
Transaction Info Or Error
Cancel Transaction
Cancel Transaction
Check ACL For The Caller
Permitted Or Error
Ensure That Caller Is Active
Caller Is Ok Or Error
Set Transaction History As Cancelled
Commit Transaction
Rollback Transaction
Confirmation Info
[On Success]
[On Error]

*Figure 20F*


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
Get user inputs for given withdrawal type (optional)
Get Fields
Get Fields
Start Transaction
Get Fields
Check ACL For The Caller
Permitted Or Error
Ensure That Caller Is Active
Caller Is Ok Or Error
Is Given Type Enabled For Program Operator
Enabled Or Error
Get Fields List
Fields
Get Types Enabled For Program Operator
Types
Get Fields List For Every Type
Fields
Fields
Fields
Commit Transaction
Rollback Transaction
Fields
[If Type Is Specified By Caller]
[If Type Is Not Specified By Caller]
[On Success]
[On Error]

*Figure 21A*


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
User initiates withdrawal and by querying fee and passing amount money container and optional type and inputs
Get Fee
Get Fee
Get Fee
Start Transaction
Check ACL For The Caller
Permitted Or Error
Ensure That Caller Is Active
Caller Is Ok Or Error
Create List Of Withdrawals Types (WT List)
[If Type Is Specified By Caller]
Ensure That Type Is Enabled For Program Operator
Enabled Or Error
Add Type To The WT List
[If Type Is Not Specified By Caller]
Get List Of Enabled Types For Program Operator
Types
Add Types To The WL List

Figure 21B


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
For Every Type From WT List Get Fields For User Entry
Fields
Update Fields In WT List
Remove Fields Populated By Caller From WL List
[If Caller Passed Fields (User Entry)]
For Every Type From WL List Get Fee
Fees
Update Fields In WT List
Based On Type Determine Withdraw Amount
Store Transaction Data (WT List, Amount, Other Data)
WT List, Transaction ID
WT List, Transaction ID
Suspend Transaction
[On Success]
Rollback Transaction
[On Error]
WT List, Transaction ID

***Figure 21C***


Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
User reviews fee, selects type, fills fields and confirms transaction
Commit Transaction (Transaction ID)
Ensure That Transaction Is Valid And Has In-Progress Status
Find Transaction By ID
Transaction Info Or Error
Commit Transaction
Commit Transaction
Check ACL For The Caller
Permitted Or Error
Ensure That Caller Is Active
Caller Is Ok Or Error
Check PIN
Valid Or Error

*Figure 21D*

Withdraw Cash (5 of 9)




Figure 21E

**Withdraw Cash (6 of 9)**




Figure 21F

Withdraw Cash (7 of 9)




Figure 21G

Case: 24-1345 Document: 19 Page: 181 Filed: 06/06/2024



**Withdraw Cash (8 of 9)**




**Figure 21H**

APPL-1001
APPLE INC. / Page 40 of 68

Withdraw Cash (9 of 9)




Figure 21I

**Money Transfer (1 of 10)**




Figure 22A

**Money Transfer (2 of 10)**




**Figure 22B**

Money Transfer (3 of 10)




Figure 22C

Money Transfer (4 of 10)




Figure 22D

**Money Transfer (5 of 10)**




**Figure 22E**

Money Transfer (6 of 10)




Figure 22F

Money Transfer (7 of 10)




Figure 22G

**Money Transfer (8 of 10)**




**Figure 22H**

Money Transfer (9 of 10)




Figure 22I


Money Transfer (10 of 10)
Channel
Integration Tier
Application Tier
Business Process Services
Notification Services
Payment Handler
Rules Engine
Database Services
Security Services
MoneyGram Agent Connect
User review fee and
Cancel Transaction (Transaction ID)
Ensure that transaction is valid and has in-progress status
Find transaction by ID
Transaction info or Error
Cancel Transaction
Cancel Transaction
Check ACL for the caller
Permitted or Error
Ensure that caller is active
Caller is OK or Error
Set transaction history record status to cancelled
Commit transaction
Rollback transaction
[ On success ]
[ On error ]
Confirmation Info

Figure 22J

# MONETARY TRANSACTION SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/213,543, entitled “Monetary Transaction System”, filed Mar. 14, 2014, which is a continuation of U.S. patent application Ser. No. 13/964,707, entitled “Monetary Transaction system”, filed Aug. 12, 2013, which application is a continuation of U.S. patent application Ser. No. 13/484,199, filed May 30, 2012, entitled “Monetary Transaction System”, which application claims priority to and the benefit of U.S. Provisional Application Ser. No. 61/522,099, filed on Aug. 10, 2011, entitled “Mobile Wallet Platform”, and also claims priority to and the benefit of U.S. Provisional Application Ser. No. 61/493,064, filed on Jun. 3, 2011, entitled “Mobile Wallet Platform”. All of the aforementioned applications are incorporated by reference herein in their entirety.

## BACKGROUND

Mobile phones and other digital devices have become increasingly popular in recent years. Many mobile device users use their devices to perform countless different daily tasks. For instance, mobile devices allow users to check email, send and receive instant messages, check calendar items, take notes, set up reminders, browse the internet, play games or perform any number of different things using specialized applications or “apps”. These applications allow mobile devices to communicate with other computer systems and perform a wide variety of network-connected tasks previously not possible with a mobile device.

## BRIEF SUMMARY

Embodiments described herein are directed to monetary transaction system for conducting monetary transactions between transaction system subscribers and other entities. In one embodiment, the monetary transaction system includes a mobile device configured to run a monetary transaction system application. The monetary transaction system also includes a monetary transaction system subscriber that has a profile with the system. The subscriber indicates, via the monetary transaction system application, one or more specified transactions that are to be performed using the monetary transaction system. The system further includes a monetary transaction system processor that performs the transactions specified by the subscriber. Performing these transactions includes communicating with a monetary transaction database to determine whether the transaction is permissible based on data indicated in the subscriber’s profile.

The monetary transaction system also includes at least one entity that is to be involved in the specified transaction, where the entity has a profile with the monetary transaction system. This entity may be a person, a retail store, an agent or other entity. The subscriber may have access to a bank account, or may be an “unbanked user” that does not have access to a bank account. Each of the terms included above will be described in greater detail below in conjunction with the drawings.

The monetary transaction system may be used for many different tasks including enrolling a customer for a mobile wallet, adding a stored value account (either hosted by a mobile wallet platform or a third party), adding a bank or credit union account to a mobile wallet, adding a debit or credit card account to a mobile wallet, depositing funds in a mobile wallet, withdrawing funds from a mobile wallet, paying bills from a mobile wallet, topping up a prepaid mobile account through a mobile wallet, transferring funds through a mobile wallet (nationally or internationally), making in-store purchases using a mobile wallet, and various other tasks as described herein below.

This Summary is provided to introduce a selection of concepts in a simplified form that are further described below in the Detailed Description. This Summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used as an aid in determining the scope of the claimed subject matter.

Additional features and advantages will be set forth in the description which follows, and in part will be apparent to one of ordinary skill in the art from the description, or may be learned by the practice of the teachings herein. Features and advantages of embodiments described herein may be realized and obtained by means of the instruments and combinations particularly pointed out in the appended claims. Features of the embodiments described herein will become more fully apparent from the following description and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

To further clarify the above and other features of the embodiments described herein, a more particular description will be rendered by reference to the appended drawings. It is appreciated that these drawings depict only examples of the embodiments described herein and are therefore not to be considered limiting of its scope. The embodiments will be described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. **1** illustrates a monetary transaction system architecture in which embodiments described herein may operate.

FIG. **2** illustrates an alternate example embodiment of a monetary transaction system.

FIG. **3** illustrates an example data flow for performing a subscriber deposit via a mobile wallet.

FIG. **4** illustrates an example data flow for performing a subscriber withdrawal via a mobile wallet.

FIGS. **5**A and **5**B illustrate example data flows for performing subscriber-to-subscriber and subscriber-to-non-subscriber eMoney transfers via a mobile wallet, respectively.

FIGS. **6**A and **6**B illustrate example data flows for performing subscriber-to-subscriber and subscriber-to-non-subscriber international eMoney transfers via a mobile wallet, respectively.

FIG. **7** illustrates an example data flow for performing a subscriber airtime purchase via a mobile wallet.

FIG. **8** illustrates an example data flow for performing a subscriber-initiated bill pay via a mobile wallet.

FIG. **9** illustrates an example data flow for performing a subscriber-initiated retail purchase via a mobile wallet.

FIGS. **10**A and **10**B illustrate example data flows for requesting and repaying micro-loans via a mobile wallet, respectively.

FIG. **11**A illustrates an example data flow of a subscriber receiving a direct deposit via a mobile wallet.

FIG. **11**B illustrates an example data flow of a subscriber receiving a governmental welfare payment via a mobile wallet.

FIG. **12**A illustrates an example data flow of an agent administrator distributing eMoney via a mobile wallet.

FIG. **12**B illustrates an example data flow of an agent company making a deposit using a mobile wallet.

FIG. **13** illustrates an example data flow of an agent company making a withdrawal using a mobile wallet.

FIG. **14** illustrates an example data flow of a subscriber making a deposit at an agent branch using a mobile wallet.

FIG. **15** illustrates an example data flow of a subscriber making a deposit with a non-agent using a mobile wallet.

FIG. **16** illustrates an example data flow of a subscriber making a withdrawal with an agent using a mobile wallet.

FIG. **17**A illustrates an example data flow of a subscriber making a withdrawal from an ATM using a mobile wallet.

FIG. **17**B illustrates an example data flow of a subscriber-to-subscriber money transfer using a mobile wallet.

FIG. **17**C illustrates an example data flow of a subscriber-to-non-subscriber money transfer using a mobile wallet.

FIG. **18**A illustrates an example data flow of a subscriber-to-subscriber international money transfer using a mobile wallet.

FIG. **18**B illustrates an example data flow of a subscriber-to-non-subscriber international money transfer using a mobile wallet.

FIG. **19**A illustrates an example data flow of a subscriber-to-subscriber international money transfer using a mobile wallet.

FIG. **19**B illustrates an example data flow of a non-subscriber-to-subscriber international money transfer using a mobile wallet.

FIGS. **20**A-**20**F illustrate embodiments of communications between specific components within a monetary transaction system during an operation to deposit of funds within a financial account.

FIGS. **21**A-**21**I illustrate embodiments of communications between specific components within a monetary transaction system during an operation to withdraw of funds from a financial account.

FIGS. **22**A-**22**J illustrate embodiments of communications between specific components within a monetary transaction system during an operation to transfer funds between financial accounts.

## DETAILED DESCRIPTION

Embodiments described herein are directed to monetary transaction system for conducting monetary transactions between transaction system subscribers and other entities. In one embodiment, the monetary transaction system includes a mobile device configured to run a monetary transaction system application. The monetary transaction system also includes a monetary transaction system subscriber that has a profile with the system. The subscriber indicates, via the monetary transaction system application, one or more specified transactions that are to be performed using the monetary transaction system. The system further includes a monetary transaction system processor that performs the transactions specified by the subscriber. Performing these transactions includes communicating with a monetary transaction database to determine whether the transaction is permissible based on data indicated in the subscriber's profile.

The monetary transaction system also includes at least one entity that is to be involved in the specified transaction, where the entity has a profile with the monetary transaction system. This entity may be a person, a retail store, an agent or other entity. The subscriber may have access to a bank account, or may be an "unbanked user" that does not have access to a bank account. Each of the terms included above will be described in greater detail below in conjunction with the drawings.



The monetary transaction system may be used for many different tasks including enrolling a customer for a mobile wallet, adding a stored value account (either hosted by a mobile wallet platform or a third party), adding a bank or credit union account to a mobile wallet, adding a debit or credit card account to a mobile wallet, depositing funds in a mobile wallet, withdrawing funds from a mobile wallet, paying bills from a mobile wallet, topping up a prepaid mobile account through a mobile wallet, transferring funds through a mobile wallet (nationally or internationally), making in-store purchases using a mobile wallet, and various other tasks as described herein below.

The following discussion now refers to a number of methods and method steps or acts that may be performed. It should be noted, that although the method steps may be discussed in a certain order or illustrated in a flow chart as occurring in a particular order, no particular ordering is necessarily required unless specifically stated, or required because a step is dependent on another step being completed prior to the step being performed.

Embodiments of the mobile transaction system or "mobile wallet platform" described herein may comprise or utilize a special purpose or general-purpose computer including computer hardware, such as, for example, one or more processors and system memory, as discussed in greater detail below. Embodiments described herein also include physical and other computer-readable media for carrying or storing computer-executable instructions and/or data structures. Such computer-readable media can be any available media that can be accessed by a general purpose or special purpose computer system. Computer-readable media that store computer-executable instructions in the form of data are computer storage media. Computer-readable media that carry computer-executable instructions are transmission media. Thus, by way of example, and not limitation, embodiments described herein can comprise at least two distinctly different kinds of computer-readable media: computer storage media and transmission media.

Computer storage media includes RAM, ROM, EEPROM, CD-ROM, solid state drives (SSDs) that are based on RAM, Flash memory, phase-change memory (PCM), or other types of memory, or other optical disk storage, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store desired program code means in the form of computer-executable instructions, data or data structures and which can be accessed by a general purpose or special purpose computer.

A "network" is defined as one or more data links and/or data switches that enable the transport of electronic data between computer systems and/or modules and/or other electronic devices. When information is transferred or provided over a network (either hardwired, wireless, or a combination of hardwired or wireless) to a computer, the computer properly views the connection as a transmission medium. Transmission media can include a network which can be used to carry data or desired program code means in the form of computer-executable instructions or in the form of data structures and which can be accessed by a general purpose or special purpose computer. Combinations of the above should also be included within the scope of computer-readable media.

Further, upon reaching various computer system components, program code means in the form of computer-executable instructions or data structures can be transferred automatically from transmission media to computer storage media (or vice versa). For example, computer-executable

instructions or data structures received over a network or data link can be buffered in RAM within a network interface module (e.g., a network interface card or "NIC"), and then eventually transferred to computer system RAM and/or to less volatile computer storage media at a computer system. Thus, it should be understood that computer storage media can be included in computer system components that also (or even primarily) utilize transmission media.

Computer-executable (or computer-interpretable) instructions comprise, for example, instructions which cause a general purpose computer, special purpose computer, or special purpose processing device to perform a certain function or group of functions. The computer executable instructions may be, for example, binaries, intermediate format instructions such as assembly language, or even source code. Although the subject matter has been described in language specific to structural features and/or methodological acts, it is to be understood that the subject matter defined in the appended claims is not necessarily limited to the described features or acts described above. Rather, the described features and acts are disclosed as example forms of implementing the claims.

Those skilled in the art will appreciate that various embodiments may be practiced in network computing environments with many types of computer system configurations, including personal computers, desktop computers, laptop computers, message processors, hand-held devices, multi-processor systems, microprocessor-based or programmable consumer electronics, network PCs, minicomputers, mainframe computers, mobile telephones, PDAs, tablets, pagers, routers, switches, and the like. Embodiments described herein may also be practiced in distributed system environments where local and remote computer systems that are linked (either by hardwired data links, wireless data links, or by a combination of hardwired and wireless data links) through a network, each perform tasks (e.g. cloud computing, cloud services and the like). In a distributed system environment, program modules may be located in both local and remote memory storage devices.

In this description and the following claims, "cloud computing" is defined as a model for enabling on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services). The definition of "cloud computing" is not limited to any of the other numerous advantages that can be obtained from such a model when properly deployed.

For instance, cloud computing is currently employed in the marketplace so as to offer ubiquitous and convenient on-demand access to the shared pool of configurable computing resources. Furthermore, the shared pool of configurable computing resources can be rapidly provisioned via virtualization and released with low management effort or service provider interaction, and then scaled accordingly.

A cloud computing model can be composed of various characteristics such as on-demand self-service, broad network access, resource pooling, rapid elasticity, measured service, and so forth. A cloud computing model may also come in the form of various service models such as, for example, Software as a Service ("SaaS"), Platform as a Service ("PaaS"), and Infrastructure as a Service ("IaaS"). The cloud computing model may also be deployed using different deployment models such as private cloud, community cloud, public cloud, hybrid cloud, and so forth. In this description and in the claims, a "cloud computing environment" is an environment in which cloud computing is employed.



Additionally or alternatively, the functionally described herein can be performed, at least in part, by one or more hardware logic components. For example, and without limitation, illustrative types of hardware logic components that can be used include Field-programmable Gate Arrays (FPGAs), Program-specific Integrated Circuits (ASICs), Program-specific Standard Products (ASSPs), System-on-a-chip systems (SOCs), Complex Programmable Logic Devices (CPLDs), and other types of programmable hardware.

Still further, system architectures described herein can include a plurality of independent components that each contribute to the functionality of the system as a whole. This modularity allows for increased flexibility when approaching issues of platform scalability and, to this end, provides a variety of advantages. System complexity and growth can be managed more easily through the use of smaller-scale parts with limited functional scope. Platform fault tolerance is enhanced through the use of these loosely coupled modules. Individual components can be grown incrementally as business needs dictate. Modular development also translates to decreased time to market for new functionality. New functionality can be added or subtracted without impacting the core system.

Various terminology will be used herein to describe the monetary transaction system (also referred to as a "mobile wallet platform", "mobile wallet program" or "mobile wallet transaction system"). The term "agent" is used to refer to an individual with mobile financial services (mFS) transaction system tools and training to support specific mFS functions. These mFS functions include subscriber registration and activation, and the deposit and withdrawal of funds from the mFS transaction system. Agents are representatives of the mFS transaction system or "program". Agents can be employees or contractors of the program provider, or other companies and organizations that partner with the program provider to provide these services themselves. Agents may be found in every facet of a typical economy, and may include large retailers, mobile network operators (MNO) airtime sales agents, gas stations, kiosks, or other places of business.

The mobile wallet platform includes a mobile wallet application, web interface or some other type of functionality that allows the user to interact with the mFS platform using their mobile device. The mobile wallet application may include a subscriber identity module (SIM) application, an Unstructured Supplementary Service Data (USSD) application, a smartphone application, a web application, a mobile web application, a Wireless Application Protocol (WAP) application, a Java 2 Platform, Micro Edition (J2ME) application, a tablet application or any other type of application or interface that provides tools for the agent to register, activate, and offer other services to the mFS subscriber.

As used herein, a mobile wallet application is a mobile wallet application installed on a SIM card. A USSD application is an application that implements USSD for various functionality including prepaid callback service, location-based content services, menu-based information services and other mobile wallet platform services. A web application is one that implements or uses the internet to provide mobile wallet platform functionality. A mobile web application is similar to a web application, but is tailored for mobile devices. A WAP application is one that uses the wireless application protocol to communicate with the mobile wallet platform to provide the platform's functionality. A J2ME application is an application developed in Java and is

designed to provide mobile wallet functionality on a variety of different hardware. A tablet application is an application specifically designed for a touchscreen-based tablet that provides mobile wallet platform functionality for tablet devices, and as part of configuring the phone on the network. Any of these applications (or any combination thereof) may be provided on the user's mobile device. This functionality can also be made available on a retail point of sale (POS) system or web site.

The term "agent administrator" refers to an individual with mFS program tools and training to administrate the allocation of funds to agent branches (e.g. retail locations). As agents perform mFS transactions with subscribers, such as depositing and withdrawing money, the agents are adding and removing money from their own accounts. If there are insufficient funds in the agent's account to complete a transaction, additional money will need to be transferred from the agent company's master account to that agent branch account to cover that transaction. An agent administrator is responsible for these funds transfers. Any of the applications referred to above may be configured to provide tools used by the agent administrator to view the agent company balance, view the agent branch balances, and transfer funds into and out of agent branch mobile wallets. This functionality can also be made available on a website for easier access.

The term "agent administrator mobile wallet application" refers to a software program or application installed on the agent administrator's terminal in the agent administrator's mobile device (such as a mobile phone or tablet). This software application provides the agent administrator the ability to securely perform agent administrator functions such as querying the agent company account balance or transferring funds into and out of agent branch accounts. The agent administrator's mobile wallet application may be installed on a global system for mobile communications (GSM) SIM card (or on any other type of SIM card), and may be accessed using a GSM mobile phone. The agent administrator's application may also be installed on a code division multiple access (CDMA) mobile phone, a 3 G, 4G, 4G LTE (Long Term Evolution) or other wireless carrier standard. The application may, additionally or alternatively, be installed directly on the agent administrator's mobile device. The application communicates with the mFS transaction system using binary and/or text short message service (SMS) messages. A wireless service provider or MNO provides the GSM SMS network infrastructure on which the mFS platform operates.

In some embodiments, the mFS platform application may utilize triple data encryption standard (3DES) encryption (or some other type of encryption), encrypted message signing, and password security on some or all of its communications with the mFS transaction system in order to ensure that the transactions are properly secured and authenticated.

The term "agent branch" refers to any location where an agent provides support for subscriber services of the mFS platform. Funds are allocated by the agent administrator from the agent company's main account to each agent branch to fund the subscriber mFS functions such as depositing or withdrawing cash, in-store purchases, bill payments, prepaid airtime top-ups and money transfers. In some cases, multiple agents may work in a single branch. However, at least in some cases, monetary funds are allocated to from the agent company's main account on a per branch basis.

The term "agent branch account balance" refers to the amount of money residing in a particular agent branch account at a given time. Funds can be deposited into the branch account by the agent administrator, or the funds can come from participating in subscriber mFS transactions such as depositing or withdrawing cash from the subscriber's mobile wallet accounts, or making retail purchases with the mobile wallet.

Each agent branch is to maintain a balance in their branch account. This applies more strongly in countries where mFS program and financial services infrastructure is still developing. In cases where real-time processing of financial transactions including card processing is not practical, subscribers leverage the applications on their mobile phones to submit transactions and conduct business with retailers, businesses, and other subscribers. The mFS platform manages the balance of mobile wallet accounts for each subscriber as value is transferred from one mobile wallet to another (e.g. from a subscriber's mobile wallet to an agent's mobile wallet in payment for goods or services). This value is referred to herein as "eMoney".

As subscribers conduct business with mFS agents, they deposit or withdraw cash from their mobile wallet accounts. Virtual or eMoney credits are transferred between the subscriber's mobile wallet account and the agent branch's account as a form of currency to support the transaction. As agents accept cash into their cash register by mFS subscribers, they transfer the equivalent amount of eMoney credits into the mFS subscriber's mobile wallet account. For instance, if an mFS subscriber gives an mFS agent $10 to deposit into the subscriber's mobile wallet account, the agent would place the cash into his register and transfer $10 from the agent branch's eMoney account into the subscriber's mobile wallet account. While the agent acquired $10 in his register, he transferred out $10 of eMoney credits from his branch eMoney account.

In some embodiments, in countries with more developed economies, it may be beneficial to use program-issued pre-paid debit cards, pre-paid access accounts, stored value accounts or gift cards to conduct business along with the added convenience of card processing networks such as Cirrus, STAR, or Visa for POS and automated teller machine (ATM) functionality. Agents, particularly those in retail outlets and kiosks, can still support subscribers with deposits, withdrawals, and other transfers, but in this case bank external card processors manage the mobile wallet and branch account balances and provide the real-time transfer of funds.

The term "agent branch ledger" refers to a written (or electronic) ledger maintained by the mFS platform. Agent branch transactions are performed on the agent's and subscriber's mobile phones where an electronic record of the transaction is generated and stored on the mFS platform. These electronic transactions are then reconciled with agent branch ledgers to ensure the security and integrity of the transaction. Agent branch ledgers are printed or electronic transaction logs that are distributed to the agent branch locations in hard copy form to serve as a backup record to the electronic transactions.

The term "agent company" refers to a business that registers to participate in the mFS program as a partner of the mFS program provider or owner. The agent company has one or more agent branches which conduct mFS business with mFS program subscribers. In some cases, the agent company may be referred to as a distributor or retailer.

The term "agent company account balance" refers to the sum of the funds deposited at a "partner bank" (defined below) by the agent company to fund the agent company's daily transactions. The funds in the agent company account are then distributed to agent branches by the agent compa-

ny's agent administrator to conduct everyday business such as accepting cash deposits and cash withdrawals from mFS subscribers. This balance is sometimes referred to as the "agent company float".

An "agent manager" is a supervisor of company agents for a given company. The agent manager has the training and tools to create, delete or modify agent accounts for a company, as well as monitor the transactions performed by agents. The agent manager may have a special application or an increased level of rights to access applications features not available to other users. The special application is a program installed on the agent manager's terminal. This application provides the agent manager the ability to securely perform agent manager functions such as registering and activating new agent accounts.

The mFS agent manager application may be installed on any terminal or device. It communicates with the mFS platform using binary and/or text SMS messages. A wireless service provider or MNO provides the GSM SMS network infrastructure on which the mFS platform operates. The mFS platform mobile wallet applications may utilize 3DES encryption (or any other type of encryption), encrypted message signing, and password security on some or all of its communications with the mFS platform in order to ensure that the transactions are properly secured and authenticated.

The term "agent application" refers to an application that provides all the tools necessary for an agent to register, activate, and offer other services to the mFS subscriber. The agent application is a program installed on the agent's SIM card or otherwise installed in the agent's mobile device's memory. This application provides the agent the ability to securely perform agent functions such as registering and activating new subscribers and depositing and withdrawing funds from mobile wallet accounts. The mFS agent application may be installed on a GSM SIM card or mobile phone and may be accessed using a GSM or CDMA mobile phone. A wireless service provider or MNO provides the data and SMS network infrastructure on which the mFS platform operates.

The terms "mFS platform", "mobile wallet platform" and "monetary transaction system" refer to an overall platform or ecosystem of different components that work together to provide the various functions described herein on a global scale. At least some of the various logic components include the following: the application. The "mobile wallet application" or "mFS application" manages the processing of incoming transactions regardless of their source. The application handles end-user authentication, transaction processing, subscriber profile management, and further manages interactions between the various platform components.

The mFS platform further includes a transaction processor. This component is used when the mFS application is implemented in a country where real-time processing of financial transactions is not practical (or not possible). The transaction processor manages the balance of mobile wallet accounts, agent accounts, and the accounts of any other program participant. The transaction processor handles balance inquiries, credits, debits, and transaction roll-backs.

The mFS platform further includes a rules engine that manages and applies the rules and policy that are defined for transactions as they are processed on the mFS platform. Rules impact transaction fees, limits, velocity limits, and commissions as well as program actor roles and permissions. Rules can be customized for each implementation. The mFS platform also includes an integration interface that manages the integration and interaction between external systems (i.e. external to the mFS platform) and the mFS platform. Connectivity to the wireless service provider's pre-paid airtime billing platform and the program partner bank, for example, are managed by the integration interface.

The mFS platform further includes a transaction database that stores the data that supports the mFS platform. This includes subscriber profiles and subscription data, transaction data and logs, and application configuration and runtime data, among other types of data. Another component of the mFS platform is a handset support service that interfaces with the wireless service provider's SMS network to allow communication between the mobile wallet applications and the back-office systems via SMS messaging or some other form of data transfer. Still further, another component of the mFS platform is a web component that provides a web interface to the mFS program participants that allows the subscriber to perform the same functions in the web interface that they would have available through their applications.

The term "bill pay company" refers to a business that signs-up to participate in the mFS transaction system. As a participant in the mFS transaction system, the company accepts payment from mFS mobile wallet accounts, either in the form of eMoney or through periodic settlements.

At least in some embodiments, financial transactions that take place in the mFS mobile wallet platform are funded through pre-paid mobile wallet accounts. Mobile wallet platform subscribers can deposit cash into their mobile wallet account through a process referred to herein as 'cash-in'. The cash-in process is supported by mFS agents at agent branch locations. The agent accepts the cash from the subscriber and transfers the equivalent amount of eMoney to the subscriber's mobile wallet account. This process is similar to withdrawing cash from a bank account.

As mentioned above, in some embodiments, financial transactions that take place in the mobile wallet platform are funded through pre-paid mobile wallet accounts. Mobile wallet platform subscribers can withdraw cash from their mobile wallet account through a process known as "cash-out". The cash-out process is supported by mFS agents at agent branch locations. The subscriber transfers eMoney from their mobile wallet account to the agent's eMoney account. Upon receiving the eMoney, the agent gives the subscriber cash from their branch cash register.

Accounts managed on the mFS platform by the mFS eMoney transaction processor maintain the mobile wallet balance of mFS program participants including subscribers, agent branches, agent companies, and non-agent companies. eMoney is moved between Mobile Wallet accounts by the transaction processor based on mFS transaction processing. Only when transactions involving cash (i.e. depositing or withdrawing funds from the mFS program) or the movement of money from mFS participants to non-mFS program participants are funds moved from the master bank accounts.

As subscribers, agents, and other mFS program participants conduct business in the mFS program, value is transferred from one account to the next as payment for services rendered or goods purchased. This value can be in the form of real currency or the electronic representation referred to herein as eMoney.

Among other situations, eMoney is used in mFS implementations where the real-time processing of financial transactions including card processing is not practical. The mFS platform utilizes an internal transaction processor for managing the real-time balance of mobile wallet and agent accounts as value (eMoney) is transferred from one mobile wallet to another in payment for services.

As subscribers conduct business with mFS agents, they deposit or withdraw cash from their mobile wallet accounts. Virtual or eMoney credits are transferred between the subscriber mobile wallet accounts and the agent branch accounts as a form of currency to support the transaction. As agents accept cash into their cash register by mFS subscribers, they transfer the equivalent amount of eMoney credits into the mFS subscriber's mobile wallet account. For example, if an mFS subscriber gives an mFS agent $10 to deposit into the subscriber's mobile wallet account, the agent would place the cash into his or her register, and transfer $10 from the agent branch eMoney account into the subscriber's mobile wallet account. While the agent acquired $10 in his or her register, the agent transferred-out $10 of eMoney credits from his or her branch eMoney account. This will be explained in greater detail below.

In some embodiments, employers may wish to participate in the mFS program by allowing the direct deposit of paychecks into subscribers' mobile wallet accounts. Accordingly, each payday, the user's pay is directly transferred to the subscribers' mobile wallet.

The term "know your customer" or "KYC" refers to information collected about an individual that identifies that individual. Such information is used to establish a mobile wallet account with the mobile wallet platform. Regulatory requirements in some countries require that new bank account creation must be preceded by a display of a valid government ID. These KYC regulations may vary from country to country. Accordingly, different KYC information may be requested from subscribers in different countries in order to establish a mobile wallet account.

The term micro-finance institution (MFI) refers to a lender that issues small loans. MFIs participating in the mFS program lend to mFS program subscribers and accept loan repayment either in the form of eMoney or settlements with the mFS platform provider.

The term "mFS program", like the term "mFS platform" refers to the ecosystem of companies, service providers, and subscribers that participate in providing mobile financial services to their customers. In some embodiments, there may be one mFS program implementation per country. Each program includes a program owner and operator, a program platform, a partner wireless services provider or MNO, and a partner bank.

The term "mFS program master account" refers to a bank account maintained by the mFS program partner bank to provide funds and float for the operation of the mFS platform. Depending on the type of mFS implementation, the master account can include sub-accounts for each of the agent branches and subscriber mobile wallets, giving the bank visibility into all transactions on a per-user basis. The mFS platform can also manage the balance of sub-accounts and interact with the bank's master account when funds need to be deposited or withdrawn from the account.

The term mobile network operator (MNO) refers to a provider of mobile phone service including basic voice, SMS, unstructured supplementary service data (USSD) and data service, and may also be referred to as a "wireless service provider".

The term "mobile wallet" or "mobile wallet account" refers to a stored value account or prepaid access account (PPA) that allows the owner (or "subscriber") to pay for goods and services on the mFS platform from his or her mobile wallet account. When the mFS eMoney transaction processor is used, the mobile wallet balance is maintained by the mFS platform and value is exchanged within the mFS program as eMoney. When the mFS platform is integrated to an external card processor, the mobile wallet utilizes funds from the subscriber's prepaid debit card and bank account to exchange value on the mFS platform.

The term "non-agent company" refers to a mFS program participant who accepts payments from mFS subscribers but does not provide the same services as mFS agent companies. Payment is accepted either in the form of eMoney or through periodic settlements with the mFS platform provider. Examples of non-agent companies include bill pay providers and micro-finance lenders.

The term "non-mFS subscribers" refers to unregistered users that participates in various use cases in the mFS program. Non-mFS subscribers can send money to or receive money from mFS subscribers through interaction with the mFS program agents or with international remittance providers.

The term "partner bank" refers to the primary bank participating in the mFS program. The partner bank is responsible for holding the mFS program master accounts that hold the funds for all mFS services and transactions. A "PIN" refers to a numeric password that may be required to perform a transaction via the mobile wallet application. A "transaction processor" refers to an application or service that manages the mFS program account balances. The transaction processor determines the amount of funds or eMoney is in a particular account at any given time, and manages account balances. Mobile transaction system requests to credit, debit, or view the balance of a particular mobile wallet or program account are handled by the transaction processor (in conjunction with other components of the mobile wallet platform).

The term "sub-accounts" refers to accounts that are maintained within the mFS platform or by an external card processor. A partner bank may elect to maintain a separate bank account for each subscriber and/or agent branch, or a single master account may be established that contains the funds for all of the subscriber mobile wallet and agent branch accounts (at least within a country or other geographical region). The balance of each individual user may be managed by the mFS transaction processor.

When using a master account, the bank is involved only in transactions that require the movement of funds external to the mFS program. For example, subscriber cash-in and cash-out transactions involve the addition and removal of cash from the mFS program and would consequently include a deposit or withdrawal from the master account. Retail purchases from participating mFS program retailers or the exchange of funds between mFS subscribers results in no net change in the mFS program balance and thus do not require involvement by the partner bank.

The term "subscriber" refers to a participant of the mFS mobile wallet platform. The subscriber maintains a mobile wallet balance and performs transactions using the mFS application. An "unbanked subscriber" is a subscriber that does not have (or does not have access to) a bank account or credit union account. The application or "mobile wallet application" provides mobile wallet functionality to the (unbanked) subscriber. The mobile wallet application is installed on a mobile device in the device's memory, on a SIM card (such as a GSM SIM card) or is otherwise accessible to the mobile device. The mobile wallet application provides the subscriber the ability to securely perform subscriber functions such as making retail purchases, paying bills, or transferring money to other mFS subscribers and non-subscribers. The mobile wallet application communicates with the mFS platform using binary and text SMS messages, among other forms of wireless communication. A

wireless service provider or MNO provides the GSM network infrastructure on which the mFS platform operates.

FIG. **1** illustrates an example system architecture for a mobile wallet platform. Integration tier **101** is configured to manage mobile wallet sessions and maintain integrity of financial transactions. Integration tier **101** can also include a communication (e.g., Web services) API and/or other communication mechanisms to accept messages from channels **111**. Other mechanisms include, but are not limited to: International Standards Organization ("ISO") **8583** for Point of Sale ("POS") and Automated Teller Machines ("ATM") devices and Advanced Message Queuing Protocol ("AMQP") for queue based interfaces. Each of channels **111** can be integrated to one or more mechanisms for sending messages to integration tier **101**. Notification services **102** is configured to send various notifications through different notification channels **112**, such as, for example, Short Message Peer-to-Peer ("SSMP") for Short Messaging Service ("SMS") and Simple Mail Transfer Protocol ("SMTP") for emails. Notification services **102** can be configured through a web services API.

Service connectors **103** are a set of connectors configure to connect to 3rd party systems **113**. Each connector can be a separate module intended to integrate an external service to the system architecture. Business process services **104** are configured to implement business workflows, including executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects. Payment handler **105** is configured to wrap APIs of different payment processors, such as, for example, banking accounts, credit/debit cards or processor **121**. Payment handler **105** exposes a common API to facilitate interactions with many different kinds of payment processors.

Security services **106** are configured to perform subscriber authentication. Authorization services **107** are configured to perform client authorization, such as, for example, using a database-based Access Control List ("ACL") table.

Database **108** is configured to manage customer accounts (e.g., storing customer accounts and properties), manage company accounts (e.g., storing company accounts and properties), manage transaction histories (e.g., storing financial transaction details), store customer profiles, storing dictionaries used by the mobile wallet platform, such as, for example, countries, currencies, etc., and managing money containers. Rules engine **109** is configured to gather financial transaction statistics and uses the statistics to provide transaction properties, such as, for example, fees and bonuses. Rules engine **109** is also configured to enforce business constraints, such as, for example, transactions and platform license constraints.

Name matching engine **110** is configured to match different objects according to specified configuration rules. Matching engine **110** can be use to find similarities between names, addresses, etc. Transaction processor **121** is configured to manage financial accounts and transactions. The transaction processor **121** can be used to hold, load, withdraw and deposit funds to mobile wallet accounts. Transaction processor **121** can also be used as a common interface to a third party processor system. When used as a common interface, financial operations may be delegated to the external processor. A Clearing House subsystem of transaction processor **121** can be used to exchange the financial information with a bank.

Components of a mobile wallet platform can be connected to one another over (or be part of) a system bus and/or a network. Networks can include a Local Area Network ("LAN"), a Wide Area Network ("WAN"), and even the Internet. Accordingly, components of the mobile wallet platform can be "in the cloud". As such, mobile wallet platform components as well as any other connected computer systems and their components, can create message related data and exchange message related data (e.g., Internet Protocol ("IP") datagrams and other higher layer protocols that utilize IP datagrams, such as, Transmission Control Protocol ("TCP"), Hypertext Transfer Protocol ("HTTP"), Simple Mail Transfer Protocol ("SMTP"), etc.) over the system bus and/or network.

The components depicted in FIG. **1** can interoperate to provide a number of financial and other services including but not limited to enrolling a customer for a mobile wallet, adding a stored value account (either hosted by a mobile wallet platform or a third party), adding a bank or credit union account to a mobile wallet, adding a debit or credit card account to a mobile wallet, depositing funds in a mobile wallet, withdrawing funds from a mobile wallet, paying bills from a mobile wallet, topping up a prepaid mobile account through a mobile wallet, transferring funds through a mobile wallet (nationally or internationally), making in-store purchases using a mobile wallet, and various other tasks as described herein below. These services will be described in greater detail below with regard to system FIGS. **1** and **2**, as well as FIGS. **3-19**B.

FIG. **2** depicts a monetary transaction system **200** similar to that described in FIG. **1**. The monetary transaction system **200** may provide a more simplified system structure in which each of the above services may be provided. The system includes a subscriber **205**. The subscriber may have access to a bank account, or may be an unbanked subscriber. The subscriber has a profile **211** with the monetary transaction system **210**. The profile includes the subscriber's KYC information, as well as any associated bank accounts, credit union accounts, bill pay accounts or other accounts. The subscriber has (or has access to) a mobile device **206** such as a phone or tablet. The mobile device runs the mobile wallet application (or mobile wallet application) **207**.

The subscriber can indicate, using the mobile application **207** which transaction or other action he or she would like to perform. The indicated transaction **208** is sent to the mobile wallet platform **210** to be carried out by the platform. The transaction processor **216** (which may be similar to or the same as transaction processor **121** of FIG. **1**) performs the transaction(s) specified by the (unbanked) subscriber **205**. The transaction processor may implement various other components to perform the transaction including memory **217**, (wireless) communication module **215**, rules engine **210** and/or transaction database **225**.

Performing the specified transactions may include communicating with the monetary transaction database **225** to determine whether the transaction is permissible based on data indicated in the unbanked subscriber's profile (for instance, whether the subscriber has enough eMoney in his or her stored value account, or has enough money in his or her bank account). Rules engine **220** may also be consulted to determine whether the subscriber has exceeded a specified number of allowed transactions. Then, if funds are available, and the transaction is otherwise permissible, the monetary transaction system can transfer money or eMoney **221** to or from an entity such as a user or agent (e.g. entity **222**) to or from an establishment such as a retail store or agent company (e.g. entity **223**).

In some cases, the monetary transaction system **210** application provides a web interface that allows subscribers to perform the same functions provided by the monetary

transaction system application. For instance, mobile wallet application **207** may provide a web interface that allows a user to enroll for a mobile wallet. The web interface (or the mobile wallet application itself) receives a subscriber-initiated transaction over one of a plurality of channels (**111** from FIG. **1**) connected to the monetary transaction system **210**. The web interface or mobile wallet application may prompt for and receive enrollment information (e.g. KYC information) for the (unbanked) subscriber **205** over at least one of the plurality of channels (e.g. web, point-of-sale (POS), interactive voice response (IVR, etc.). The web interface or mobile wallet application may then send activation instructions over the same or a different channel to activate the (unbanked) subscriber **205** and create a subscriber account for the (unbanked) subscriber.

Once the subscriber has an account, the monetary transaction system generates a corresponding mobile wallet for the unbanked subscriber (available via the web interface and/or the mobile wallet application. The system then presents the (unbanked) subscriber's account data associated with the mobile wallet and/or a notification indicating that enrollment was successful to the subscriber. Accordingly, the mobile wallet application or the web interface may be used to provide user enrollment functionality. It should also be understood that either the mobile wallet application or the web interface may be used to provide substantially all of the mobile wallet functionality described herein.

It should also be noted that the mobile device **206** may be any type of plan-based phone or tablet, or prepaid phone or tablet. Many subscribers, such as unbanked subscribers, may primarily use prepaid phones. The mobile wallet application **207** may be installed on both plan-based phones and prepaid phones. The mobile wallet application may be installed on the device's SIM card, or on the device's main memory. Accordingly, the monetary transaction system **200** may be accessed and used via substantially any type of plan-based or prepaid mobile device.

FIG. **3** shows three different graphics (**301**-**303**) and corresponding method steps (**310**-**370**) that illustrate an unbanked subscriber making a deposit using a mobile wallet (and, by extension, using the mobile wallet transaction system **210**). In at least some of the embodiments described below, the actions of each participant are shown and described. This will also, at least in some embodiments, include an illustration of money flow throughout the mobile wallet transaction system. In the graphics, various terms are used as follows: $C=Cash Balance and $E=Electronic Money (eMoney) Balance.

At graphic **301**, it is assumed that the unbanked subscriber (e.g. **205**) has already registered and activated an eMoney account at an agent branch location (e.g. a retail store, gas station, or other location that has registered to be an agent branch). To deposit cash in order to get eMoney credit, the subscriber informs the agent manager or agent that they want to deposit a certain amount of cash (in **301**). The agent manager/agent takes the cash and notifies the mobile wallet transaction system of the deposit using their agent manager or agent application (**302**). The transaction system **210** then credits the subscriber's eMoney account (**303**). Accordingly, any location that has registered to accept eMoney payments from subscribers' mobile wallets can also accept cash deposits. The agent branch's eMoney balance is reduced because their actual money balance was increased by the amount of the deposit. The subscriber's mobile wallet account is credited with eMoney in the amount of the deposit. In this manner, a subscriber can deposit cash into their mobile



wallet account (in the form of eMoney) at any retail location or other agent branch location.

Thus, the agent manager receives the physical cash deposit into the subscriber's eMoney account via the agent manager or agent's application. The subscriber gives cash to agent manager or agent, and the mFS platform processes the request, updates the agent branch and subscriber's eMoney balances, logs the transaction, and sends details (such as eMoney account balances, transaction logs, etc.) to bank specified by the mobile wallet platform. These details may be sent instantaneously as transactions occur, or in batches at pre-determined intervals.

In one embodiment, the monetary transaction system **210** of FIG. **2** is implemented to deposit funds at an agent branch using a mobile wallet. The monetary transaction system **210** receives communication from an agent branch over one of a plurality of channels (e.g. **111**) connected to the monetary transaction system (step **310**). The agent communication indicates that the unbanked subscriber **205** desires to deposit a specified amount of funds into the unbanked subscriber's mobile wallet account. The transaction processor **216** then validates the status of the unbanked subscriber's mobile wallet account (step **320**) and determines if the agent branch is authorized to receive deposited money (i.e. determine if it has pre-registered as an official agent branch) (step **330**).

The monetary transaction system may then use rules engine **220** to perform a limit check (to determine whether sufficient funds are available) and/or a velocity check (to determine whether the user has exceeded a specified number of (hourly, daily, or weekly) transactions) on the unbanked subscriber's mobile wallet account (step **340**). The transaction system then credits the unbanked subscriber's mobile wallet account with the specified amount of funds (step **350**) and returns a notification to the agent branch confirming the deposit (step **360**) and returns another notification to the subscriber notifying the subscriber that the specified amount of funds was deposited in the their mobile wallet account (step **370**). Any of channels **111** may be used to perform these communications.

FIG. **4** shows three different graphics (**401**-**403**) and corresponding method steps (**410**-**490**) that illustrate an unbanked subscriber making a withdrawal using a mobile wallet (and, by extension, using the mobile wallet transaction system **210**). As above, the terms in the graphics include "$C" representing cash balance and "$E" representing eMoney balance.

To withdraw cash at an agent branch, a subscriber submits a withdrawal request using their application (**401**). The subscriber may also enter information about the agent branch (e.g. name of establishment, name of agent, location or other information) that allows the monetary transaction system **210** to identify the agent branch. The transaction processor **216** may then determine whether the unbanked subscriber has enough eMoney to withdraw the requested amount. If he or she does have enough eMoney, then the subscriber's eMoney is deducted and that amount is transferred to the agent branch's eMoney account (**402**). Then, the agent branch gives the subscriber the requested amount of cash (**403**). In this manner, any entity that has established itself as an agent branch (including retail stores, gas stations, service providers, etc.) can provide cash withdrawal to a mobile wallet subscriber (whether banked or unbanked). The agent's or agent manager's role is to verify the withdrawal request (e.g. via SMS on the agent's or agent manager's phone) and gives the cash to subscriber. The subscriber requests cash withdrawal from agent branch's eMoney account via the application, and receives physical

cash from agent manager/agent. The mobile wallet platform processes the request, updates the agent branch's and subscriber's eMoney balances, logs the transaction, and sends transaction details to a specified bank at pre-determined intervals.

In one embodiment, the monetary transaction system **210** is implemented to withdraw funds at an agent branch using a mobile wallet. The communication module **215** receives a communication from an unbanked subscriber over one of a plurality of channels **111** connected to the monetary transaction system **210** (step **410**). The communication indicates that the unbanked subscriber **205** desires to withdraw a specified amount of funds from the unbanked subscriber's mobile wallet account at the agent branch. The monetary transaction system **210** validates the status of the unbanked subscriber's mobile wallet account (step **420**) and determines if the balance of the unbanked subscriber's mobile wallet account is sufficient to accommodate the requested withdrawal for the specified amount of funds (step **430**).

The transaction processor **216** performs one or more of a limit check (to verify sufficient funds) and a velocity check (to verify the subscriber hasn't exceeded specified transfer limits) on the unbanked subscriber's mobile wallet account (step **440**). The monetary transaction system **210** then returns a secure, perishable withdrawal code to the subscriber **205** over at least one of the plurality of channels **111** connected to the monetary transaction system (step **450**). The monetary transaction system **210** receives subsequent agent branch communication over at least one of the plurality of channels connected to the monetary transaction system indicating that the withdrawal code has been presented to the agent branch (step **460**). The monetary transaction system **210** then debits the unbanked subscriber's mobile wallet account by the specified amount of funds (step **470**), returns a notification to the agent branch confirming the withdrawal (step **480**) and notifies the subscriber that the specified amount of funds was withdrawn from the unbanked subscriber's mobile wallet account over at least one of the channels **111** connected to the monetary transaction system (step **490**). Accordingly, the monetary transaction system **210** may be used to allow subscribers to withdraw cash using their mobile wallet applications at any store or other entity registered as an agent branch.

FIG. **5**A depicts a subscriber-to-subscriber eMoney transfer. To perform such a transfer, subscriber A (**501**) enters some type of identification information identifying subscriber B (e.g. subscriber B's phone number) and an amount of money he or she wishes to transfer. The transaction processor **216** of the monetary transaction system **210** determines if there are sufficient funds to complete the transfer. If sufficient funds are available, the monetary transaction system **210** decrements subscriber A's account and credits subscriber B's account (**502**). The system then sends some kind of notification (e.g. SMS) to subscriber B indicating that a certain amount of money was transferred to their account. Subscriber A may also receive a notification that the transfer was successful. Accordingly, eMoney may be transferred between two mFS platform subscribers, one or both of which may be unbanked. The monetary transaction system **210** processes the subscribers' requests, updates the subscribers' eMoney balances, logs the transactions, and sends transaction information to a specified bank when needed.

FIG. **5**B illustrates a subscriber-to-non-subscriber eMoney transfer. In graphic **505**, subscriber A wishes to send eMoney to another individual that is not a subscriber to the mFS platform. The transaction is initiated in the same fashion as the subscriber-to-subscriber transfer scenario. However, since non-subscriber B does not have a mobile wallet account, the monetary transaction system **210** cannot credit them with eMoney. Instead, the monetary transaction system **210** sends a notification (e.g. via SMS) to non-subscriber B with instructions for how to pick-up the transferred money, along with an authorization code (**506**). The monetary transaction system **210** puts a hold on subscriber A's account for the amount transferred. Subscriber B then has a specified number of days to pick up the cash before the hold expires and the amount is credited back to subscriber A's eMoney account by the monetary transaction system **210**.

When non-subscriber B goes to pick up the money at an agent branch, the agent branch's manager or agent verifies the authorization code via an agent manager or agent mobile wallet application (that, in turn, accesses the mFS platform). Once the transfer has been validated, the agent gives the cash to non-subscriber B. The agent branch's mFS account is credited with the transfer amount (**507**) and the user leaves with the cash in hand (**508**). The mFS platform processes the transfer request, updates subscriber A's eMoney balance, logs the transaction, and sends transaction details to a platform-specified bank.

FIG. **6**A illustrates a subscriber-to-subscriber international eMoney transfer. This embodiment is, at least in some respects, similar to sending eMoney to an mFS subscriber domestically. In this case the monetary transaction system **210** leverages one or more existing international money transfer organizations or "remittance companies" such as MoneyGram®. In some embodiments, MoneyGram® is pre-integrated to the monetary transaction system **210**, but other international money transfer organizations may also be used. Still further, at least in some embodiments, subscriber B may need to have an eMoney account with a foreign mFS program that is also affiliated with MoneyGram® or another international money transfer organization.

In FIG. **6**A, subscriber A initiates the international eMoney transfer at **601**, the international money transfer organization (e.g. MoneyGram®) transfers the eMoney to subscriber B at **602** and subscriber B's eMoney balance is increased by the transferred amount. Thus, subscriber A requests to send eMoney from his or her eMoney account via the mobile wallet application. The eMoney is transferred using an international money transfer organization, and subscriber B receives a notification (that may, for example, include a reference number, among other information) that their eMoney balance has increased by the transfer amount. The monetary transfer system **210** processes subscriber A's request, updates subscriber A's and subscriber B's eMoney balances, logs the transaction, and send transaction details to a mFS platform-specified bank.

FIG. **6**B illustrates a subscriber-to-non-subscriber international eMoney transfer. In this illustration, subscriber A wishes to send cash to subscriber B who is not an mFS program subscriber. Similar to the scenario described in FIG. **6**A, the monetary transaction system **210** leverages various international money transfer organizations or remittance companies such as MoneyGram® to transfer the eMoney. Subscriber A initiates a typical eMoney transfer at **605** by providing non-subscriber B's identification information, as well as the amount to be transferred. The Monetary transaction system **210** recognizes the eMoney transfer is not destined for a domestic phone number and routes the request to the international money transfer organization (e.g. MoneyGram®) (**606**).

The international money transfer organization sends non-subscriber B a notification (e.g. via SMS) with instructions for how and where to pick up the money (in embodiments where MoneyGram® transfers the eMoney, the notification may include a MoneyGram® reference number (MGRN)) (**607**). Non-subscriber B can then show the MGRN to an agent at an agent branch (**608**) and then receive the cash (**609**). The monetary transaction system **210** then decrements subscriber A's eMoney account for the transferred amount. The monetary transfer system **210** thus processes subscriber A's transfer request, updates subscriber A's eMoney balance, logs the transaction, and sends transaction detail to a platform-specified bank. It should also be noted that an mFS subscriber may also receive money in a foreign country from either a subscriber or a non-subscriber in a similar manner.

FIG. **7** illustrates a subscriber purchasing airtime using a mobile wallet. Mobile wallet platform subscribers may buy airtime by using their mobile wallet application **207**. The monetary transaction system **210** will reload their airtime account within the mobile network operator's (MNO's) systems. The subscriber requests to purchase airtime by entering the request via the mobile wallet application or via a mobile wallet web interface. The monetary transaction system **210** then decrements the subscriber's eMoney account (**701**), while crediting the mFS platform's eMoney account (**702**). The purchased airtime is then added to the subscriber's airtime balance (**703**). The monetary transaction system **210** processes the subscriber's request, updates the subscriber's eMoney balances as well as its own eMoney balance, logs the transaction, and sends transaction detail to a mFS platform-specified bank.

In one embodiment, the monetary transaction system **210** is implemented to top up a prepaid mobile account from a mobile wallet. The communication module **215** of the monetary transaction system **210** receives a subscriber communication over one of a plurality of channels **111** connected to the monetary transaction system (step **710**). The subscriber communication indicates that an unbanked subscriber **205** desires to top up a prepaid mobile account by a specified amount using a specified payment method from the unbanked subscriber's mobile wallet. The transaction processor **216** validates the status of the selected payment method (step **720**) and performs a limit check and/or a velocity check on the selected payment method (step **730**). The monetary transaction system **210** then debits the specified payment method by the specified amount of funds (step **740**) and processes the mobile top-up via a billing system integrator and/or an aggregator (step **750**), and notifies the subscriber that the prepaid mobile account was topped up over at least one of the channels connected to the monetary transaction system (step **760**).

FIG. **8** illustrates an embodiment where a mFS subscriber pays a bill using a mobile wallet. At least in some embodiments, the company that the subscriber wishes to pay needs to have signed-up to be part of the mFS platform. The mFS platform may publish a list of company names that have registered to be part of the mFS platform. This list of companies may include company IDs so that subscribers can know which company ID to enter in their mobile wallet application. Once the company ID is known, the subscriber can pay a bill by entering the company ID and the amount to be paid. The monetary transaction system **210** then decrements the subscriber's eMoney account (**801**) and credits the identified company's eMoney account (**802**). Accordingly, in response to the subscriber's request to pay bill via their mobile wallet application, the monetary transaction system **210** processes the request, updates the bill pay company's and the subscriber's eMoney balances, logs the transaction, and sends transaction details to the mFS platform-specified bank.

In one embodiment, the monetary transaction system **210** is implemented to pay a bill from a mobile wallet. The communications module **215** of the monetary transaction system **215** receives a subscriber communication over a communication channel **111** connected to the monetary transaction system (step **810**). The subscriber communication indicates that unbanked subscriber **205** desires to pay a bill for a specified amount using a specified payment method from the unbanked subscriber's mobile wallet (e.g. eMoney). The monetary transaction system **210** validates the status of the selected payment method (step **820**) and performs a limit check and/or a velocity check on the selected payment method to ensure the eMoney transfer is permissible (step **830**). The monetary transaction system then debits the specified payment method by the specified amount of funds (step **840**), processes the bill payment via a direct biller connection or a bill pay aggregator (step **850**), and notifies the unbanked subscriber that the bill was paid using a communication channel (e.g. SMS) connected to the monetary transaction system (step **860**). Thus, in this manner, a subscriber may use a mobile wallet to pay various bills including rent, utility, mortgage, phone, cable, medical and other bills.

FIG. **9** illustrates a mobile wallet subscriber making a retail purchase.

Mobile wallet subscribers can make retail purchases at agent branches directly from their mobile device. Agent branches, as explained above, are retail stores or other entities that have registered with the mFS system and are able to accept mobile wallet payments. Accordingly, a subscriber can select the items they wish to purchase, and indicate (via the mobile wallet application) to the agent branch that they wish to pay for the items. The mobile wallet application then communicates with the agent branch and the monetary transaction system to indicate the price of the transaction. The monetary transaction system **210** then debits the subscriber's eMoney account (**901**) and credits the agent branch's eMoney account (**902**). The agent branch (and/or the agent manager or agent) receives confirmation that subscriber paid for the purchase. The subscriber may also receive a summary of the retail purchase and may be asked to confirm the purchase by entering a PIN. The monetary transaction system processes the purchase request, updates the agent branch and subscriber's eMoney balances, logs the transaction, and sends transaction details to a mFS platform-specified bank.

In one embodiment, the monetary transaction system **210** is implemented to make a purchase from a mobile wallet. The communications module **215** of the monetary transaction system **210** receives a communication from a subscriber over a communication channels **111** (step **910**). The subscriber communication indicates that an unbanked subscriber **205** desires to purchase an item for a specified amount of funds using a specified payment method from the unbanked subscriber's mobile wallet.

The monetary transaction system **210** then returns a secure, perishable purchase code to the unbanked subscriber over at least one of the channels connected to the monetary transaction system (step **920**) and receives a subsequent agent branch communication over a channel indicating that the purchase code has been presented to an agent (branch) (step **930**). The monetary transaction system **210** validates the status of the specified payment method (step **940**),

determines if the specified payment method can accommodate a purchase for the specified amount (step **950**), performs a limit check and/or a velocity check on the selected payment method (**960**), debits the specified payment method by the specified amount of funds (**970**), returns a notification to the agent branch authorizing the purchase (**980**) and sends a receipt to the unbanked subscriber over a communication channel. The monetary transaction system **210** may thus be used to make a retail purchase using a mobile wallet.

FIG. **10**A illustrates a subscriber requesting a micro-loan. Financial institutions and potentially other mFS program participants may sign up to become money or eMoney lenders. Mobile wallet subscribers may be able to use their mobile wallets to request micro-loans from these approved lenders. The micro-loans are tracked by the monetary transaction system **210**, and repayment reminders, interest and commissions are managed by the monetary transaction system. The subscriber requests a micro-loan from a lender, indicating the amount in the request, as well as other information such as the repayment date and the commission (i.e. interest rate). Potential lenders then have a chance to counter the loan request with their own terms. Once the lender approves the subscriber's request, the lender's eMoney account balance is debited for the specified amount (**1001**) and the subscriber's eMoney account is credited with the requested amount (**1002**). The monetary transaction system **210** processes the micro-loan requests, update the lender and subscriber's eMoney balances, sets up repayment schedules and reminders, logs the transaction, and sends transaction detail to a mFS bank. It should also be noted that while the term "micro-loan" is used herein, the loan may be for substantially any amount of money.

Following on the embodiment described in FIG. **10**A, FIG. **10**B illustrates a subscriber repaying a micro-loan. The subscriber may repay the loan using functionality provided in the mobile wallet application or in a similar web interface. Repayments can be made in installments or in full depending on the rules of the micro-loan. The subscriber enters the amount they wish to repay and the loan ID. The subscriber's eMoney account is then debited for the specified amount (**1005**), while the lender's eMoney account is credited the specified amount (**1006**). Both the lender and the subscriber may receive confirmation that the loan has been repaid via SMS or some other communication channel. The mFS platform thus processes the subscriber's micro-loan repayment request, updates lender and subscriber's eMoney balances, updates repayment schedule and reminders, logs the transaction, and sends transaction details to a specified mFS platform bank.

FIG. **11**A illustrates a subscriber receiving a direct deposit from an employer or other entity. Subscribers to the mFS platform have the ability to receive any direct deposit into their eMoney account. Subscribers may be asked by their employers to provide account information in order to set up direct deposit. The employer then submits a direct deposit request using their existing processes (i.e the processes they use for a normal checking or savings bank account). Once the direct deposit is set up and a payday arrives, the employer's bank account is debited for the proper amount (**1101**) and the employer's mFS account is credited with that amount (**1102**). Then, once the funds have been received at the mFS platform bank, the mFS platform bank sweeps the employers direct deposit balance (**1103**) into a mFS platform master account (**1104**) and notifies the mFS platform of each account to be incremented (including the subscriber's mobile wallet (eMoney) account). The subscriber's eMoney account is then credited with the paycheck amount (**1105**) upon which the eMoney may be used to pay for goods, pay bills, top up airtime, transfer to other entities or for cash withdrawal.

The subscriber does not need to have a bank account to participate in direct deposit. The employer's bank can communicate with the mFS platform's bank to perform the necessary steps in directly depositing the subscriber's paycheck in his or her eMoney mobile wallet account. The bank facilitates monetary deposit into the employer's bank account for direct deposit and performs an automated sweep of recent deposits from the employer's bank account into the mFS platform's master bank account. The bank also sends transaction details to the monetary transaction system **210** including transaction logs. The monetary transaction system receives a list of eMoney accounts that are to be credited directly from the employer (or bank), processes the list and requests to establish a direct deposit, updates subscriber's eMoney balance, log the transaction, and sends transaction details to the mFS platform bank.

In a similar manner, a subscriber may receive a government welfare payment directly on their mobile device. FIG. **11**B illustrates a subscriber receiving a government social welfare payment directly into their eMoney account. In some embodiments, subscribers may need to opt-in and register with the government program for which they choose to receive the payment via their mobile wallet. Once the funds have been received, the subscriber can use that eMoney for any goods or services, as described above. Once the direct deposit has been established and a payout has been initiated, the government's welfare account deposits the money (**1110**) into the government's bank account for welfare payments (**1111**) and performs an automated sweep of recent deposits from the government's bank account (**1112**) into the mFS program's master bank account (**1113**). The bank then sends transaction details to the monetary transaction system **210** regarding the deposit. The subscriber receives a notification that the welfare payment has been credited to their eMoney account (**1114**). The mFS platform receives an indication of eMoney accounts that are to be credited from the government, processes the welfare payments, updates the subscriber's eMoney balance, logs the transactions, and sends transaction details to the mFS platform bank.

FIG. **12**A illustrates an agent administrator distributing eMoney to various recipients. An agent administrator, as explained above, is a person who acts as an agent company's representative. The agent administrator deposits, withdraws, and distributes funds into and out of the agent company's bank account. When an agent administrator deposits cash into an agent company's bank account, it is credited as eMoney to the agent company's account. In order to provide the agent branches with eMoney, the agent administrator first moves the eMoney from the agent company's account (**1201**) to the branch accounts (**1202**). This is performed using the agent administrator's mobile wallet application or portal. In an agent administrator money transfer, the monetary transaction system **210** processes the administrator's eMoney transfer request, updates the agent company and agent branch eMoney balances, logs the transaction, and sends transaction details to the mFS platform bank.

FIG. **12**B illustrates an agent company deposit. The agent company has an eMoney account in the monetary transaction system **210** that may also include a corresponding bank account (that may be created automatically upon creation of the agent company's eMoney account). After the agent company's bank account has been set up, the agent administrator can make deposits into that account. As FIG. **12**B

shows, once cash (**1205**) has been deposited into the bank account (**1206**), it is transferred to a mFS platform master account (**1208**) that includes all or a part of the mFS platform's funds. The agent company's bank account is decreased by the deposit amount (**1207**), while the agent company's eMoney account balance is correspondingly increased (**1210**). At this time, the agent company account is credited with eMoney. The agent company's bank facilitates a physical cash deposit into the agent company's bank account and performs an automated sweep (**1209**) of recent deposits from the agent company's bank account into the mFS platform's master bank account. The agent company's bank then sends transaction details to the monetary transaction system **210**. The agent administrator physically delivers the cash (or form of money such as a check or money order) to a bank branch for deposit. The monetary transfer system receives transaction details from the agent company's bank about recent transactions (including deposits, as shown in FIG. **12**B.

FIG. **13** illustrates an agent company withdrawal. To make a cash withdrawal for an agent company, the agent administrator requests a withdrawal using the agent administrator mobile wallet application. The monetary transaction system **210** then notifies the bank that a certain amount of eMoney is to be transferred from the master mFS account (**1302**) to the agent company bank account (**1303**). When the money is in the agent company bank account, the agent administrator can withdraw the cash by traditional withdrawal means. The mFS master bank receives transaction details from the monetary transaction system **210** about recent transactions (recent withdrawals in this case). The mFS master bank performs an automated sweep (**1304**) of the mFS platform's master bank account to reflect the recent withdrawal request from agent the agent company (**1301**). The agent company's eMoney account is reduced by the amount of the withdrawal. The agent company also sends transaction details to the monetary transaction system **210**. The agent administrator can request withdrawal via the agent administrator mobile wallet application and physically withdrawal cash (**1305**) from the agent company's bank branch (**1306**). The mFS platform processes the agent company's withdrawal request, updates agent company and agent branch eMoney balances, logs the transaction, and sends transaction details to an mFS platform-specified bank.

Attention will now be turned to embodiments in which subscribers have bank accounts associated with their mobile wallets. The monetary transaction system **210** provides similar functionality to consumers that have bank or credit union accounts. Although many different transactions are presented herein, many more and varied types of transactions may be processed by the monetary transaction system. In the following figures, "$C" refers to cash balance, "$DC" refers to a debit card (prepaid) balance and "$PIN" refers to a recharge PIN value.

FIG. **14** describes a subscriber deposit at an agent branch. The subscriber has a registered and activated (prepaid) debit card at an agent branch location. The prepaid debit card is associated with the mobile wallet application in the subscriber's mobile device. As such, the debit card is linked to the subscriber's account in the monetary transaction system **210**. To deposit cash onto the mobile wallet, the subscriber informs the agent that they want to deposit a specified amount of cash (**1401**). The agent takes the cash and notifies the monetary transaction system **210** of the deposit using their point of sale (POS) system or the agent mobile wallet application (**1402**), and the monetary transaction system **210** credits the subscriber's mobile wallet account (**1403**). The funds collected at the cash register typically do not reach a bank account until the reconciliation and settlement of funds occurs between the agent and the mFS owner's bank.

The subscriber's bank then receives a settlement report from the card processor and receives funds from the agent's bank. The agent or agent manager physically deposits the cash into the subscriber's mobile wallet account via their POS system or agent manager/agent mobile wallet application. The monetary transaction system processes the deposit request, increments the subscriber's mobile wallet balance within the card processor and logs the transaction. An external card processor increments the subscriber's mobile wallet balance and sends reports to the bank for settlement on a regular (e.g. nightly) basis.

In one embodiment, the monetary transaction system **210** is implemented to deposit funds into a bank or credit union account using a mobile wallet. The communications module **215** of the monetary transaction system **210** receives communication from an agent branch over a communication channel (step **1410**). The agent communication indicates that a subscriber **205** desires to deposit a specified amount of funds into a bank or credit union account. The transaction processor **216** validates the status of the bank or credit union account (step **1420**), determines if the agent branch is authorized to deposit money (step **1430**), and performs a limit check and/or a velocity check on the bank or credit union account (step **1440**). The monetary transaction system then credits the bank or credit union account with the specified amount of funds (step **1450**), returns a notification to the agent branch confirming the deposit (step **1460**) and notifies the subscriber that the specified amount of funds was deposited in the bank or credit union account using at least one of the communication channels connected to the monetary transaction system (step **1470**). Accordingly, cash may be deposited into a bank or credit union account associated with a subscriber's mobile wallet.

FIG. **15** illustrates a subscriber deposit that is performed with a non-agent. In some economies, subscribers may have the ability to leverage other channels outside of agents to deposit funds onto their card. One deposit method is a PIN-based recharge that allows a subscriber to purchase a PIN worth the deposit value. The PIN can then be redeemed via an interactive voice response (IVR) system or via the subscriber's mobile wallet application. The mobile wallet application will allow the monetary transaction system **210** to deposit the funds onto the subscriber's card. The retailer's bank settles with the PIN card provider's bank and the PIN card provider's bank settles with the mFS platform's bank for the deposit. The subscriber gives cash to the agent (**1501**) which increases the agent company's physical cash (**1502**). The subscriber uses IVR or their SIM Application to recharge mobile wallet account using a PIN card (**1503**). In some cases, an agent may provide the PIN card (i.e. the prepaid debit card) to the subscriber. The monetary transaction system **210** processes the subscriber deposit request, increments the subscriber's mobile wallet balance within the card processor and logs the transaction. An external card processor decreases the subscriber's PIN card balance (**1504**), increments the subscriber's mobile wallet balance (**1505**) and send reports to the mFS platform bank for settlement.

FIG. **16** illustrates a subscriber withdrawal at an agent branch. To withdraw cash at an agent branch from a (prepaid) debit card, a subscriber submits a withdrawal request using the mobile wallet application on their mobile device. The subscriber may also need to enter details about the agent branch that allows the monetary transaction system **210** to

determine if the subscriber has sufficient funds on their debit card. The mFS platform then notifies the agent branch that it can give cash to the subscriber. If the subscriber has sufficient funds, the monetary transaction system **210** will decrement the subscriber's funds from their card (**1601**) and transfer it to the mobile wallet owner's account within the same card processor or bank. The agent branch (**1602**) then provides the withdrawn cash to the subscriber (**1603**).

Accordingly, the subscriber requests a cash withdrawal from their own mobile wallet account via the mobile wallet application. The agent or agent manager verifies the withdrawal request via POS authorization or SMS received on agent's phone and, once verified, gives cash to the subscriber. The monetary transaction system **210** processes the subscriber's withdrawal request, decrements the subscriber's mobile wallet balance within the card processor and logs the transaction. An external card processor decrements the subscriber's mobile wallet balance and sends reports to the bank for settlement on a periodic basis.

In one embodiment, the monetary transaction system **210** is implemented to withdraw funds from a bank or credit union account using a mobile wallet. The communication module **215** of the monetary transaction system **210** receives a communication from a subscriber **205** over a communication channel **111** (step **1610**). The subscriber communication indicates that subscriber **205** desires to withdraw a specified amount of funds from a bank or credit union account. The transaction processor validates the status of the bank or credit union account (step **1620**), determines if the balance of the bank or credit union account is sufficient to accommodate the requested withdrawal for the specified amount of funds (step **1630**) and performs a limit check and/or a velocity check on the bank or credit union account (step **1640**).

The monetary transaction system **210** then returns a secure, perishable withdrawal code to the subscriber **205** over at least one of the communication channels (step **1650**) and receives a subsequent agent branch communication indicating that the withdrawal code has been presented to an agent (step **1660**). The monetary transaction system **210** then debits the bank or credit union account by the specified amount of funds (step **1670**), returns a notification to the agent branch confirming the withdrawal (**1680**) and notifies the subscriber that the specified amount of funds were withdrawn from the bank or credit union account using at least one of the communication channels connected to the monetary transaction system (step **1690**). Accordingly, a subscriber can withdraw cash stored on their mobile wallet from an agent branch or a non-agent branch.

FIG. **17**A illustrates a subscriber withdrawal using an automated teller machine (ATM). Subscribers in many countries have access to ATM machines and can use their mobile wallets to perform withdrawals using their (prepaid) debit card at most ATMs. Banks provide ATMs to their customers (typically at no charge) and to non-customers (typically for a small charge). The subscriber requests a cash withdrawal from the subscriber's mobile wallet via the subscriber's debit card that is associated with the mobile wallet. The bank providing the debit card may receive settlement reports from the card processor and may transfer and/or settle funds from subscriber's account to the ATM network bank. An extern card processor decrements the subscriber's mobile wallet balance (**1701**) and sends transaction reports to the bank for settlement. Accordingly, once the withdrawal request has been received and the external card processor (e.g. Visa® or MasterCard®) (**1702**) has debited the debit card account, the ATM (**1703**) dispenses the withdrawn cash to the subscriber (**1704**).

FIG. **17**B illustrates a subscriber-to-subscriber money transfer. An mFS subscriber (**1705**) may send money to another mFS subscriber (**1706**). To do so, subscriber A enters information identifying subscriber B (e.g. a phone number, email address or other identifier). The monetary transaction system **210** determines if there are enough funds to complete the transaction, and if so, the monetary transaction system **210** decrements subscriber A's debit card and credits subscriber B's debit card. The subscriber, accordingly, may request to send money from their own mobile wallet (i.e. money stored on a (prepaid) debit card) account via the subscriber mobile wallet application. The other subscriber receives a notification that the balance of the debit card associated with their mobile wallet has increased. The bank receives a settlement report from the debit card processor and transfers or settles funds from subscriber A's account to subscriber B's account (if necessary). The monetary transaction system **210** processes the transfer request, updates subscriber A's and subscriber B's debit cards that are associated with their mobile wallets and logs the transaction. The external card processor decrements subscriber A's debit card balance, increments subscriber B's debit card balance and sends transaction reports to the mFS platform bank for settlement.

FIG. **17**C illustrates subscriber-to-non-subscriber money transfers. In this embodiment, subscriber A (an mFS subscriber) wishes to send money to another subscriber (a non-mFS subscriber). The transaction is initiated in the same fashion as described above in FIG. **17**B. However, since subscriber B does not have an mFS account, the monetary transaction system **210** cannot credit them with money. Instead, the monetary transaction system **210** sends a communication (e.g. a SMS) to subscriber B (**1708**) with an authorization code and instructions for how to pick up the cash. The monetary transaction system **210** puts a hold on subscriber A's debit card for the amount transferred (**1707**). Subscriber B has a specified time period in which to pick up the cash before the hold expires and the amount is credited back to the debit card associated with subscriber A's mobile wallet account. The agent branch verifies the authorization code via POS or their agent mobile wallet application (**1709**) and gives the cash to the non-subscriber (**1710**). (In some countries, an agent network needs to be capable of giving cash to a subscriber based on the money transfer reference number).

The mFS bank receives a settlement report from the card processor and transfer and settle funds from subscriber A's debit card to the agent's bank (if necessary). The monetary transaction system **210** processes the money transfer request, decrements subscriber A's mobile wallet balance within the card processor, generates a money transfer reference number, authorizes the reference number to be paid out by the agent and logs the transaction. An external card processor decrements subscriber A's mobile wallet balance and sends periodic transaction reports to the bank for settlement. Thus, as seen in FIGS. **17**B and **17**C, money may be transferred from subscriber to subscriber and from subscriber to non-subscriber.

Subscribers may similarly send money internationally to both subscribers and non-subscribers. FIG. **18**A illustrates a subscriber-to-subscriber international money transfer. In this embodiment, subscriber A wishes to send cash to subscriber B who resides in another country. As in the embodiments described above where money was transferred internation-

ally, the monetary transaction system **210** may use one or more international money transfer organizations or remittance companies such as MoneyGram® to transfer the money. Subscriber A initiates the international money transfer using his or her phone. Subscriber A's debit card account is decremented by the transfer amount (**1801**). The money is transferred between countries using an international money transfer organization (**1802**). In this case, subscriber B has an mFS eMoney account with a foreign mFS platform that is also affiliated with the selected international money transfer organization. That organization can then credit subscriber B's eMoney account directly (**1803**).

Thus, subscriber A requests to send money from their debit card account via the subscriber mobile wallet application. Subscriber B receives a notification (including a MoneyGram® Reference Number (MGRN) (or other reference number when other international money transfer organizations are used) and instructions on how to access the eMoney) that their eMoney balance has increased. The mFS bank receives settlement reports from the debit card processor and transfers and/or settles funds from subscriber's account to the international organization's bank. The monetary transfer system **210** processes the transfer request, update subscriber A's and subscriber B's eMoney balances and logs the transaction. An external card processor decrements subscriber A's mobile wallet balance and sends periodic transaction reports to the bank for settlement.

FIG. **18**B illustrates a subscriber-to-non-subscriber international money transfer. In this embodiment, subscriber A wishes to send cash to subscriber B who resides in another country. As above, the monetary transaction system **210** uses an international money transfer organization (**1806**) to transfer the money between countries. Once the transfer has been initiated by subscriber A, the international money transfer organization debits subscriber A's debit card account (**1805**) and transfers that money to subscriber B. Subscriber B (**1807**) receives a notification (e.g. via SMS) with pick up instructions and a transfer ID number. Subscriber B can then go to an agent company (**1808**), show them the notification (including, perhaps an authorization code), and receive the transferred money (**1809**).

Similar to the transaction described in FIG. **18**A, the embodiment of **19**A illustrates a transaction where a subscriber receives an international money transfer. Subscriber B (**1901**) initiates a money transfer using their mobile wallet application. The international money transfer organization (**1902**) debits subscriber B's eMoney account balance. This money is then transferred by the international money transfer organization to subscriber A. Subscriber A receives a notification along with a transfer ID number indicating that their debit card account has been credited with the transferred money (**1903**).

FIG. **19**B illustrates a non-subscriber-to-subscriber international money transfer. This scenario is very similar to that described in FIG. **19**A from the mFS subscriber's perspective, except that their eMoney account is credited here, and their debit card account was credited in **19**A. The initiator, subscriber B (**1905**), does not have an mFS account and, as a result, takes their cash to an international money transfer organization (e.g. MoneyGram®) or other remittance company's agent (**1906**) to send it to subscriber A's mobile wallet eMoney account. The international money transfer organization (**1907**) then transfers the specified amount to subscriber A (**1908**) and subscriber A's mobile wallet eMoney account is credited with the amount of the transfer. Subscriber A may receive a transaction ID number, along with an indication that the transfer has occurred. The mFS bank may receive settlement reports from the card processor and settle funds from the international money transfer organization's bank to subscriber A's mobile wallet account. The monetary transaction system processes the money transfer request, updates subscriber A's mobile wallet balance within the card processor and logs the transaction. An external card processor increments subscriber A's mobile wallet balance and sends periodic transaction reports to the mFS bank for settlement.

Other functionality described above in relation to using an eMoney mobile wallet account may also apply to banked subscribers using a debit card associated with their mobile wallet. Such subscribers may buy airtime for their mobile device, pay bills, make retail purchases, receive direct deposits, and perform other functionality.

In one embodiment, the monetary transaction system **210** is implemented to add a mobile wallet platform stored value account to a mobile wallet. The stored value account may include eMoney or other monetary credits. In the embodiment, communication module **215** of monetary transaction system **210** may receive subscriber data for an unbanked subscriber **205** over a communication channel. The transaction processor may perform validation checks on the unbanked subscriber to validate that the unbanked subscriber is not exceeding a specified allowable number of accounts per subscriber. The monetary transaction system **210** may then send subscriber data to another entity (such as a third party verification system) for identification of the unbanked subscriber. The monetary transaction system **210** receives results from the third party verification system indicating that the subscriber data appropriately identifies the unbanked subscriber, creates a stored value account for the unbanked subscriber that maintains a recorded balance for the created stored value account, adds the stored value account to the unbanked subscriber's mobile wallet and notifies the unbanked subscriber of the addition of the stored value account over at least one communication channel connected to the mobile wallet platform.

In another embodiment, the monetary transaction system **210** is implemented to add a third party stored value account to a mobile wallet. The monetary transaction system **210** receives unbanked subscriber data, including account details, over a communication channel. The transaction processor **216** performs a validation check on the unbanked subscriber to validate that the unbanked subscriber is not exceeding a specified allowable number of accounts per subscriber. If the validation check is ok, the monetary transaction system **210** sends subscriber data to a third party verification system for identification of the unbanked subscriber. In some cases, validating the status of the sender or the recipient includes performing a check on the specified sender or recipient to comply with the office of foreign assets control. The monetary transaction system **210** then receives results from the third party verification system indicating that the subscriber data appropriately identifies the unbanked subscriber, and submits the unbanked subscriber's account details to a third party account processor. The monetary transaction system **210** receives an indication from the third party account processor that third party account processor created a third party stored value account for the subscriber. The transaction processor maintains a link between the subscriber data and the third party stored value account and adds the third party stored value account to the unbanked subscriber's mobile wallet. The monetary transaction system **210** then notifies the unbanked subscriber of the addition of the third party stored value account over a communication channels connected to the monetary transaction system.

In another embodiment, the monetary transaction system **210** is implemented to add a bank or credit union account to a mobile wallet. The communication module **215** receives subscriber data, including bank or credit union account details, over a communication channel **111**. The transaction processor **216** performs validation checks on the subscriber to validate that the subscriber is not exceeding a specified allowable number of accounts per subscriber and sends subscriber data to a third party verification system for identification of the subscriber. The communication module then receives results from the third party verification system indicating that the subscriber data appropriately identifies the subscriber. Upon receiving these results, the monetary transaction system **210** submits bank or credit union account details for validation by the transaction processor, receives an indication that the bank or credit union account details correspond to a valid bank or credit union account, maintains a link between the subscriber data and the bank or credit union account and notifies the subscriber of the bank or credit union account validation over a communication channel.

In still another embodiment, the monetary transaction system is implemented to add a debit or credit card account to a mobile wallet. The communication module **215** receives subscriber data, including a debit or credit card account number, over a communication channel **111** connected to the monetary transaction system. The transaction processor performs validation checks on the subscriber to validate that the subscriber is not exceeding a specified allowable number of accounts per subscriber. The communication module sends subscriber data to a third party verification system for identification of the subscriber and receives results from the third party system indicating that the subscriber data appropriately identifies the subscriber. The monetary transaction system **210** securely stores the debit or credit card account number for access by the mobile wallet (e.g. in memory **217** or transaction database **225**), adds the debit or credit card account number to the subscriber's mobile wallet, and notifies the subscriber of the addition of the debit or credit card account number. It should be noted that many other transactions can take place over the monetary transaction system, and that the embodiments described herein should not be read as limiting.

Embodiments of the invention can adhere to Know Your Customer (KYC) rules in the US by performing Customer Identification Program (CIP) checks as required by the Bank Secrecy Act and US PATRIOT Act. A minimum amount of information can be gathered about a customer, such as, for example, first name, last name, date of birth, government ID Type, government ID number and address. The CIP processes are designed to validate customer identity against government blacklists and assists in the prevention of money laundering and terrorist financing. A combination of non-documentary and documentary verification can be used to ensure beyond a reasonable doubt the identity of the customer.

Non-documentary verification can occur through the presentment of the information that was collected from the user to an external third party, such as, for example, Lexis Nexis®. Documentary verification can occur if non-documentary verification fails, then the user is asked to present an unexpired government ID. Various differ forms of identification including driver's license, passport, alien identification (e.g., green card or work visa), and Mexican Consular identification card, can be accepted.

Embodiments of the invention can perform Anti-Money Laundering (AML) and Combating the Financing of Terrorism (CFT) checks. AML and CFT checks can be performed using transaction monitoring methods to flag names and suspicious transactions for further investigation. The mobile wallet platform can perform AML and CFT checks on all electronic financial transactions to ensure that electronic funds are not being used for money laundering or terrorism. Transaction limits can be placed on user accounts. The transaction limits are fully configurable for each particular use case, channel and payment method that allows maximum flexibility to restrict higher risk use cases. Velocity checks can also be performed. Velocity Checks ensure that subscribers are not abusing the mobile wallet platform within the allowable limits.

FIGS. **20**A through **20**F depicts relationships between embodiments of various components within the monetary transaction system depicted in FIG. **1**. In particular, FIGS. **20**A through **20**F depict communications between the specific components within the monetary transaction system during an operation to deposit of funds within a financial account. The depicted interactions are representative of computer executed functions that enable the deposit of money through a mobile transaction system that is capable of functioning without an associated bank account.

FIGS. **21**A through **21**I depicts relationships between embodiments of various components within the monetary transaction system depicted in FIG. **1**. In particular, FIGS. **21**A through **21**I depict communications between the specific components within the monetary transaction system during an operation to withdraw of funds from a financial account. The depicted interactions are representative of computer executed functions that enable the withdrawal of money through a mobile transaction system that is capable of functioning without an associated bank account.

FIGS. **22**A through **22**J depicts relationships between embodiments of various components within the monetary transaction system depicted in FIG. **1**. In particular, FIGS. **22**A through **22**J depict communications between the specific components within the monetary transaction system during an operation to transfer funds between financial accounts. The depicted interactions are representative of computer executed functions that enable the transfer of money through a mobile transaction system that is capable of functioning without an associated bank account.

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

I claim:

**1**. A monetary transaction system for conducting monetary transactions between subscribers and other entities, the system comprising one or more of:

an integration tier operable to manage mobile wallet sessions, the integration tier also including a communication application programming interface (API) and other communication mechanisms to accept messages from channels;

notification services operable to send notifications through different notification channels including one or more of short message peer-to-peer, short-message services and simple mail transfer protocol emails;

business process services operable to implement business workflows, including at least one of executing financial

transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects;

database services operable to store financial transaction details, store customer profiles, and manage money containers;

a payment handler service operable to use APIs of different payment processors including one or more APIs of banks, credit and debit cards processors, bill payment processors;

a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce constraints including transaction constraints;

a security service operable to perform subscriber authentication;

at least one entity that is to be involved in the specified transaction, the at least one entity having a profile with the monetary transaction system: wherein the at least one entity is the agent;

wherein the monetary transaction system is implemented to deposit funds at an agent branch, the funds being deposited by a subscriber at the agent branch using a mobile device configured to run a monetary transaction system application, the monetary transaction system performing the following steps:

receiving a communication message from the mobile device over one of a plurality of channels connected to the monetary transaction system, the communication message being received by an API associated with the integration tier of the monetary transaction system, the communication message indicating that the subscriber desires to deposit a specified amount of funds into the subscriber's account;

validating the status of the subscriber's account, wherein validating the status of the subscriber's account comprises communicating from the integration tier to the database services to query attributes of the subscriber's account;

committing a pending transaction through the business process services, wherein the integration tier communicates a transaction commitment request to the business process services;

receiving a confirmation from the business process services that the pending transaction has been committed;

sending, through the notification services, a receipt notification to the mobile device; and

upon receiving a confirmation of commitment from the business process services, committing the pending transaction to the database services; and

wherein committing the pending transaction further comprises the following steps as orchestrated by the business process services:

ensuring, via the database services, that the subscriber has an active account;

validating, through communication with the security services, one or more of a PIN number and an access control list;

applying with the rules engine, velocity rules;

creating with the database services a new pending transaction history record;

holding funds from the agent account balance using the payment handler,

loading the funds to the subscriber account using the payment handler; and

updating, using the database services, a pending transaction history record to reflect the funds.

2. A monetary transaction system for conducting monetary transactions between subscribers and other entities, the system comprising one or more of:

an integration tier operable to manage mobile wallet sessions and maintain the integrity of financial transactions, the integration tier also including a communication application programming interface (API) and other communication mechanisms to accept messages from channels;

notification services operable to send notifications through different notification channels including one or more of short message peer-to-peer, short-message services and simple mail transfer protocol emails;

business process services operable to implement business workflows, including at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects;

a security service operable to perform subscriber authentication;

database services operable to store financial transaction details, store customer profiles, and manage money containers;

a mobile device configured to run a monetary transaction system application;

a payment handler service operable to use APIs of different payment processors including one or more APIs of banks, credit and debit cards processors, bill payment processors;

a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce business constraints including transaction constraints;

a security service operable to perform subscriber authentication;

at least one entity that is to be involved in the specified transaction, the at least one entity having a profile with the monetary transaction system, wherein the at least one entity is the agent;

a monetary transaction system subscriber that has a profile with the monetary transaction system the subscriber profile stored in the database of the monetary transaction system, wherein the subscriber indicates, via the monetary transaction system application, one or more specified transactions that are to be performed using the monetary transaction system;

wherein the monetary transaction system is implemented to withdraw funds at an agent branch using the mobile device configured to run a monetary transaction system application, including performing the following steps:

receiving a communication message from the mobile device over one of a plurality of channels connected to the monetary transaction system, the communication message being received by an API associated with the integration tier of the monetary transaction system, the communication message indicating that the subscriber desires to withdraw a specified amount of funds from an account associated with the subscriber, the communication comprising a secure, perishable code;

determining that the transaction is valid and in progress, wherein determining that the transaction is valid comprises validating the secure, perishable

code and communicating from the integration tier to the database services to query attributes of the subscriber's account;

committing a pending transaction through the business process services, wherein the integration tier communicates a transaction commitment request to the business process services;

receiving a confirmation from the business process services that a pending transaction has been committed;

sending, through the notification services, a receipt notification to the mobile device; and

upon receiving a confirmation of commitment from the business process services, committing the pending transaction to the database services; and

wherein committing the pending transaction further comprises the following steps as orchestrated by the business process services:

ensuring, via the database services, that the subscriber has an active account;

validating, through communication with the security services, one or more of a PIN number and an access control list;

applying with the rules engine, velocity rules;

creating with the database services a new pending transaction history record;

holding funds from the agent account balance using the payment handler;

loading the funds to the subscriber account using the payment handler; and

updating using the database services, a pending transaction history record to reflect the funds.

**3**. A monetary transaction system for conducting monetary transactions between subscribers and other entities, the system comprising one or more of:

an integration tier operable to manage mobile wallet sessions and maintain the integrity of financial transactions, the integration tier also including a communication application programming interface (API) and other communication mechanisms to accept messages from channels;

notification services operable to send notifications through different notification channels including one or more of short message peer-to-peer, short-message services and simple mail transfer protocol emails;

business process services operable to implement business workflows, including at least one of executing financial transactions, auditing financial transactions, invoking third-party services, handling errors, and logging platform objects;

database services operable to store financial transaction details, store customer profiles, and manage money containers;

a monetary transaction system subscriber that has a profile with the monetary transaction system the subscriber profile stored in the database of the monetary transaction system, wherein the subscriber indicates, via the monetary transaction system application, one or more specified transactions that are to be performed using the monetary transaction system;

a payment handler service operable to use APIs of different payment processors including one or more APIs of banks, credit and debit cards processors, bill payment processors;

a rules engine operable to gather financial transaction statistics and use the gathered financial transaction statistics to enforce business constraints including transaction constraints;

a security service operable to perform subscriber authentication;

at least one entity that is to be involved in the specified transaction, the at least one entity having a profile with the monetary transaction system; wherein the at least one entity is the agent;

wherein the monetary transaction system is implemented to transfer funds using the mobile device configured to run a monetary transaction system application, including performing the following steps:

receiving a communication message from the mobile device over one of a plurality of channels connected to the monetary transaction system, the communication message being received by an API associated with the integration tier of the monetary transaction system, the communication message indicating that the subscriber desires to transfer a specified amount of funds from the subscriber's account to a recipient;

validating the status of the subscriber's account, wherein validating the status of the subscriber's account comprises communicating from the integration tier to the database services to query attributes of the subscriber's account;

committing a pending transaction through the business process services, wherein the integration tier communicates a transaction commitment request to the business process services;

receiving a confirmation from the business process services that a pending transaction has been committed;

sending, through the notification services, a receipt notification to the mobile device; and

upon receiving a confirmation of commitment from the business process services, committing the pending transaction to the database services; and

wherein committing the pending transaction further comprises the following steps as orchestrated by the business process services:

ensuring, via the database services, that the subscriber has an active account;

validating, through communication with the security services, one or more of a PIN number and an access control list;

applying with the rules engine, velocity rules;

creating with the database services a new pending transaction history record;

holding funds from the agent account balance using the payment handler;

loading the funds to the subscriber account using the payment handler; and

updating, using the database services, a pending transaction history record to reflect the funds.

* * * * *